## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF MICHIGAN, GOVERNOR OF THE STATE OF MICHIGAN, and MICHIGAN DEPARTMENT OF NATURAL RESOURCES, | ) ) ) ) ) ) | Case No. |
|  | ) | Hon. |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY PARTNERS, L.P, | ) ) ) ) ) ) |  |
| Defendants. | ) ) ) ) ) |  |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT Defendants Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P. (collectively, "Enbridge"), hereby remove this action from the Circuit Court for the 30th Judicial Circuit, Ingham County, Case No. 20-646, to the United States District Court for the Western District of Michigan pursuant to 28 U.S.C. § 1331, 1441(a), 1442, and 1367.

This Court has original federal question jurisdiction under 28 U.S.C. §1331, because the Complaint arises under federal laws and treaties, and it presents substantial federal questions. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims for which it does not have original federal question jurisdiction because those claims form part of the same case or controversy as the claims over which the Court has original jurisdiction. While the Plaintiffs include the State of Michigan and one of its agencies, the Eleventh Amendment does not bar removal to federal court of a suit initiated

by the State. S*ee Oklahoma ex rel. Edmondson v. Magnolia Marine Transp. Co.,* 359 F.3d 1237, 1239 (10th Cir. 2004) ("[T]he Eleventh Amendment's abrogation of federal judicial power 'over any suit ... commenced or prosecuted against one of the United States' does not apply to suits commenced or prosecuted by a State."); *California ex rel. Lockyer v. Dynegy*, 375 F.3d 831, 847-48 (9th Cir. 2004) (same); *In re Katrina Canal Litigation Breaches,* 524 F.3d 700, 710-11 (5th Cir. 2008).

Though nominally asserted under state law, the Complaint seeks to shut down an Enbridge interstate pipeline that has been serving the energy needs of multiple states and parts of Canada for over 65 years.  Pipelines such as the one at issue are classic channels of interstate commerce.  As the Complaint acknowledges, this pipeline (known as Line 5) traverses multiple states, including Michigan, and also crosses the U.S.-Canadian border. Complaint ¶ 10.  Despite the dominant federal interests, Plaintiffs ask a Michigan state court to shut down operations on a 4-mile portion of Line 5 located in the Straits of Mackinac.  Such a shutdown order would prevent Enbridge from continuing to serve the energy needs of customers in other parts of this country and in Canada.  Plaintiffs' claims interfere with exclusive federal spheres of regulating interstate and foreign commerce; implicate duties imposed by federal statutes and regulations governing pipeline safety; frustrate the federal interest in ensuring the interstate and international transport of petroleum products; and impede treaty agreements between the United States and Canada. Accordingly, Plaintiffs' Complaint is properly heard in this federal forum to protect the national interests.

**I.      Timeliness of removal**

1.      Plaintiffs filed a Complaint against Enbridge in the Circuit Court for 30th Judicial Circuit, Ingham County, No. 20-646, on November 13, 2020.  A copy of the Complaint is attached as Exhibit A to this notice.

2.      This notice of removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after receipt by Enbridge of a copy of the initial pleading setting forth the claims for relief upon which this action is based.  28 U.S.C. § 1446(b).  All defendants consent to removal.

**II.     Summary of allegations and grounds for removal**

3.      Plaintiffs brought claims against Enbridge for alleged noncompliance with an easement issued in 1953.  This easement granted Enbridge the right "to construct, lay, maintain, use and operate" two 20-inch diameter pipelines for the purpose of transporting petroleum and other products, "over, through, under, and upon" specifically described bottomlands owned by the State of Michigan in the Straits of Mackinac.  Complaint ¶ 15. Enbridge completed the construction of Line 5 in 1953.  This pipeline "extends from Superior, Wisconsin, across the Upper Peninsula of Michigan, crosses the Straits of Mackinac through the Straits Pipelines portion of Line 5, and continues through the Lower Peninsula to Marysville, Michigan and then crosses beneath the St. Clair River to Sarnia, Ontario, Canada."  Complaint ¶ 10.

4.      On November 13, 2020, plaintiffs issued a Notice of Revocation and Termination of Easement (hereafter "Shutdown Order").  Complaint ¶ 21.  In their Complaint, Plaintiffs seek declaratory relief that the Shutdown Order is proper and also

seek injunctive relief requiring Enbridge to cease operating a 4-mile portion of Line 5 located in the Straits of Mackinac within 180 days.  Plaintiffs assert three claims in their Complaint:  the State properly revoked the 1953 Easement because it violates the public trust (Count I); the State properly terminated the 1953 Easement because of Enbridge's alleged non-compliance with the terms and conditions (Count II); and the State properly determined that the December 2018 Third Agreement between Enbridge and the State and two of its agencies does not preclude the revocation and termination of the 1953 Easement (Count III).

5.      Enbridge bears the burden of demonstrating that removal jurisdiction is proper.  But because district courts have supplemental jurisdiction over related claims, 28 U.S.C. § 1367(a), Enbridge need only show that there is federal jurisdiction over a single claim.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546, 563 (2005).

6.      Enbridge submits that removal is proper on at least two independent and alternative grounds.

7.      *First*, removal is authorized under 28 U.S.C. §1441(a) and 28 U.S.C. §1331 because the action necessarily raises disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg*., 545 U.S. 308 (2005).  In fact, the causes of action as alleged in the Complaint threaten to upset longstanding federal-state relations, second-guess policy decisions made by Congress and the Executive Branch, and skew divisions of responsibility set forth in federal statutes and the United States Constitution.  Additionally, the action necessarily raises disputed and substantial federal questions that implicate the

federal regulatory scheme for pipeline safety.  See 49 U.S.C. §§ 60101, *et seq*.; *see also Grable*, 545 U.S. at 314.

8.      *Second*, Enbridge is authorized to remove this action under 28 U.S.C. §1442(a)(1) because it was "acting under" the regulations and directives of a federal agency; there is a causal nexus between Enbridge's  actions in managing the pipelines at issue under federal safety standards and the Plaintiffs' claims that the pipelines should be closed because they pose a safety risk (i.e., the risk of an oil spill); and Enbridge will assert colorable federal defenses.  *See Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209–10 (4th Cir. 2016).

9.      For the convenience of the Court and all parties, Enbridge will address each of these grounds in additional detail below.  Should Plaintiffs challenge this Court's jurisdiction, Enbridge will further elaborate on these grounds and will not be limited to the specific articulations in this Notice.

## III.    The action is removable because it raises disputed and substantial federal issues

10.      "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a). Federal district courts, in turn, "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331. The U.S. Supreme Court has "recognized for nearly 100 years that in certain federal cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable*, 545 U.S. at 312.

11.     In *Grable*, the Court held that suits apparently alleging only state-law causes of action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.  Applying this test "calls for a common-sense accommodation of judgment to the kaleidoscopic situations that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id*. at 313.

12.     Here, Plaintiffs' claims raise multiple "federal issues, actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities." *Id*.at 314.  The federal issues are substantial and include federal regulatory authority over interstate and foreign commerce, foreign affairs, energy policy, environmental protection, and the safety of interstate pipelines.  Any one of these issues suffices to satisfy the *Grable* standard.

13.     For example, Plaintiffs' claims raise substantial federal issues because they have far "more than [an] incidental effect on foreign affairs[.]"  *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 424 (2003).  As Plaintiffs admit, Line 5 crosses the U.S.-Canada border.  Complaint ¶ 10.  Line 5's crossing of the international boundary is federally authorized by a Presidential Permit issued to Enbridge for Line 5 on April 28, 1953 to facilitate foreign commerce.  The United States and Canada have entered into a Senate-ratified treaty intended to promote the flow of commerce between the two nations and remove undue barriers to pipelines that transport hydrocarbons between the nations. The Canada-United States Transit Pipelines Treaty of 1977 provides:  "No public authority …

shall institute any measures … [which] have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbon in transit" from one nation to the other through pipelines.  Article II(1).  Another relevant international agreement is the Energy Regulatory Measures and Regulatory Transparency Annex to the 2020 United States-Mexico-Canada Agreement, which states:  "Each party shall … accord[ ] access to … pipeline networks for the purposes of importation … that is neither unduly discriminatory nor unduly preferential …."  Article 5(1)(a).

14.    Plaintiffs' Shutdown Order undermines these international agreements and severely infringes upon the foreign policy decisions that are squarely in the purview of the political branches of the U.S. Government.  Because Plaintiffs' claims implicate the "exercise of state power that touches on foreign relations" in a significant way, any state law basis "must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nationals' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place."  *Garamendi*, 539 U.S. at 413 (invalidating California's statutory effort to encourage Holocaust reparations by European insurance carriers); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374-80 (2000) (striking down Massachusetts law barring state entities from transacting with companies doing business in Burma); *Al Shimari v. CACI Int'l, Inc*., 679 F.3d 205, 231 (4th Cir. 2012) ("[T]he federal government has exclusive power over foreign affairs, and ... states have very little authority in this area.").

15.    Congress has already weighed, and continues to weigh, the costs and benefits of pipeline transportation.  Congress has acted through a variety of federal statutes—primarily, but not exclusively, the Pipeline Safety Act—to ensure pipeline safety

and strike the balance between pipeline transportation and environmental protections.  49

U.S.C. § 60102(b).  Under the Pipeline Safety Act, a federal agency known as the Pipeline

and Hazardous Materials Safety Administration ("PHMSA"), which is part of the US

Department of Transportation, is assigned responsibility for regulating the safety of

interstate pipelines, and does so through detailed safety regulations and enforcement

activities.  Congress included in the Pipeline Safety Act a section entitled "Preemption,"

which provides: "A State authority may not adopt or continue in force safety standards for

interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c).

The need for preemption of state law stems from the fact that pipelines move through and

serve multiple states.   This broad preemption provision—which explicitly bars the

continued enforcement of any state-imposed safety standards in place at the time of

enactment—reflects Congress' intent to ensure that the national pipeline infrastructure is

free of a patchwork of local safety regulations and is not at the mercy of any state's

parochial interests. *See, e.g., Olympic Pipe Line Co v. City of Seattle*, 437 F3d 872, 880

(9th Cir. 2006) (stating that "federal preemption of the regulation of interstate pipeline

safety is manifest in the language of the PSA [Pipeline Safety Act]"); *Kinley Corp. v. Iowa

Utils. Bd*., 999 F.2d 354, 358 (8th Cir. 1993) ("we need look no further than the express

statutory language" to find that Congress intended to preempt state regulation of pipeline

safety); *Williams v. City of Mounds*, 651 F. Supp. 551, 569 (D. Minn. 1987) (concluding

that if landowners of land crossed by an interstate pipeline were "entitled to demand

compliance with their own safety standards, the clear Congressional goal of a national

standard for hazardous liquid pipeline safety [under the PSA] would be thwarted").

16.     Even  where  the  State  has  ownership  of  the  submerged  bottomlands, Congress made this ownership subject to federal regulation.  The federal Submerged Lands Act of 1953 (SLA), transferred to the States "title to and ownership of the lands beneath navigable waters within the boundaries of the respective states, and the natural resources within such lands and waters and [ ] the right and power to manage, administer, lease, develop, and use the said lands and natural resources." 43 USC § 1311(a).  The SLA, however, expressly retains on behalf of the Federal Government "all its … rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs … all of which shall be paramount to" the State's ownership interest.  43 U.S.C. § 1314(a).  Thus, the Pipeline Safety Act and PHMSA regulations fully apply to pipelines that are located in navigable waters, consistent with Congress' intent that such federal laws be "paramount" to whatever interest may arise from the State's ownership of the bottomlands on which the pipelines are located.

17.     The  congressional  directives  have  regulatory  teeth.    As  directed  by Congress, PHMSA has promulgated an extensive body of federal safety regulations that govern  the  construction  and  operation  of  pipelines  like  the  one  at  issue  here.    *See* Transportation of Hazardous Liquids by Pipeline, 49 C.F.R. § 195 et seq.  PHMSA's safety regulations address matters such as corrosion, cracking, and strain on interstate pipelines, among  a  broad  range  of  other  safety  matters  addressed  in  its  regulations.    PHMSA possesses exclusive authority to issue an order providing for the shutdown of a pipeline based on safety concerns, or to impose operational restrictions to ensure the safe operation of a pipeline.  *See* Pipeline Safety Act at 49 U.S.C. § 60117(o); 49 C.F.R. § 190.236; 49

C.F.R. § 190.233; 49 C.F.R. § 190.239.  In addressing this authority, the federal statute recognizes the wide-ranging implications of ordering an interstate pipeline to close and thereby directs PHMSA to consider and balance the impact of any shutdown order on (1) public health and safety, (2) the national or regional economy or national security, and (3) the ability of pipeline owners and operators to maintain reliability and continuity of services to customers.  The statute further requires that PHMSA consult with appropriate federal and state agencies and entities knowledgeable in pipeline safety or operations before ordering a pipeline to shut down.

18.     The question of whether the federal agencies charged by Congress to balance energy and environmental needs for the entire Nation have struck that balance in an appropriate way is "inherently federal in character" and gives rise to federal question jurisdiction.  *Buckman Co. v. Plaintiffs' Legal Comm*.,531 U.S. 341, 347 (2001); *accord, e.g.*, *Pet Quarters, Inc. v. Depository Trust & Clearing Corp*.,5 59 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co*.,484 F.3d 907, 909 (7th Cir. 2007) (federal removal under Grable appropriate where claims were "a collateral attack on the validity of" agency action under a highly reticulated regulatory scheme). Adjudicating these claims in federal court is appropriate because the relief sought by Plaintiffs would necessarily alter the regulatory regime designed by Congress, impacting residents of the Nation far outside the state court's jurisdiction. *See, e.g., Grable*, 545 U.S. at 312 (claims that turn on substantial federal questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly* & Co., 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007)

(removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme ...requiring some degree of national uniformity in interpretation"). The Complaint necessarily requires evaluation of a federal regulatory scheme and the adequacy of federal decision-making under that scheme.  In seeking a shutdown, Plaintiffs assert a right to close the pipelines based on a public trust obligation that assertedly derives from their ownership of the Straits bottomlands.  They also invoke safety standards in the easement as grounds for terminating Line 5.  But the grounds on which plaintiffs rely are in areas already regulated by federal agencies and as to which federal law is explicitly "paramount" as provided in the SLA.  Further, to determine whether Enbridge violated any safety standards, a court would need to construe federal law, including the pipeline shutdown provisions of the Pipeline Safety Act, plus the applicability of the safety regulatory regime administered by PHMSA. This unquestionably gives rise to federal question jurisdiction.  *See Boyeston v. S.C. Elec. & Gas Co.*, 2016 WL 1578950 at *5 (D.S.C. Apr. 20, 2016) (removal proper where "allegations of negligence appears on their face to not reference federal law, [but] federal issues are cognizable as the source for the duty of care ...."); *accord, e.g.*, *Bd. Of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., L.L.C.*, 850 F.3d 714,724 (5th Cir. 2017) (in the context of comprehensive federal regulatory scheme, nuisance claims amount to "a collateral attack ... premised on the notion that the scheme provides inadequate protection"); *Pet Quarters, Inc. v. Depository Trust and Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (complaint "presents a substantial federal question because it directly implicates actions taken by" a federal agency); *McKay v. City and Cty. of San Francisco*, 2016 WL 7425927, at *4 (N.D. Cal. Dec. 23, 2016) (denying remand and ruling that federal jurisdiction lies under *Grable*

11

because state-law claims were "tantamount to asking the Court to second guess the validity of the FAA's decision").

**IV.    The action is removable under the federal officer removal statute.**

19.    The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1). A party seeking removal under section 1442 must establish "(1) it is a federal officer or a person acting under that officer, (2) a colorable federal defense; and (3) the suit is for an act under color of office, which requires a causal nexus between the charged conduct and asserted official authority." *Ripley*, 841 F.3d at 209–10 (internal citations, quotation marks, and alterations omitted).  All three elements are satisfied here.

20.    First, the Enbridge Defendants "acted under" a federal officer because "the government [PHMSA] exert[ed] some 'subjection, guidance, or control,'" over Enbridge's action in the operation and safety management of the Dual Pipelines through its extensive regulations and because Enbridge thereby  "engage[d] in an effort 'to assist, or to help carry out, the duties or tasks of the federal superior.'"  *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151–52 (2007)).

21.    Second, there is a causal nexus between Enbridge's  management of the Dual Pipelines, taken pursuant to PHMSA's regulations and directives, and Plaintiffs' claims concerning the safety of the Pipelines.  In *Sawyer*, the Fourth Circuit held removal proper where a military contractor, sued for failing to warn about asbestos in military equipment, showed extensive evidence of federal control over its activities. This included

"highly detailed ship specifications and military specifications provided by the Navy," whereby the Navy exercised "intense direction and control ... over all written documentation to be delivered with" the equipment, deviations from which "were not acceptable." *Id*. at 253.  Here, Plaintiffs' allegations depend on the activities of Enbridge over the past decades in its management of the Dual Pipelines—many of which activities were undertaken in furtherance of PHMSA requirements and, as warranted, direct oversight.  For example, PHMSA was actively involved in reviewing the safety of, and allowing the renewed operation of, the Dual Pipelines following an incident reported in 2020 involving damage to a pipeline support.

22.     Third, Enbridge intends to raise numerous meritorious federal defenses, including preemption, interstate and foreign commerce, and foreign affairs.  These and other federal defenses are more than colorable. *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

## V.     This Court has jurisdiction and removal is proper

23.     For these reasons, this Court has original jurisdiction over this action under 28 U.S.C. §1331.  Removal of this action is proper under 28 U.S.C. §§ 1441(a), 1442, and 1367.  Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiffs' counsel, and will file and serve a copy of this Notice with the Clerk of the Circuit Court for 30th Judicial Circuit, Ingham County pursuant to 28 U.S.C. § 1446(d).

Accordingly, Defendants hereby remove to this Court the above action pending against them in the Circuit Court for 30th Judicial Circuit, Ingham County.

Dated:  November 24, 2020

Respectfully submitted,

/s/ *Peter H. Ellsworth*

_____

Peter H. Ellsworth  (P23657)
Jeffery V. Stuckey (P34648)
DICKINSON WRIGHT PLLC
123 W. Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730
pellsworth@dickinsonwright.com
jstuckey@dickinsonwright.com

Phillip J. DeRosier (P55595)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866
pderosier@dickinson-wright.com

John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Avenue SE, #78
Caledonia, MI 49316
(616) 450-4235
jbursch@burschlaw.com

David H. Coburn
William T. Hassler
Alice Loughran
Joshua H. Runyan
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
dcoburn@steptoe.com
whassler@steptoe.com
aloughran@steptoe.com
jrunyan@steptoe.com