# Exhibit A

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| **STATE OF MICHIGAN**<br>30th    JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | **SUMMONS** | **CASE NO.**<br>20- 646 -CE |
|---|---|---|

**Court address**
313 W. Kalamazoo Street, 1st Floor, Lansing, MI 48933

**CLINTON CANADY III**

Court telephone no.
(517) 483-6500

**Plaintiff's name(s), address(es), and telephone no(s).**
THE STATE OF MICHIGAN, GOVERNOR OF THE
STATE OF MICHIGAN, AND MICHIGAN DEPARTMENT
OF NATURAL RESOURCES

v

**Defendant's name(s), address(es), and telephone no(s).**
ENBRIDGE ENERGY, Limited Partnership
c/o The Corporation Company, Resident Agent
40600 Ann Arbor Road E, Suite 201
Plymouth, MI 48170

**Plaintiff's attorney, bar no., address, and telephone no.**
Robert P. Reichel (P31878)
Daniel P. Bock (P71246)
Attorneys General for the State of Michigan
P.O. Box 30755
Lansing, MI 48909      (517) 335-7664

2020 NOV 13
BARB BYRUM
CLERK OF THE 30TH
JUDICIAL CIRCUIT COURT
INGHAM COUNTY CLERK

PM 9: 53

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**
☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.
☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.
☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**
☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).
☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☑ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☑ this court, ☐ _____ Court, where

it was given case number 19-474-CE _____ and assigned to Judge James Jamo _____

The action ☑ remains ☐ is no longer pending.

Summons section completed by court clerk.

**SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>NOV 13 2020 | Expiration date*<br>FEB 1 2 2021 | Court clerk<br>J. WHORTON |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (9/19)   **SUMMONS**              MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| 30th JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | **SUMMONS** | 20- 646 -CE |

| Court address<br>313 W. Kalamazoo Street, 1st Floor, Lansing, MI 48933 | Court telephone no.<br>(517) 483-6500 |
|---|---|

CLINTON CANADY III

| Plaintiff's name(s), address(es), and telephone no(s).<br>THE STATE OF MICHIGAN, GOVERNOR OF THE STATE OF MICHIGAN, and MICHIGAN DEPARTMENT OF NATURAL RESOURCES | v | Defendant's name(s), address(es), and telephone no(s).<br>ENBRIDGE ENERGY COMPANY, INC.<br>c/o The Corporation Company, Resident Agent<br>40600 Ann Arbor Road E, Suite 201<br>Plymouth, MI 48170 |
|---|---|---|

| Plaintiff's attorney, bar no., address, and telephone no.<br>Robert P. Reichel (P31878)<br>Daniel P. Bock (P71246)<br>Attorneys General for the State of Michigan<br>P.O. Box 30755<br>Lansing, MI 48909      (517) 335-7664 |

2020 NOV 13 A 8: 53
BARB BYRUM
CLERK OF THE 30TH
JUDICIAL CIRCUIT COURT
INGHAM COUNTY CLERK

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☑ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☑ this court, ☐ _____ Court, where

it was given case number 19-474-CE _____ and assigned to Judge James Jamo _____

The action ☑ remains ☐ is no longer pending.

Summons section completed by court clerk.   [ **SUMMONS** ]

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court and** serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>NOV 13 2020 | Expiration date*<br>FEB 1 2 2021 | Court clerk<br>J. WHORTON |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

| MC 01 (9/19) **SUMMONS** | MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105 |
|---|---|

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| **STATE OF MICHIGAN** | | **CASE NO.** |
|---|---|---|
| 30th    JUDICIAL DISTRICT<br>      JUDICIAL CIRCUIT<br>      COUNTY PROBATE | **SUMMONS** | 20- C646 -CE |

**Court address**
313 W. Kalamazoo Street, 1st Floor, Lansing, MI 48933

**CLINTON CANADY III**

Court telephone no.
(517) 483-6500

Plaintiff's name(s), address(es), and telephone no(s).

THE STATE OF MICHIGAN, GOVERNOR OF THE
STATE OF MICHIGAN, and MICHIGAN DEPARTMENT
OF NATURAL RESOURCES

v

Defendant's name(s), address(es), and telephone no(s).

ENBRIDGE ENERGY PARTNERS, L.P.
c/o The Corporation Company, Resident Agent
40600 Ann Arbor Road E, Suite 201
Plymouth, MI 48170

Plaintiff's attorney, bar no., address, and telephone no.

Robert P. Reichel (P31878)
Daniel P. Bock (P71246)
Attorneys General for the State of Michigan
P.O. Box 30755
Lansing, MI 48909          (517) 335-7664

*[stamp: BARB BYRUM CLERK OF THE 30TH JUDICIAL CIRCUIT INGHAM COUNTY ... 2020 NOV 13 A 53]*

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☑ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☑ this court, ☐ _____ Court, where

it was given case number 19-474-CE _____ and assigned to Judge James Jamo _____

The action ☑ remains ☐ is no longer pending.

Summons section completed by court clerk.      **SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.

2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).

3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>NOV 13 2020 | Expiration date*<br>FEB 1 2 2021 | Court clerk<br>J. WHORTON |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (9/19)   **SUMMONS**              MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30TH JUDICIAL CIRCUIT
INGHAM COUNTY

THE STATE OF MICHIGAN, GOVERNOR
OF THE STATE OF MICHIGAN, and
MICHIGAN DEPARTMENT OF NATURAL
RESOURCES,

No. 20- 646 - CE

HON. CLINTON CANADY III

    Plaintiffs,

v

ENBRIDGE ENERGY LIMITED
PARTNERSHIP, ENBRIDGE ENERGY
COMPANY, INC., and ENBRIDGE ENERGY
PARTNERS, L.P.,

    Defendants.

_____

Robert P. Reichel (P31878)
Daniel P. Bock (P71246)
Assistant Attorneys General
Attorneys for Plaintiffs
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664

_____

FILED 2020 NOV 13 A 8: 54 BARB BYRUM CLERK OF THE 30TH JUDICIAL CIRCUIT COURT INGHAM COUNTY CLERK

There is a prior civil action arising out of the same transaction or occurrence
as alleged in this Complaint pending in this Court, assigned to
Judge James Jamo and given case number 19-474-CE.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, the State of Michigan, the Governor of the State of Michigan, and

the Michigan Department of Natural Resources, by and through their undersigned

counsel, allege as follows:

## NATURE OF THE CASE

1.     Plaintiffs bring this action to resolve actual controversies between the Parties regarding the legality of and Defendants' noncompliance with an easement entitled "Straits of Mackinac Pipe Line Easement Conservation Commission of the State of Michigan to Lakehead Pipe Line Company, Inc." ("1953 Easement" or "Easement"), a copy of which is attached as Exhibit 1.  The 1953 Easement authorized Defendants' predecessor to construct, operate and maintain dual petroleum pipelines on state-owned bottomlands at the Straits of Mackinac ("Straits Pipelines" or "Pipelines").  On November 13, 2020, the Governor of the State of Michigan and the Michigan Department of Natural Resources, on behalf of the State of Michigan, issued the Notice of Revocation and Termination of Easement ("Notice"), a copy of which is attached as Exhibit 2.  For the reasons more fully stated therein, the Notice provided that the State was (a) revoking the 1953 Easement, effective 180 days from the date of the Notice, based upon the public trust doctrine, and (b) terminating the 1953 Easement, effective 180 days from the date of the Notice, based upon Defendants' persistent and incurable violations of the terms and conditions of the Easement, including Defendants' duty to at all times exercise the due care of a reasonably prudent person.  The Notice also provided that the December 19, 2018 Third Agreement between the State of Michigan and Enbridge does not preclude the revocation and termination of the 1953 Easement. A copy of the Third Agreement is attached as Exhibit 3.

2.     Defendants publicly maintain that:  (a) the 1953 Easement is lawful and does not violate the public trust doctrine; (b) they have complied with the terms

2

and conditions of the Easement; and (c) the Third Agreement ensures that they may continue to operate the existing Straits Pipelines until they are replaced with a new pipeline to be located in a proposed tunnel beneath the Straits. Therefore, actual controversies between the Parties exist on those subjects, warranting declaratory judgment.

3. Plaintiffs seek declaratory judgments consistent with the Notice declaring that the State: (a) properly revoked the 1953 Easement effective 180 days after the date of the Notice because operation of the Straits Pipelines violates the public trust doctrine; (b) properly determined that the 1953 Easement should be terminated effective 180 days after the date of the Notice because of Defendants' persistent and incurable violations of the Easement's terms and conditions; and (c) properly determined that the Third Agreement does not preclude revocation and termination of the 1953 Easement. Plaintiffs seek injunctive relief consistent with the Notice requiring Defendants to: (a) cease operation of the Straits Pipelines 180 days after the date of the Notice; and (b) permanently decommission the Straits Pipelines in accordance with applicable law and plans approved by the State of Michigan.

## PARTIES

4. The State of Michigan is a sovereign state and body politic. Upon its admission to the Union in 1837, and under the equal footing doctrine, the State took title to all unpatented bottomlands of navigable waters within its boundaries, including those in the Great Lakes at the Straits of Mackinac. Under the public

3

trust doctrine, the State holds those lands in trust for the benefit of the People of the State and has the perpetual duty to protect public uses of the waters and lands.

5.      Governor Gretchen Whitmer is the duly elected Governor of the State of Michigan pursuant to Article V, Section 21 of Michigan's Constitution.  Under Article V, Section 1 of the Constitution, all executive power of the State is vested in the Governor, subject to exceptions not relevant here.

6.      The Michigan Department of Natural Resources ("Department") is a principal department of the State of Michigan charged with the duty to protect and conserve the natural resources of this state.  MCL 324.503(1).  The Department has the power and jurisdiction over the management, control, and disposition of all land under the public domain.  MCL 324.503(2).  As related to the 1953 Easement, the Department is the legal successor to the Easement's Grantor, the Conservation Commission of the State of Michigan.

7.      Enbridge Energy, Limited Partnership is a Delaware limited partnership conducting business in Michigan.  Upon information and belief, it is the successor in interest to the Grantee of the 1953 Easement, Lakehead Pipe Line Company, Inc.

8.      Enbridge Energy Company, Inc. is a Delaware corporation conducting business in Michigan.

9.      Enbridge Energy Partners, L.P. is a Delaware limited partnership conducting business in Michigan.

4

10.    Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P., (collectively "Enbridge") control and operate the Enbridge Line 5 pipeline that extends from Superior, Wisconsin, across the Upper Peninsula of Michigan, crosses the Straits of Mackinac through the Straits Pipelines portion of Line 5, and continues through the Lower Peninsula to Marysville, Michigan and then crosses beneath the St. Clair River to Sarnia, Ontario, Canada.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this civil matter under MCL 600.605.

12.    Venue for this civil action is proper in this Court under MCL 600.1631.

## FACTUAL AND LEGAL BACKGROUND

### 1953 Easement

13.    On April 23, 1953, the Conservation Commission of the State of Michigan granted the 1953 Easement to Lakehead Pipe Line Company, Inc.

14.    The Easement recited that it was issued by the Conservation Commission under the authority of 1953 PA 10 and in consideration of a one-time payment of $2,450.00 by the Grantee to the Grantor.

15.    Subject to its terms and conditions, the Easement granted the Grantee and its successors and assigns the right "to construct, lay, maintain, use and operate" two 20-inch diameter pipelines for the purpose of transporting petroleum

5

and other products, "over, through, under, and upon" specifically described

bottomlands owned by the State of Michigan in the Straits of Mackinac.

16.     As stated in the Notice, the 1953 Easement obligates the Grantee and

its successors to at all times exercise due care:

> Paragraph A of the 1953 Easement provides: "Grantee
> [originally Lakehead Pipe Line Company, Inc., now Enbridge] in its
> exercise of rights under this easement, including its designing,
> constructing, testing, operating, maintaining, and, in the event of
> termination of this easement, its abandoning of said pipe lines, shall
> follow the usual, necessary and proper procedures for the type of
> operation involved, and at all times shall *exercise the due care of a
> reasonably prudent person* for the safety and welfare of all persons and
> of all private and public property . . . ." (Emphasis added.)

17.     In addition, as stated in the Notice, the 1953 Easement is also subject

to specific terms and conditions relating to, among other things, spans of

unsupported pipeline, pipeline coatings, and pipeline curvature.

18.     As stated in the Notice, by its terms, the Easement may be terminated

by the Grantor if after receiving notice that it has breached its terms, the Grantee

fails to cure the violation(s) within a specified period:

> Paragraph C.(1) of the Easement provides that it may be
> terminated by Grantor "[i]f, after being notified in writing by Grantor
> of any specified breach of the terms and conditions of this easement,
> Grantee shall fail to correct said breach within ninety (90) days, or,
> having commenced remedial action within such ninety (90) day period,
> such later time as it is reasonably possible for the Grantee to correct
> said breach by appropriate action and the exercise of due diligence in
> the correction thereof . . . ."

19.     On June 27, 2019, Governor Whitmer directed the Department to

undertake a comprehensive review of Enbridge's compliance with the 1953

Easement. The Department submitted several requests to Enbridge to provide

6

documents and information pertaining to its compliance with the Easement. Beginning in February 2020 and ending in June 2020, Enbridge provided some documents in response to these requests.

20.     In addition to reviewing Enbridge's compliance with the 1953 Easement, the State has also reviewed whether the continued operation of the Straits Pipelines is consistent with the public trust doctrine.

21.     Based upon those reviews, the State determined, for the reasons stated in detail in the Notice issued November 13, 2020, that the 1953 Easement:  (a) should be revoked based upon the public trust doctrine; and (b) should be terminated under its terms and conditions based upon Enbridge's repeated and incurable violations of its due-care and specific compliance obligations.  The State further determined for the reasons stated in the Notice that the Third Agreement does not preclude the revocation and termination of the 1953 Easement.

22.     The Notice provided that the State:

A.     Revokes the 1953 Easement, effective 180 days from the date of this Notice to provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met.

B.     Terminates the 1953 Easement, effective 180 days from the date of this Notice to provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met.

C.     Requires Enbridge to cease operation of the Straits Pipelines 180 days from the date of this Notice.

D.     Requires Enbridge to permanently decommission the Straits Pipelines in accordance with applicable law and plans approved by the State of Michigan.

## COUNT I

**The State properly revoked the 1953 Easement because it violates the public trust.**

23. Paragraphs 1 through 22 above are re-alleged and incorporated by reference.

24. As the Michigan Supreme Court held in *Glass v Goeckel,* 473 Mich 667, 678–679 (2005):

> [U]nder longstanding principles of Michigan's common law, the state, as sovereign, has an obligation to protect and preserve the waters of the Great Lakes and the lands beneath them for the public. The state serves, in effect, as the trustee of public rights in the Great Lakes for fishing, hunting, and boating for commerce or pleasure. (Citations and footnote omitted.)

25. These public rights are protected by a *"high, solemn* and *perpetual* trust which it is the duty of the state to forever maintain." *Collins v Gerhardt,* 237 Mich 38, 49 (1926) (emphasis added).

26. Plaintiffs incorporate by reference Sections I.A and I.B of the Notice explaining the public trust doctrine and the limitations it imposes upon transfers of public trust bottomlands to private parties.

27. As stated in the Notice, the 1953 Easement violated the public trust doctrine from its inception because the State never made a finding that the Easement: (1) would improve navigation or another public trust interest; or (2) could be conveyed without impairment of the public trust.

28. The Notice properly concluded that in the absence of either of the due findings required under the public trust doctrine, the 1953 Easement was void from its inception.

8

29.    Plaintiffs incorporate by reference Section I.C of the Notice explaining the State's perpetual duty to protect the public trust, that any grant of State public trust lands remains subject to the public trust and that such a grant is necessarily revocable to ensure protection of the public trust.

33.    As the Notice stated:

> Recent events have made clear that continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect public trust uses of the Lakes from potential impairment or destruction. As outlined below, transporting millions of gallons of petroleum products each day through two 67-year-old pipelines that lie exposed in the Straits below uniquely vulnerable and busy shipping lanes presents an extraordinary, unreasonable threat to public rights because of the very real risk of further anchor strikes and other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits.

34.    The State properly determined for the reasons detailed in Section I.C of the Notice that continued operation of the Straits Pipelines violates the public trust and that the 1953 Easement should be revoked, effective 180 days from the date of the Notice.

## COUNT II

**The State properly terminated the 1953 Easement because of Enbridge's repeated and incurable violations of the Easement's terms and conditions.**

35.    Paragraphs 1 through 34 above are re-alleged and incorporated by reference.

36.    Plaintiffs incorporate by reference Section II of the Notice.

37. As detailed in Section II.B of the Notice, Enbridge has persistently and incurably violated its due-care and specific compliance obligations under the Easement.

38. As explained in Section II.B.1 of the Notice, Enbridge has violated the Easement requirement limiting spans of unsupported pipeline and its due-care obligation in connection therewith:

Paragraph A.(10) of the Easement requires that each Pipeline must be physically supported (i.e., either rest on the lakebed or be supported by some other structure/device) at least every 75 feet. This prohibition of unsupported pipeline "spans" longer than 75 feet serves to protect the structural integrity of the pipelines from stresses and vibrations that may be caused by the strong currents surrounding the Pipelines. Those same currents can erode the lakebed on which portions of the Pipelines rest, creating excessive spans.

For virtually the entire time the Easement has been in place, Enbridge has ignored the 75' span requirement.⁏ Documents provided by Enbridge confirm that since at least 1963 and continuing through 2012, Enbridge has known that multiple unsupported pipe spans have exceeded 75 feet but has failed to take remedial action to address the non-compliant spans[.]

\*\*\*

Several documents submitted by Enbridge suggest that at some point in time the company chose to ignore the Easement's 75' span requirement and replace it with a 140' requirement for taking corrective action on unsupported pipe spans. . . .

\*\*\*

. . . Enbridge's apparent unilateral adoption a 140' pipe span criterion in lieu of the 75' Easement condition was itself a violation of the Easement. For virtually the entire life of the Easement, Enbridge disregarded its obligation to comply with the 75' pipe span requirement, and even failed to take corrective action when pipe spans exceeded 200' in length (e.g., see above, unsupported spans of 216' to 421' in length).

10

For decades, Enbridge violated and neglected its obligations under Paragraph A.(10) of the Easement, and its concomitant duties to inspect, timely repair, and disclose exceedances of pipe spans to the State of Michigan. In doing so, Enbridge exhibited an astonishing lack of candor and indifference to its due-care obligations under the Easement.

39. As explained in Section II.B.2 of the Notice, Enbridge has violated the Easement requirement regarding pipeline coatings and its due-care obligation in connection therewith:

Paragraph A.(9) of the Easement requires Enbridge to maintain a multi-layer coating on the Pipelines. This protective coating is intended to prevent the steel from being exposed to environmental factors that could cause corrosion or other physical damage.

Since at least 2003, and continuing until 2014, Enbridge was on notice that heavy biota (i.e., mussels) accumulation on the Straits Pipelines made it impossible to do a detailed analysis of the integrity of the coating/wrap for the Pipelines over much of their length. Despite these repeated warnings, and notwithstanding its affirmative obligation under the Easement to ensure the integrity of the pipeline coating/wrap, documents submitted by Enbridge show it made little to no effort to undertake a more detailed study of the condition of the pipeline coating/wrap until 2016-2017 – a gap of approximately 13-14 years from notice to response.

***

. . . In March 2017, in response to questions raised by the Michigan Pipeline Safety Advisory Board, Enbridge publicly represented to the Board, whose members included State agency representatives, that no gaps [in the pipeline coating exposing bare metal] existed on the Pipelines and there was no need for any repairs. Yet in August 2017, Enbridge informed State officials that there were three small areas of bare metal exposed, and later was forced to acknowledge both that it had known of these coating gaps since 2014 and that some were apparently caused by Enbridge during the installation of pipe supports. Subsequent inspections showed dozens more areas of coating damage.

Enbridge's course of conduct, by failing to undertake a detailed examination of the condition of the pipeline coating/wrap despite being

on notice of the need to do so for 13-14 years, delaying disclosure to the State of several areas of bare metal for three years after initially denying such conditions existed, and only belatedly undertaking further inspections and repairs when demanded by the State, evidences a pattern of indifference to, and violation of, the conditions of Paragraph A.(9) of the Easement and its obligation to exercise due care.

40.    As stated in Section II.B.3 of the Notice, Enbridge has violated the Easement requirement regarding pipeline curvature and its due-care obligation in connection therewith:

Paragraph A.(4) of the Easement includes a condition that "[t]he minimum curvature of any section of pipe shall be no less than two thousand and fifty (2,050) feet radius." This condition relating to pipeline curvature limits stresses placed on the Pipelines.

The DNR requested documents and information relating in any way to Enbridge's efforts to ensure compliance with this condition, and Enbridge provided several GEOPIG Geometry Inspection Reports beginning in 2005.◻ The GEOPIG Reports do not refer to the pipe's radius curvature but rather record the diameter bend of the pipe. A diameter bend of 1230D feet is equivalent to a minimum curvature of 2,050 feet radius.

Any diameter bend between 0D and 1230D would violate the Easement standard. The GEOPIG Reports, however, only provide data on bends less than 100D. Even with this limitation, the GEOPIG Reports identify 20 to 25 exceedances of the Easement's minimum pipe curvature requirement.◻ . . .

Enbridge ignored the pipeline curvature mandate of Paragraph A.(4) of the Easement, perhaps from the very beginning with installation of the Straits Pipelines. Noncompliance with the curvature condition continues today and remains uncorrected. This is contrary to the standard of due care imposed by the Easement and represents an ongoing, incurable violation of one of the Easement's fundamental terms and conditions.

41.    In addition, as explained in Section II.B.4 of the Notice, Enbridge's continued operation of the exposed Straits Pipelines in the open water, where recent events demonstrate they are vulnerable to impacts by anchors and other external

objects, creates an unreasonable risk of grave environmental and economic harm

that violates its due-care obligation under the Easement:

> In the face of the documented and recently demonstrated
> vulnerability of the Straits Pipelines to external impacts from anchors
> and other objects, and the complete failure of safety systems intended
> to mitigate such impacts, as well as the inherent threats to pipeline
> integrity from incorrect operations and procedural errors, Enbridge's
> continued operation of the Straits Pipelines is contrary to and
> incompatible with its affirmative duty under the Easement to "exercise
> the due care of a reasonably prudent person for the safety and welfare
> of all persons and of all private and public property." Under these
> circumstances, continued operation of the Straits Pipelines presents a
> substantial, inherent and unacceptable risk of a catastrophic oil spill
> with grave ecological and economic consequences. . . .

42.    Enbridge's violations of the Easement cannot be corrected.  As

explained in the Notice:

> Paragraph C.(1) of the Easement provides that the Easement
> may be terminated by Grantor "[i]f, after being notified in writing by
> Grantor of any specified breach of the terms and conditions of this
> easement, Grantee shall fail to correct said breach within ninety (90)
> days, or, having commenced remedial action within such ninety (90)
> day period, such later time as it is reasonably possible for the Grantee
> to correct said breach by appropriate action and the exercise of due
> diligence in the correction thereof . . . ."

> The stated timeframes for correcting a breach of the Easement
> presume that the identified breach or violation is "correctable." As
> more fully explained below, Enbridge has failed for decades to meet its
> compliance and due-care obligations under the Easement, and it
> remains in violation of those obligations.  There is nothing Enbridge
> can do to change its past behavior and callous disregard for its duties
> under the Easement, and its breaches of the Easement's terms and
> conditions cannot be corrected or otherwise cured.

43.    Enbridge's longstanding and persistent violations of the Easement's

terms and conditions, including its continuing, unreasonably risky operation of the

Straits Pipelines in violation of its due-care obligation under the Easement, cannot be corrected except by ceasing the Pipelines' operation.

44. For all these reasons, the State properly terminated the Easement, effective 180 days from the date of the Notice.

## COUNT III

**The State properly determined that the December 19, 2018 Third Agreement does not preclude the revocation and termination of the 1953 Easement.**

45. Paragraphs 1 through 44 above are re-alleged and incorporated by reference.

46. Plaintiffs incorporate by reference Sections I.D and II.C of the Notice.

47. On December 19, 2018, the then Governor of Michigan, the then Director of the Department of Natural Resources, the then Director of the Department of Environmental Quality, and representatives of Enbridge signed a document entitled "Third Agreement between the State of Michigan, Michigan Department of Environmental Quality, and Michigan Department of Natural Resources and Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P." ("Third Agreement") relating to the Straits Pipelines. The Third Agreement provided that, subject to specified conditions, Enbridge could continue to operate the existing Straits Pipelines pending completion of a tunnel beneath the Straits and of a Straits Line 5 Replacement Segment to be constructed and operated within the proposed tunnel.

48. Specifically, Article 4.1 of the Third Agreement states:

14

4.1    The State agrees that Enbridge may continue to operate the
Dual Pipelines, which allow for the functional use of the current Line 5
in Michigan, until the Tunnel is completed, and the Straits Line 5
Replacement segment is placed in service within the Tunnel, subject to
Enbridge's continued compliance with all of the following:

(a)    The Second Agreement;

(b)    The Tunnel Agreement;

(c)    This Third Agreement;

(d)    *The 1953 Easement; and*

(e)    *All other applicable laws,* including those listed in
Section V of the Second Agreement. (Emphasis
added.)

49.    As explained in Section I.D of the Notice, the Third Agreement does

not preclude the revocation of the 1953 Easement:

Notwithstanding the Third Agreement, the 1953 Easement is
subject to revocation under the public trust doctrine, and the Third
Agreement's stated conditional right to continue to operate the Straits
Pipelines does not preclude that revocation, for at least two reasons.
First, as detailed below in Section II of this Notice, Enbridge incurably
has violated and continues to violate the 1953 Easement.  Second, as
set forth above, the public trust doctrine is among the laws that apply
to the existing Straits Pipelines and Enbridge's continued operation of
the Pipelines violates the public trust.

Section 4.2 of the Third Agreement states in part:

4.2    Provided that Enbridge complies with Section 4.1 above,
the State agrees that:

***

(c)    The replacement of the Dual Pipelines with the
Straits Line 5 Replacement Segment in the Tunnel
is expected to eliminate the risk of a potential
release from Line 5 at the Straits.

(d)    In entering into this Third Agreement, and thereby
authorizing the Dual Pipelines to continue to
operate until such time that the Straits Line 5

15

> Replacement Segment is placed into service within
> the Tunnel, the State has acted in accordance with
> and in furtherance of the public's interest in the
> protection of waters, waterways, or bottomlands
> held in public trust by the State of Michigan.

The language of Section 4.2 quoted above does not and cannot preclude the revocation of the 1953 Easement under the public trust doctrine for at least the following reasons. To begin, it is expressly conditioned on Enbridge's compliance with Section 4.1; as discussed, Enbridge is not, and has not been, in compliance with that provision. Furthermore, nothing in Section 4.2 provides a "due finding" that Enbridge's continued use of public trust bottomlands and waters to operate the existing Straits Pipelines would either enhance the public trust or not impair the public trust uses of waters and lands at the Straits. Section 4.2(d) does not itself supply it. Nor does the related assertion in Section 4.2(c) that the eventual replacement of the existing Pipelines with a new pipeline in the proposed tunnel is expected to eliminate the risk of a potential release from Line 5 at the Straits. It simply does not follow from that assertion that continuing to operate the existing Pipelines until they are replaced would somehow enhance the public trust or not impair it. And nothing else in the Third Agreement suggests, let alone embodies, a finding that continued operation of the Pipelines now, before a tunnel is completed, mitigates the risk of releases from them. Nor, for that matter, could the requisite due finding have been made when the Third Agreement was signed in December 2018, given the substantial, inherent and unreasonable risk of grave harm presented by the continued operation of the Straits Pipelines. See Section I.C, *supra*.

Finally, even if the Third Agreement contained a lawful finding by the State officials who signed it in 2018 that Enbridge's continued operation of the Straits Pipelines is consistent with the public trust— which it did not—any such finding is not permanently binding on the State and those former State officials' successors, who retain a solemn, perpetual and irrevocable duty to protect the public trust. Accordingly, the Third Agreement does not preclude the revocation of the 1953 Easement for the reasons stated in this Notice.

50. As explained in Section II.C of the Notice, the Third Agreement does not preclude termination of the 1953 Easement:

> As noted in Section I.D above, the continued operation of the
> existing Straits Pipelines under the terms of the Third Agreement is

expressly conditioned upon Enbridge's compliance with the 1953 Easement. And, as outlined above, Enbridge incurably has violated and continues to violate the Easement.

Section 4.2 of the Agreement addresses compliance with certain terms and conditions of the Easement discussed in this Notice:

> 4.2   Provided that Enbridge complies with Section 4.1 above, the State agrees that:
>
> &ast;&ast;&ast;
>
> (b)   Enbridge's compliance with *Article 5* below demonstrates compliance *with the specified conditions* of the 1953 Easement.
>
> &ast;&ast;&ast;
>
> (e)   *Based on currently available information*, the State is not aware of any violation of the 1953 Easement that would not be addressed and cured by compliance with Section 4.1 and Article 5 of this Agreement.  (Emphasis added.)

These provisions do not preclude termination of the Easement pursuant to this Notice for at least the following reasons.  First, as noted above, Section 4.2 is conditioned on Enbridge's compliance with Section 4.1 of the Third Agreement, and Enbridge is not, and has not been, in compliance with that provision.  Second, neither Section 4.2 nor Article 5 addresses in any way two of the terms and conditions of the Easement that form the basis of this Notice of Termination:  the obligation to exercise due care and the condition on pipeline curvature in Paragraph A.(4).  Third, the statement in Section 4.2(e)—that the State is not aware of any violation of the 1953 Easement that would not be addressed and cured by compliance with Article 5—expressly provided that it was "based on currently available information," i.e., information considered as of December 2018.  Here, as noted above, beginning in 2019, the State undertook a systematic investigation and review of Enbridge's compliance with the Easement.  It was through that subsequent review that the State has now identified the full scope of repeated past and continuing violations of the Easement that form the grounds for this Notice of Termination.

Article 5 of the Third Agreement, which is referenced in Section 4.2, addresses two of the Easement conditions at issue here:  Paragraph A.(9) concerning pipeline coatings (addressed in Section 5.2

of the Third Agreement) and Paragraph A.(10) concerning unsupported pipe spans (addressed in Section 5.3 of the Third Agreement). But the language of Sections 5.2 and 5.3 is limited and qualified in two important ways. First, as in Section 4.2(e), the statements in these provisions of Article 5 regarding compliance with the Easement are expressly qualified by reference to "currently available information":

> The State agrees, *based upon currently available information,* that Enbridge's compliance with the requirements under this Section 5.2 satisfies the requirements of Paragraph A (9) of the 1953 Easement. (Section 5.2(d) (emphasis added).)

> \*\*\*

> The State agrees, *based upon currently available information,* that Enbridge's compliance with the requirements under this Section 5.3 satisfies the requirements of Paragraph A (10) of the 1953 Easement. (Section 5.3(d) (emphasis added).)

Again, as noted above, the full scope of violations of Paragraphs A.(9) and A.(10) of the Easement discussed in this Notice were identified through the State's recent review of Easement compliance. Moreover, the terms of Sections 5.2 and 5.3 were focused solely on actions to be taken prospectively regarding then current or potential future issues with pipeline coatings and unsupported pipe spans. They do not consider or address the longstanding pattern of Enbridge's violations of Paragraphs A.(9) and A.(10). Accordingly, the Third Agreement does not preclude the termination of the Easement for the reasons stated in this Notice.

## RELIEF REQUESTED

For the reasons stated in this complaint, Plaintiffs request that this Court grant the following relief:

A.      Enter a declaratory judgment that the State properly revoked the 1953 Easement, effective 180 days from the date of the Notice, because it violates the public trust doctrine.

B.    Enter a declaratory judgment that the State properly terminated the 1953 Easement, effective 180 days from the date of the Notice, because of Enbridge's persistent and incurable violations of the Easement's terms and conditions.

C.    Enter a declaratory judgment that the State properly determined that the December 19, 2018 Third Agreement does not preclude the revocation and termination of the 1953 Easement.

D.    Enter a permanent injunction, consistent with the Notice, requiring Enbridge to (1) cease operation of the Straits Pipelines 180 days from the date of the Notice; and (2) permanently decommission the Straits Pipelines in accordance with applicable law and plans approved by the State of Michigan.

E.    Any other relief that the Court finds just and reasonable.

Respectfully submitted,

Dana Nessel
Attorney General

/s/ *Robert P. Reichel*
Robert P. Reichel (P31878)
Daniel P. Bock (P71246)
Assistant Attorneys General
Attorneys for Plaintiffs
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664

Dated:  November 13, 2020

LF: Enbridge Straits (Dec & Inj Relief)(GOV)(DNR)AG# 2020-0304222-A/Complaint 2020-11-13-Final

# EXHIBIT 1

123

STRAITS OF MACKINAC PIPE LINE EASEMENT

CONSERVATION COMMISSION OF THE STATE OF MICHIGAN

TO

LAKEHEAD PIPE LINE COMPANY, INC.

THIS EASEMENT, executed this twenty-third day of April, A. D. 1953, by the State of Michigan by the Conservation Commission, by Wayland Osgood, Deputy Director, acting under and pursuant to a resolution adopted by the Conservation Commission at its meeting held on February 13, 1953, and by virtue of the authority conferred by Act No. 10, P. A. 1953, hereinafter referred to as Grantor, to Lakehead Pipe Line Company, Inc., a Delaware corporation, of 510 22nd Avenue East, Superior, Wisconsin, hereinafter referred to as Grantee,

W I T N E S S E T H:

WHEREAS, application has been made by Grantee for an easement authorizing it to construct, lay and maintain pipe lines over, through, under and upon certain lake bottom lands belonging to the State of Michigan, and under the jurisdiction of the Department of Conservation, located in the Straits of Mackinac, Michigan, for the purpose of transporting petroleum and other products; and

WHEREAS, the Conservation Commission is of the opinion that the proposed pipe line system will be of benefit to all of the people of the State of Michigan and in furtherance of the public welfare; and

WHEREAS, the Conservation Commission duly considered the application of Grantee and at its meeting held on the 13th day of February, A. D. 1953, approved the conveyance of an easement.

-1-

124

NOW, THEREFORE, for and in consideration of the sum of Two
Thousand Four Hundred Fifty Dollars ($2,450.00), the receipt of which is
hereby acknowledged, and for and in consideration of the undertakings of
Grantee and subject to the terms and conditions set forth herein, Grantor
hereby conveys and quit claims, without warranty express or implied, to
Grantee an easement to construct, lay, maintain, use and operate two (2)
pipe lines, one to be located within each of the two parcels of bottom lands
hereinafter described, and each to consist of twenty inch (20") O D pipe,
together with anchors and other necessary appurtenances and fixtures, for
the purpose of transporting any material or substance which can be conveyed
through a pipe line, over, through, under and upon the portion of the bottom
lands of the Straits of Mackinac in the State of Michigan, together with the
right to enter upon said bottom lands, described as follows:

>All bottom lands of the Straits of Mackinac, in the State
>of Michigan, lying within an area of fifty (50) feet on
>each side of the following two center lines:

>(1) Easterly Center Line: Beginning at a point on the
>northerly shore line of the Straits of Mackinac on a
>bearing of South twenty-four degrees, no minutes and thirty-
>six seconds East (S 24° 00' 36" E) and distant one thousand
>seven hundred and twelve and eight-tenths feet (1,712.8')
>from United States Lake Survey Triangulation Station "Green"
>(United States Lake Survey, Latitude 45° 50' 00", Longitude
>84° 44' 58"), said point of beginning being the intersection
>of the center line of a twenty inch (20") pipe line and the
>said northerly shore line; thence, on a bearing of South
>fourteen degrees thirty-seven minutes and fourteen seconds
>West (S 14° 37' 14" W) a distance of nineteen thousand one
>hundred and forty-six and no tenths feet (19,146.0') to a
>point on the southerly shore line of the Straits of Mackinac
>which point is the intersection of the said center line of
>the twenty inch (20") pipe line and the said southerly
>shore line; and is distant seven hundred and seventy-four
>and seven tenths feet (774.7') and on a bearing of South
>thirty-six degrees, eighteen minutes and forty-five seconds
>West (S 36° 18' 45" W) from United States Lake Survey Tri-
>angulation Station "A. Mackinac West Base" (United States



Lake Survey, Latitude 45° 47' 14", Longitude 84°
46' 22").

(2) Westerly Center Line: Beginning at a point on the
northerly shore line of the Straits of Mackinac on a
bearing of South forty-nine degrees, twenty-five minutes
and forty-seven seconds East (S 49° 25' 47" E) and dis-
tant two thousand six hundred and thirty-four and nine
tenths feet (2,634.9') from United States Triangulation
Station "Green" (United States Lake Survey, Latitude
45° 50' 00", Longitude 84° 44' 58") said point of be-
ginning being the intersection of the center line of a
twenty inch (20") pipe line and the said northerly shore
line; thence on a bearing of South fourteen degrees,
thirty-seven minutes and fourteen seconds West (S 14°
37' 14" W), a distance of nineteen thousand four hundred
and sixty-five and no tenths feet (19,465.0') to a point
on the southerly shore line of the Straits of Mackinac
which point is the intersection of the said center line
of the twenty inch (20") pipe line and the said southerly
shore line and is distant one thousand no hundred and
thirty-six and four tenths feet (1,036.4') on a bearing
of South sixty-three degrees, twenty minutes and fifty-
four seconds East (S 63° 20' 54" E) from United States
Lake Survey Triangulation Station "A. Mackinac West
Base" (United States Lake Survey, Latitude 45° 47' 14",
Longitude 84° 46' 22").

TO HAVE AND TO HOLD the said easement unto said Grantee, its

successors and assigns, subject to the terms and conditions herein set

forth, until terminated as hereinafter provided.

This easement is granted subject to the following terms and

conditions:

A.  Grantee in its exercise of rights under this easement,

including its designing, constructing, testing, operating,

maintaining, and, in the event of the termination of this

easement, its abandoning of said pipe lines, shall follow

the usual, necessary and proper procedures for the type of

operation involved, and at all times shall exercise the due

care of a reasonably prudent person for the safety and welfare

-3-

126

of all persons and of all public and private property,
shall comply with all laws of the State of Michigan and
of the Federal Government, unless Grantee shall be con-
testing the same in good faith by appropriate proceedings,
and, in addition, Grantee shall comply with the following
minimum specifications, conditions and requirements, unless
compliance therewith is waived or the specifications or
conditions modified in writing by Grantor:

(1)  All pipe line laid in water up to fifty
(50) feet in depth shall be laid in a ditch
with not less than fifteen (15) feet of cover.
The cover shall taper off to zero (0) feet at
an approximate depth of sixty-five (65) feet.
Should it be discovered that the bottom material
is hard rock, the ditch may be of lesser depth,
but still deep enough to protect the pipe lines
against ice and anchor damage.

(2)  Minimum testing specifications of the twenty
inch (20") OD pipe lines shall be not less than
the following:

Shop Test----------1,700 pounds per square inch gauge
Assembly Test------1,500 pounds per square inch gauge
Installation Test--1,200 pounds per square inch gauge
Operating Pressure- 600 pounds per square inch gauge

(3)  All welded joints shall be tested by X-Ray.

-4-



(4)  The minimum curvature of any section of pipe shall be no less than two thousand and fifty (2,050) feet radius.

(5)  Automatic gas-operated shut-off valves shall be installed and maintained on the north end of each line.

(6)  Automatic check valves shall be installed and maintained on the south end of each line.

(7)  The empty pipe shall have a negative buoyancy of thirty (30) or more pounds per linear foot.

(8)  Cathodic protection shall be installed to prevent deterioration of pipe.

(9)  All pipe shall be protected by asphalt primer coat, by inner wrap and outer wrap composed of glass fiber fabric material and one inch by four inch (1" x 4") slats, prior to installation.

(10)  The maximum span or length of pipe unsupported shall not exceed seventy-five (75) feet.

(11)  The pipe weight shall not be less than one hundred sixty (160) pounds per linear foot.

(12)  The maximum carbon content of the steel, from which the pipe is manufactured, shall not be in excess of .247 per cent.

128

(13)  In locations where fill is used, the top·of the
fill shall be no less than fifty (50) feet wide.

(14)  In respect to other specifications, the line
shall be constructed in conformance with the detailed
plans and specifications heretofore filed by Grantee
with Lands Division, Department of Conservation of
the State of Michigan.

B.   Grantee shall give timely notice to the Grantor in writing:

(1)  Of the time and place for the commencement of
construction over, through, under or upon the bottom
lands covered by this easement, said notice to be
given at least five (5) days in advance thereof;

(2)  Of compliance with any and all requirements of
the United States Coast Guard for marking the location
of said pipe lines;

(3)  Of the filling of said pipe lines with oil or
any other substance being transported commerially;

(4)  Of any breaks or leaks discovered by Grantee in
said pipe lines, said notice to be given by telephone
promptly upon discovery and thereafter confirmed by
registered mail;

129

(5)  Of the completion of any repairs of said
pipe lines, and time of testing thereof, said
notice to be given in sufficient time to per-
mit Grantor's authorized representatives to be
present at the inspection and testing of the
pipe lines after said repairs; and

(6)  Of any plan or intention of Grantee to
abandon said pipe lines, said notice to be
given at least sixty (60) days prior to commence-
ment of abandonment operations.

C.  The easement herein conveyed may be terminated by
Grantor:

(1)  If, after being  notified in writing by
Grantor of any specified breach of the terms
and conditions of this easement, Grantee shall
fail to correct said breach within ninety (90)
days, or, having commenced remedial action within
such ninety (90) day period, such later time as
it is reasonably possible for the Grantee to cor-
rect said breach by appropriate action and the
exercise of due diligence in the correction thereof;
or



(2)  If Grantee fails to start construction of
the pipe lines authorized herein within two years
from date of execution of this instrument; or

(3)  If Grantee fails for any consecutive three-
year period to make substantial use of said pipe
lines commercially and also fails to maintain said
pipe lines during said period in such condition as
to be available to commercial use within thirty
(30) days.

D.  Construction of the pipe lines contemplated by this
instrument shall not be commenced until all necessary authori-
zation and assent of the Corps of Engineers, United States
Army, so far as concerns the public rights of navigation,
shall have been obtained.

E.  In the event of any relocation, replacement, major repair,
or abandonment of either of the pipe lines authorized by this
easement, Grantee shall obtain Grantor's written approval of
procedures, methods and materials to be followed or used prior
to commencement thereof.

F.  The maximum operating pressure of either of said pipe lines
shall not exceed six hundred (600) pounds per square inch
gauge.

|3|

If there is a break or leak or an apparent break or leak in either of said pipe lines, or if Grantor notifies Grantee that it has good and sufficient evidence that there is or may be a break or leak therein, Grantee shall immediately and completely shut down the pipe line involved and said pipe line shall not be placed in operation until Grantee has conducted a shut-in two (2) hour pressure test of six hundred (600) pounds per square inch gauge showing that no substance is escaping from a break or leak in said pipe line.

G.  If oil or other substance escapes from a break or leak in the said pipe lines, Grantee shall immediately take all usual, necessary and proper measures to eliminate any oil or other substance which may escape.

H.  In the event the easement herein conveyed is terminated with respect to either or both of said pipe lines, or if any part or portion of a pipe line is abandoned, Grantee shall take all of the usual, necessary and proper abandonment procedures as required and approved by Grantor.  Said abandonment operations shall be completed to the satisfaction of Grantor within one year after any abandonment of any part or portion of a pipe line; or in event of termination of this easement, within one year thereafter.  After the expiration of one year following the termination of this easement, Grantee

132

shall at the option of Grantor quit claim to the State of Michigan
all of its right, title and interest in or to any pipe line, appurte-
nances or fixtures remaining over, through, under or upon the bottom
lands covered by this easement.  Abandonment procedures as used
herein include all operations that may be reasonably necessary to
protect life and property from subsequent injury.

I.  Grantee shall permit Grantor to inspect at reasonable times
and places its records of oil or any other substance being trans-
ported in said pipe lines and shall, on request, submit to
Grantor inspection reports covering the automatic shut-off and
check valves and metering stations used in connection with the
Straits of Mackinac crossing.

J.  (1)  Grantee shall indemnify and hold harmless the State of
Michigan from all damage or losses caused  to property (including
property belonging to or held in trust by the State of Michigan),
or persons due to or arising out of the operations or actions of
Grantee, its employees, servants and agents hereunder.  Grantee
shall place in effect prior to the construction of the pipe lines
authorized by this easement and shall maintain in full force and
effect during the life of this easement, and until Grantor has
approved completion of abandonment operations, a Comprehensive
Bodily Injury and Property Damage Liability policy, bond or surety,
in form and substance acceptable to Grantor in the sum of at least
One Million Dollars (\$1,000,000.00), covering the liability herein
imposed upon Grantee.

133

(2)  Grantee, prior to commencing construction of
the pipe lines authorized by this easement, shall
provide the State of Michigan with a surety bond
in the penal sum of One Hundred Thousand Dollars
($100,000.00) in form and substance acceptable to
Grantor, and surety or sureties approved by Grantor,
to well, truly and faithfully perform the terms,
conditions and requirements of this easement.  Said
bond shall be maintained in full force and effect
during the life of this easement and until Grantor
has approved completion of Grantee's abandonment
operations.  Said bond shall not be reduced in amount
except with the written consent of Grantor.

K.  Grantee shall within sixty (60) days thereafter notify
Grantor in writing of any assignment of this easement.

L.  The terms and conditions of this easement shall be bind-
ing upon and inure to the benefit of the respective successors
and assigns of Grantor and Grantee.

M.  All rights not specifically conveyed herein are reserved
to the State of Michigan.

134

N. Grantee shall not improvise, construct or maintain ship-to-shore or ship-to-pipe line loading or unloading facilities over, through, under or upon any of the bottom lands herein described for the purpose of removing material from or injecting material into said pipe lines.

O. Grantor shall have the right at all reasonable times and places to inspect the pipe lines, appurtenances and fixtures authorized by this easement.

P. It shall not be a breach of the terms and conditions of this easement if for operating or maintenance reasons Grantee shall make use of only one of said pipe lines at a time.

Q. Where provision is made herein that Grantee shall obtain the authorization, approval or consent of Grantor, Grantor agrees that it will not unreasonably withhold the same.

IN WITNESS WHEREOF, the State of Michigan by the Conservation Commission, by Wayland Osgood, Deputy Director, acting pursuant to authority specifically conferred upon him, has caused this instrument to be executed this twenty-third day of April, A.D. 1953.

Signed, Sealed and Delivered  
in the Presence of:

STATE OF MICHIGAN  
BY THE CONSERVATION COMMISSION

/s/ Jane Bower  
Jane Bower

By /s/ Wayland Osgood  
Wayland Osgood, Deputy Director,  
pursuant to resolutions of the  
Conservation Commission dated  
February 13, 1953 and July 10,  
1951

/s/ Elizabeth Soule  
Elizabeth Soule

135

STATE OF MICHIGAN )
       )   ss.
COUNTY OF INGHAM )


On this twenty-third day of April, A.D. 1953, before me, a
Notary Public, in and for said county, personally appeared Wayland Osgood,
Deputy Director, known by me to be the person who executed the within
instrument and who, being duly sworn, deposes and says that he is the duly
appointed deputy director of the Conservation Commission and that he
executed the within easement under authority specifically conferred upon
him by law and by the Conservation Commission at its meetings held on
February 13, 1953 and July 10, 1951, and who acknowledged the same to be
his free act and deed and the free act and deed of the State of Michigan
by the Conservation Commission, in whose behalf he acts.


          /s/ C. R. Humphrys
         C. R. Humphrys, Notary Public, Ingham County, Michigan
         My Commission expires September 20, 1954

Examined and approved 4/23/53
as to legal form and effect:


  /s/ R. Glen Dunn
  Assistant Attorney General

# EXHIBIT 2

STATE OF MICHIGAN
OFFICE OF THE GOVERNOR
DEPARTMENT OF NATURAL RESOURCES

## NOTICE OF REVOCATION AND TERMINATION OF EASEMENT

### INTRODUCTION

Through Governor Gretchen Whitmer and the Department of Natural Resources, the State of Michigan hereby provides formal notice to Enbridge (as defined below) that the State is revoking and terminating the 1953 Easement. The 1953 Easement authorized Lakehead Pipe Line Company, Inc., and its successors, to operate dual pipelines in the Straits of Mackinac to transport petroleum and other products. As more fully described below, the Easement is being revoked for violation of the public trust doctrine, and is being terminated based on Enbridge's longstanding, persistent, and incurable violations of the Easement's conditions and standard of due care. The revocation and termination each take legal effect 180 days after the date of this Notice to provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met. Enbridge must cease operation of the Straits Pipelines 180 days after the date of this Notice.

### BACKGROUND

On April 23, 1953, the Conservation Commission of the State of Michigan granted an easement entitled "Straits of Mackinac Pipe Line Easement Conservation Commission of the State of Michigan to Lakehead Pipe Line Company, Inc." ("1953 Easement" or "Easement"), a copy of which is attached as Exhibit 1.

The Easement was issued by the Conservation Commission under the authority of 1953 PA 10 and in consideration of a one-time payment of $2,450.00 by the Grantee to the Grantor.

Subject to its terms and conditions, the Easement granted Lakehead Pipe Line Company, Inc., the Grantee, and its successors and assigns, the right "to construct, lay, maintain, use and operate" two 20-inch diameter pipelines for the purpose of transporting petroleum and other products "over, through, under, and upon" specifically described public trust bottomlands owned by the State of Michigan in the Straits of Mackinac.

The two pipelines subject to the Easement ("Straits Pipelines" or "Pipelines") were completed in 1953 and thereafter have been operated by the Grantee and its successors.

The Grantee's current successors, Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P. (collectively "Enbridge"), operate the Straits Pipelines as part of the Enbridge Line 5 pipeline that

extends from Superior, Wisconsin and across Michigan, to Sarnia, Ontario. Line 5, including the Straits Pipelines, currently transports an average of 540,000 barrels or 22,680,000 gallons of crude oil and/or natural gas liquids per day.

The Governor is the chief executive officer of the State of Michigan. The Department of Natural Resources ("DNR") is the successor to the Conservation Commission, Grantor of the 1953 Easement.

On June 27, 2019, Governor Gretchen Whitmer directed the DNR to undertake a comprehensive review of Enbridge's compliance with the 1953 Easement. The DNR submitted several requests to Enbridge to provide documents and information pertaining to its compliance with the Easement. Beginning in February 2020 and ending in June 2020, Enbridge provided some documents in response to these requests.[1]

This Notice is based on review of the records recently submitted by Enbridge, other documents in the public domain, and the legal and factual grounds specified below.

## I. REVOCATION OF EASEMENT PURSUANT TO THE PUBLIC TRUST DOCTRINE

The State of Michigan, in both its sovereign and proprietary capacities, is revoking the Easement pursuant to the public trust doctrine.

### A. The Public Trust Doctrine

In *Glass v Goeckel*, 473 Mich 667, 678-679 (2005), the Michigan Supreme Court held that the state, as sovereign, is obligated to protect and preserve the waters of, and lands beneath, the Great Lakes. "The state serves, in effect, as the *trustee of public rights* in the Great Lakes for fishing, hunting, and boating for commerce or pleasure." *Id.* at 679 (emphasis added).[2]

---

[1] Among other things, the DNR included a request for records confirming that Enbridge systematically has undertaken efforts (inspections, investigations, assessments and evaluations) to comply with the Easement from its issuance in 1953 to the present. In response, Enbridge produced few contemporaneous records and little evidence that it conducted a pipeline inspection and maintenance program from 1953 to the late 1990s or early 2000s – i.e., during most of the Easement's existence.

[2] The Michigan Legislature has recognized the public trust doctrine in various state statutes. For example, Part 17 of the Natural Resources and Environmental Protection Act ("NREPA"), the Michigan Environmental Protection Act, grants broad standing to any person to file an action in circuit court "against any person for the protection of the air, water, and other natural resources and the *public trust in these resources* from pollution, impairment, or destruction." MCL 324.1701(1) (emphasis added). In Part 301 of NREPA, Inland Lakes and Streams, the Department of Environment, Great Lakes, and Energy is prohibited from issuing a permit for a proposed project or activity if it will "adversely affect the public trust,"

2

These public rights are protected by a "*high, solemn* and *perpetual* trust, which it is the duty of the state to forever maintain." *Collins v Gerhardt*, 237 Mich 38, 49 (1926) (emphasis added). As the Michigan Supreme Court long ago explained, "[t]he state is sovereign of the navigable waters within its boundaries, bound, however, in trust, to do nothing in hindrance of the public right of navigation, hunting and fishing." *Nedtweg v Wallace*, 237 Mich 14, 20 (1926).

Both the United States Supreme Court and the Michigan Supreme Court have held that the public trust doctrine strictly limits the circumstances under which a state may convey property interests in public trust resources. In *Illinois Central Railroad Co v Illinois*, 146 US 387, 455-456 (1892), the United States Supreme Court identified only two exceptions under which such a conveyance is permissible:

> The trust with which they are held, therefore, is governmental, and cannot be alienated, except in those instances mentioned, of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining.

The Court held that because neither of those conditions was satisfied by a state statute purporting to grant submerged lands along the Chicago lakefront to a private company, a subsequent state statute revoking that grant and restoring public rights was valid and enforceable. *Id.* at 460.

In *Obrecht v National Gypsum Co*, 361 Mich 399, 412 (1960), the Michigan Supreme Court declared that "[l]ong ago we committed ourselves . . . to the universally accepted rules of such trusteeship as announced by the Supreme Court in *Illinois Central*," including *Illinois Central*'s delineation of the limited conditions under which public trust resources may be conveyed:

> [N]o part of the beds of the Great Lakes, belonging to Michigan and not coming within the purview of previous legislation . . . can be alienated or otherwise devoted to private use *in the absence of due finding of one of two exceptional reasons for such alienation or devotion to non-public use*. One exception exists where the State has, *in due recorded form*, determined that a given parcel of such submerged land may and should be conveyed 'in the improvement of the interest thus held' (referring to the public trust). The other is present where the State has, *in similar form*, determined that such disposition may be made 'without detriment to the public interest in the lands and waters remaining.'

which includes consideration of uses of lakes and streams for "*recreation, fish and wildlife, aesthetics, local government, agriculture, commerce, and industry*." MCL 324.30106 (emphasis added). And, as noted in footnote 3 below, Part 325 of NREPA, Great Lakes Submerged Lands, includes "*hunting, fishing, swimming, pleasure boating, or navigation*" as public uses. MCL 324.32502 (emphasis added); see also, e.g., MCL 324.32503 & .32505.

*Obrecht,* 361 Mich at 412-413, quoting *Illinois Central,* 146 US at 455-456 (emphasis added). The Michigan Legislature has incorporated and codified that common-law standard and "due finding" requirement into Part 325 (Great Lakes Submerged Lands) of the Natural Resources and Environmental Protection Act, MCL 324.32501 *et seq.*[3]

### B.   The 1953 Easement Violated the Public Trust and Was Void From its Inception

The 1953 Easement violated the public trust doctrine from its inception because the State never made a finding that the Easement: (1) would improve navigation or another public trust interest; or (2) could be conveyed without impairment of the public trust. The Easement itself contains no such findings, and there is no contemporaneous document in which the State determined that the proposed Easement met either of the two exceptions. In fact, there is no indication whatsoever that the Conservation Commission determined that the conveyance of the Easement and the operation of the Straits Pipelines would improve public rights in navigation, fishing, or other uses protected by the public trust. Moreover, there is no evidence that the Commission determined that the Pipelines' operation could not adversely affect those rights.[4]

Also, contemporaneous approval of the construction of what is now Enbridge's Line 5 in Michigan by the Michigan Public Service Commission ("PSC") lacked any such public trust findings and determinations.[5]

Finally, the enactment of 1953 PA 10, the statute authorizing issuance of the Easement, does not evidence a finding that either of the public trust limitations would

---

[3] See, e.g., MCL 324.32502 (conveyance of property interests in submerged lands allowed "whenever it is determined by the department that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition"); MCL 324.32503(1) (requiring a "finding that the public trust in the waters will not be impaired or substantially affected" in order to "enter into agreements pertaining to waters over and the filling in of submerged patented lands, or to lease or deed unpatented lands"); MCL 324.32505(2) (requiring a "finding that the public trust will not be impaired or substantially injured" in order to "allow, by lease or agreement, the filling in of patented and unpatented submerged lands and allow permanent improvements and structures").

[4] The 1953 Easement lacks any mention of the two required findings and merely states the following: "*WHEREAS, the Conservation Commission is of the opinion that the proposed pipe line system will be of benefit to all of the people of the State of Michigan and in furtherance of the public welfare*" and "*WHEREAS, the Conservation Commission duly considered the application of Grantee and at its meeting held on the 13th day of February, A.D. 1953, approved the conveyance of an easement.*"

[5] PSC Opinion and Order for the 1953 Line 5 pipeline (March 31, 1953), https://www.michigan.gov/documents/deq/Appendix_A.3_493982_7.pdf.

be satisfied by the Straits Pipelines. That legislation merely authorized the Conservation Commission to grant easements for pipelines, electric lines and telegraph lines on certain state lands and lake bottomlands, subject to terms and conditions determined by the Commission. The statute did not find or determine that the 1953 Easement, as subsequently granted, would either benefit public trust uses or not impair such uses of the Great Lakes and the bottomlands.

In the absence of either of the due findings required under the public trust doctrine, the 1953 Easement was void from its inception.

### C. Current and Continued Use of the Straits Pipelines Violates the Public Trust

As noted above, public rights in navigable waters "are protected by a *high, solemn,* and *perpetual* trust, which it is the duty of the state to forever maintain." *Collins,* 237 Mich at 49 (emphasis added). The State did not surrender its trust authority and concurrent responsibilities when it granted the 1953 Easement to Enbridge's predecessor. "The state, as sovereign, cannot relinquish [its] duty to preserve public rights in the Great Lakes and their natural resources." *Glass,* 473 Mich at 679. A state's conveyance of property rights "to private parties leaves intact public rights in the lake and its submerged land. . . . Under the public trust doctrine, the sovereign never had the power to eliminate those rights, *so any subsequent conveyances . . . remain subject to those public rights." Id.* at 679-681 (emphasis added).

Under Michigan law, all conveyances of bottomlands and other public trust resources are encumbered by the public trust. *Nedtweg,* 237 Mich at 17. When the State conveys a property interest in Great Lakes bottomlands, "it necessarily conveys such property *subject to the public trust." Glass,* 473 Mich at 679. Even if initially valid, the 1953 Easement remains subject to the public trust and the State's continuing duty to protect the Great Lakes public trust resources. Indeed, the Easement itself broadly reserved the State's rights. 1953 Easement, Paragraph M ("All rights not specifically conveyed herein are reserved to the State of Michigan.").

As the United States Supreme Court held in *Illinois Central,* a grant of property rights in public trust resources "is necessarily revocable, and the exercise of the trust by which the property was held by the state can be resumed at any time." 146 US at 455. In that case, the State of Illinois subsequently determined that it should rescind its prior grant of lake bottomlands to a private entity and the Court upheld that action.

Recent events have made clear that continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect public trust uses of the Lakes from potential impairment or destruction. As outlined below, transporting millions of gallons of petroleum products each day through two 67-year old pipelines that lie exposed in the Straits below uniquely vulnerable and busy shipping lanes presents an extraordinary, unreasonable threat to public rights because of the very

real risk of further anchor strikes and other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits.

The Straits Pipelines are located where multiple lanes of heavy shipping activity converge and are oriented north-south, perpendicular to the direction of most commercial vessel traffic. Also, despite near-shore sections of the Straits Pipelines (those in waters less than 65 feet deep) being laid in trenches and covered with soil, most of each Pipeline was placed and remains on or above the State-owned lakebed, exposed in open water and with no covering shielding it from anchor strikes or other physical hazards.

In October 2017, Dynamic Risk Assessment Systems, Inc. ("Dynamic Risk"), an independent consulting firm working under a contract with the State of Michigan, issued the final report of its Alternatives Analysis for the Straits Pipelines ("Dynamic Risk Report") that included, among other things, an analysis of the risks associated with continued operation of the existing Pipelines. Dynamic Risk determined that the dominant threat of a rupture to the Pipelines is the inadvertent deployment of anchors from ships traveling through the Straits. The Report noted that inadvertent anchor strikes are known in the industry to be the principal threat to offshore pipelines. They are both "increas[ing] in frequency" and "not influenced by mitigation measures."[6]

According to the Dynamic Risk Report, the risk of a pipeline-anchor incident depends largely on four "vulnerability factors": (1) size of the pipeline; (2) water depth (relative to anchor chain length); (3) pipeline protection (depth of burial, use of armoring material); and (4) number and size distribution of ship crossings per unit of time. Dynamic Risk found that the Straits Pipelines score high on all four of these factors.[7]

Recent events confirm that the threat of damage to the Straits Pipelines from anchor strikes or impacts from other external objects is very real. In April 2018, a commercial tug and barge vessel inadvertently dropped and dragged an anchor across the lakebed at the Straits. The anchor severed or dragged several electric transmission cables located on the bottom of the Straits near the Pipelines. The anchor actually struck and dented the Pipelines at three locations, though neither Pipeline ruptured. Fortunately, those strikes to the Pipelines happened to occur at locations where the Pipelines rest on the lakebed rather than other areas where they are suspended above it and are particularly vulnerable to anchor hooking.

The 2018 anchor strike was not an isolated event. Most recently, in June 2020, Enbridge disclosed that both the east and west legs of the Straits Pipelines had been

---

[6] Dynamic Risk Report, p. 2-35, https://mipetroleumpipelines.com/document/alternatives-analysis-straits-pipeline-final-report.
[7] Id., pp. 2-36, 2-42 to -43.

hit by external objects, apparently cables or anchors deployed from vessels operating near the Pipelines, most likely in 2019. Those impacts damaged pipeline coatings and, at one location on the east Pipeline, severely damaged a pipeline support structure previously installed by Enbridge. Tellingly, none of the measures implemented by Enbridge since the April 2018 incident to mitigate the risk of anchor strikes was sufficient to prevent or even contemporaneously detect the recently disclosed impacts to the Pipelines. And while the specific cause(s) of the impacts has not yet been determined, Enbridge's own reports on these events conclude that four of the five vessels potentially responsible for the impacts were operated by Enbridge's own contractors.[8]

According to Dynamic Risk, even apart from their unique vulnerability to anchor strikes, operation of the Straits Pipelines presents inherent risks of environmental harm. Dynamic Risk sought to identify what it classified as the "Principal Threats," i.e., "Threats for which an evaluation of susceptibility attributes indicates *a significant vulnerability*, and that have the potential to provide the most significant contributions to overall failure probability."[9] The threats considered included "incorrect operations," which were described as follows:

> The threats to transmission pipeline integrity from incorrect operations include, but are not necessarily limited to accidental over-pressurization, exercising inadequate or improper corrosion control measures, and improperly maintaining, repairing, or calibrating piping, fittings, or equipment.[10]

Dynamic Risk concluded that notwithstanding the various operational and procedural changes Enbridge adopted after the Marshall, Michigan Line 6B failure, "incorrect operations" remain a Principal Threat for the Straits Pipelines.[11]

The Straits of Mackinac are at the heart of the Great Lakes, a unique ecosystem of enormous public importance. As noted in "Independent Risk Analysis for the Straits Pipelines," Michigan Technological University (September 2018), a report commissioned by the State and carried out by a multi-disciplinary team of experts ("Michigan Tech Report"):

> The Straits of Mackinac hydraulically link Lakes Michigan and Huron. . . and are wide and deep enough . . . to permit the same average water level in both water bodies, technically making them two lobes of a single large lake. The combined Michigan–Huron system forms the largest lake in the world by surface area and the fourth largest by volume, containing nearly 8% of the world's surface freshwater. The Straits of

---

[8] Enbridge Report, Investigation of Disturbances to Line 5 in the Straits of Mackinac Discovered in May and June of 2020 (Updated August 21, 2020), p. 8.
[9] Dynamic Risk Report, p. 2-11 (emphasis added).
[10] *Id.*, p. 2-37.
[11] *Id.*, p. 2-47.

Mackinac serve as a hub for recreation, tourism, commercial shipping, as well as commercial, sport and subsistence [including tribal] fishing . . . .[12]

An oil spill at the Straits threatens a wide range of highly valuable resources:

The waters and shoreline areas of Lake Michigan and Lake Huron including areas surrounding and adjacent to the Straits of Mackinac contain abundant natural resources, including fish, wildlife, beaches, coastal sand dunes, coastal wetlands, marshes, limestone cobble shorelines, and aquatic and terrestrial plants, many of which are of considerable ecological and economic value. These areas include stretches of diverse and undisturbed Great Lakes shorelines that provide habitat for many plant and animal species.[13]

Among other complicating factors, water currents in the Straits are unusually strong, complex, and variable:

Water currents in the Straits of Mackinac can reach up to 1 [meter per second] and can also reverse direction every 2-3 days flowing either easterly into Lake Huron or westerly towards Lake Michigan. . . . Flow volumes through the Straits can reach 80,000 [cubic meters per second] and thus play essential roles in navigation and shipping in this region, the transport of nutrients, sediments and contaminants between Lakes Michigan and Huron, and also the ecology and biodiversity of this region.[14]

Consequently, oil spilled into the Straits could be transported into either Lake, and depending upon the season and weather conditions, could impact up to hundreds of miles of Great Lakes shoreline.[15]

Crude oil contains toxic compounds that would cause both short- and long-term harm to biota, habitat, and ecological food webs.[16] Numerous species of fish, especially in their early life stages, as well as their spawning habitats and their supporting food chains, are also at risk from an oil spill.[17] Viewed as a whole, the ecological impacts would be both widespread and persistent.[18]

---

[12]Michigan Tech Report, p. 26, https://mipetroleumpipelines.com/files/document/pdf/Straits_Independent_Risk_Analysis_Final.pdf.
[13] *Id.*, p. 165.
[14] *Id.*, p. 56.
[15] *Id.*, pp. 68-69.
[16] *Id.*, pp. 166-169, 176, 181-185.
[17] *Id.*, pp. 192-199.
[18] *Id.*, pp. 213-214.

And "[b]ecause of the unique and complex environment of the Great Lakes and the Straits area," it is uncertain how effectively and at what cost the affected resources could be restored.[19] The Michigan Tech Report also estimated several types of economic and natural resource damages that would likely result from a worst-case oil spill from the Straits Pipelines.[20] Among other findings, the Report estimated large damages to recreational fishing, recreational boating, commercial fishing, and commercial navigation,[21] all activities within the rights subject to the public trust.

The Great Lakes and the Straits of Mackinac also have special ecological, cultural and economic significance for the tribes of Michigan, including, but not limited to, the tribes that retain reserved hunting, fishing and gathering rights in the lands and waters ceded to the United States under the 1836 Treaty of Washington.[22] An oil spill or release from the Straits Pipelines would have severe, adverse impacts for tribal communities. The tribes have fundamental interests in the preservation of clean water, fish and habitat at the Straits. Many tribal members rely on treaty-protected rights of commercial and subsistence fishing in the Straits and other Great Lakes waters that could be impacted by an oil spill or release.

Enbridge's operation of the Straits Pipelines presents a substantial, inherent and unreasonable risk of an oil spill and such a spill would have grave ecological and economic consequences, severely impairing public rights in the Great Lakes and their public trust resources. While Enbridge has proposed to replace the existing Pipelines with a new pipeline to be constructed in a tunnel beneath the lakebed, that project is likely years away from completion at best. For all these reasons, the Governor and the Director of the Department of Natural Resources find that Enbridge's use of the Straits Pipelines is contrary to and in violation of the public trust.

### D. The December 19, 2018 Third Agreement Between the State of Michigan and Enbridge Does Not Preclude Revocation of the 1953 Easement

On December 19, 2018, the then Governor of Michigan, the then Director of the DNR, the then Director of the Department of Environmental Quality, and representatives of Enbridge signed a document entitled "Third Agreement Between the State of Michigan, Michigan Department of Environmental Quality, and Michigan Department of Natural Resources and Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P." ("Third Agreement") relating to the Straits Pipelines. The Third Agreement provided

---

[19] *Id.,* pp. 261-263.

[20] *Id.,* pp. 272-318.

[21] *Id.,* pp. 285-294.

[22] Those tribes are the Bay Mills Indian Community, the Grand Traverse Band of Ottawa and Chippewa Indians, the Little River Band of Ottawa Indians, the Little Traverse Bay Bands of Odawa Indians, and the Sault Ste. Marie Tribe of Chippewa Indians. The exercise of those rights in the Great Lakes is covered by the 2000 Consent Decree in *United States v Michigan* to which the State of Michigan is a party.

that, subject to specified conditions, Enbridge could continue to operate the existing Straits Pipelines pending completion of a tunnel beneath the Straits and of a Straits Line 5 Replacement Segment to be constructed and operated within the proposed tunnel.

Specifically, Article 4.1 of the Third Agreement states:

4.1 The State agrees that Enbridge may continue to operate the Dual Pipelines, which allow for the functional use of the current Line 5 in Michigan, until the Tunnel is completed, and the Straits Line 5 Replacement segment is placed in service within the Tunnel, subject to Enbridge's continued compliance with all of the following:

(a) The Second Agreement;

(b) The Tunnel Agreement;

(c) This Third Agreement;

(d) *The 1953 Easement; and*

(e) *All other applicable laws,* including those listed in Section V of the Second Agreement. (Emphasis added.)

Notwithstanding the Third Agreement, the 1953 Easement is subject to revocation under the public trust doctrine, and the Third Agreement's stated conditional right to continue to operate the Straits Pipelines does not preclude that revocation, for at least two reasons. First, as detailed below in Section II of this Notice, Enbridge incurably has violated and continues to violate the 1953 Easement. Second, as set forth above, the public trust doctrine is among the laws that apply to the existing Straits Pipelines and Enbridge's continued operation of the Pipelines violates the public trust.

Section 4.2 of the Third Agreement states in part:

4.2 Provided that Enbridge complies with Section 4.1 above, the State agrees that:

***

(c) The replacement of the Dual Pipelines with the Straits Line 5 Replacement Segment in the Tunnel is expected to eliminate the risk of a potential release from Line 5 at the Straits.

(d) In entering into this Third Agreement, and thereby authorizing the Dual Pipelines to continue to operate until such time that the Straits Line 5 Replacement Segment is placed into service within the Tunnel, the State has acted in accordance with and in furtherance of the public's interest in the protection of waters,

10

waterways, or bottomlands held in public trust by the State of Michigan.

The language of Section 4.2 quoted above does not and cannot preclude the revocation of the 1953 Easement under the public trust doctrine for at least the following reasons. To begin, it is expressly conditioned on Enbridge's compliance with Section 4.1; as discussed, Enbridge is not, and has not been, in compliance with that provision. Furthermore, nothing in Section 4.2 provides a "due finding" that Enbridge's continued use of public trust bottomlands and waters to operate the existing Straits Pipelines would either enhance the public trust or not impair the public trust uses of waters and lands at the Straits. Section 4.2(d) does not itself supply it. Nor does the related assertion in Section 4.2(c) that the eventual replacement of the existing Pipelines with a new pipeline in the proposed tunnel is expected to eliminate the risk of a potential release from Line 5 at the Straits. It simply does not follow from that assertion that continuing to operate the existing Pipelines until they are replaced would somehow enhance the public trust or not impair it. And nothing else in the Third Agreement suggests, let alone embodies, a finding that continued operation of the Pipelines now, before a tunnel is completed, mitigates the risk of releases from them. Nor, for that matter, could the requisite due finding have been made when the Third Agreement was signed in December 2018, given the substantial, inherent and unreasonable risk of grave harm presented by the continued operation of the Straits Pipelines. See Section I.C, *supra*.

Finally, even if the Third Agreement contained a lawful finding by the State officials who signed it in 2018 that Enbridge's continued operation of the Straits Pipelines is consistent with the public trust—which it did not—any such finding is not permanently binding on the State and those former State officials' successors, who retain a solemn, perpetual and irrevocable duty to protect the public trust. Accordingly, the Third Agreement does not preclude the revocation of the 1953 Easement for the reasons stated in this Notice.

## II.   TERMINATION OF EASEMENT FOR VIOLATION AND BREACH BY ENBRIDGE

### A.   Easement Terms and Conditions

#### 1.   Standard of Due Care

Paragraph A of the 1953 Easement provides: "Grantee [originally Lakehead Pipe Line Company, Inc., now Enbridge] in its exercise of rights under this easement, including its designing, constructing, testing, operating, maintaining, and, in the event of termination of this easement, its abandoning of said pipe lines, shall follow the usual, necessary and proper procedures for the type of operation involved, and *at all times shall exercise the due care of a reasonably prudent person* for the safety and welfare of all persons and of all public and private property . . . ." (Emphasis added.)

The standard of due care under the Easement is that of a reasonably prudent person. The Merriam-Webster Dictionary's definition of "prudence" includes "skill and good judgment in the use of resources" and "caution or circumspection as to danger or risk."[23]

## 2. Compliance Obligations

Paragraph A of the Easement further states: "Grantee shall comply with the following minimum specifications, conditions and requirements, unless compliance therewith is waived or the specifications or conditions modified in writing by Grantor . . . ."

Among other requirements, the Easement includes specific conditions obligating the Grantee to: (1) maintain a maximum span or length of unsupported pipe not to exceed 75 feet; (2) protect all pipe with a specified coating and wrap; and (3) maintain a minimum curvature of any section of pipe of not less than 2,050 feet radius.[24]

## 3. Easement Termination

Paragraph C.(1) of the Easement provides that the Easement may be terminated by Grantor "[i]f, after being notified in writing by Grantor of any specified breach of the terms and conditions of this easement, Grantee shall fail to correct said breach within ninety (90) days, or, having commenced remedial action within such ninety (90) day period, such later time as it is reasonably possible for the Grantee to correct said breach by appropriate action and the exercise of due diligence in the correction thereof . . . ."

The stated timeframes for correcting a breach of the Easement presume that the identified breach or violation is "correctable." As more fully explained below, Enbridge has failed for decades to meet its compliance and due-care obligations under the Easement, and it remains in violation of those obligations. There is nothing Enbridge can do to change its past behavior and callous disregard for its duties under the Easement, and its breaches of the Easement's terms and conditions cannot be corrected or otherwise cured.

## B. Enbridge Has Violated Conditions of the Easement and the Easement's Standard of Due Care

Enbridge has breached or violated the standard of due care and its obligations to comply with the conditions of the Easement in several fundamental and incurable ways.

---

[23] https://www.merriam-webster.com/dictionary/prudence.
[24] 1953 Easement, Paragraphs A.(10), (9), and (4).

### 1.    Unsupported Pipeline Spans or Lengths

Paragraph A.(10) of the Easement requires that each Pipeline must be physically supported (i.e., either rest on the lakebed or be supported by some other structure/device) at least every 75 feet. This prohibition of unsupported pipeline "spans" longer than 75 feet serves to protect the structural integrity of the Pipelines from stresses and vibrations that may be caused by the strong currents surrounding the Pipelines. Those same currents can erode the lakebed on which portions of the Pipelines rest, creating excessive spans.

For virtually the entire time the Easement has been in place, Enbridge has ignored the 75' span requirement.[25] Documents provided by Enbridge confirm that since at least 1963 and continuing through 2012, Enbridge has known that multiple unsupported pipe spans have exceeded 75 feet but has failed to take remedial action to address the non-compliant spans:

- 1963: 17 spans detected – action taken on 0 spans
- 1972: 7 spans detected – action taken on 0 spans
- 1975: 13 spans detected – action taken on 3 spans
- 1982: 7 spans detected – action taken on 0 spans
- 1987: 7 spans detected – action taken on 7 spans
- 1992: 17 spans detected – action taken on 6 spans (4 spans exceeded 200': 216'; 221'; 292'; 359')
- 1997: 45 spans detected – action taken on 0 spans (4 spans exceeded 200': 278'; 311'; 286'; 421')
- 2001: 50 spans detected – action taken on 8 spans
- 2003: 62 spans detected – action taken on 16 spans
- 2004: 75 spans detected – action taken on 16 spans
- 2005: 40 spans detected – action taken on 14 spans
- 2006: 64 spans detected – action taken on 12 spans
- 2007: 64 spans detected – action taken on 0 spans
- 2010: 62 spans detected – action taken on 7 spans
- 2012: 33 spans detected – action taken on 17 spans[26]

Spreadsheet data on pipe spans for Calendar Years 2005 through 2012 provided by Enbridge further confirm that Enbridge failed to take timely corrective action to address span lengths known to exceed 75 feet for significant periods of time,

---

[25] In correspondence to then Attorney General Bill Schuette and then DEQ Director Dan Wyant, dated June 27, 2014, Enbridge refers to a Span Management Program employed by the company *since construction of the dual pipelines* in the Straits of Mackinac. Despite this reference, Enbridge failed to produce any such document(s) or proof of the program's existence and later, through legal counsel, acknowledged that *"Enbridge is not aware of a single document that fits this description."* Correspondence from William Hassler to Steven Chester, dated May 8, 2020.

[26] Summary Information and Tables provided by Enbridge Counsel, June 22, 2020; and June 27, 2014 Correspondence to Bill Schuette and Dan Wyant.

including data indicating delays of up to 3 to 5 years to repair 17 noncompliant spans, 7 years to repair 11 noncompliant spans, and 9 years to repair 17 noncompliant spans.[27]

Several documents submitted by Enbridge suggest that at some point in time the company chose to ignore the Easement's 75' span requirement and replace it with a 140' requirement for taking corrective action on unsupported pipe spans. These include a 2003 Onyx ROV Report that indicates Onyx detected 61 pipe spans exceeding 75' and yet only 17 spans exceeding 140' were repaired, leaving 44 pipe spans exceeding 75' unrepaired. Two other documents referring to a 140' span length are the 2004 Kenny Report and the 2016 Kiefner and Associates Report.[28]

Enbridge has failed to produce any records or evidence that the 75' span length requirement of the Easement was ever waived or modified in writing by the State of Michigan. Enbridge's apparent unilateral adoption of a 140' pipe span criterion in lieu of the 75' Easement condition was itself a violation of the Easement. For virtually the entire life of the Easement, Enbridge disregarded its obligation to comply with the 75' pipe span requirement, and even failed to take corrective action when pipe spans exceeded 200' in length (e.g., see above, unsupported spans of 216' to 421' in length).

For decades, Enbridge violated and neglected its obligations under Paragraph A.(10) of the Easement, and its concomitant duties to inspect, timely repair, and disclose exceedances of pipe spans to the State of Michigan. In doing so, Enbridge exhibited an astonishing lack of candor and indifference to its due-care obligations under the Easement.

## 2.    Pipeline Coatings

Paragraph A.(9) of the Easement requires Enbridge to maintain a multi-layer coating on the Pipelines. This protective coating is intended to prevent the steel from being exposed to environmental factors that could cause corrosion or other physical damage.

Since at least 2003, and continuing until 2014, Enbridge was on notice that heavy biota (i.e., mussels) accumulation on the Straits Pipelines made it impossible to do a detailed analysis of the integrity of the coating/wrap for the Pipelines over much of their length. Despite these repeated warnings, and notwithstanding its affirmative obligation under the Easement to ensure the integrity of the pipeline coating/wrap, documents submitted by Enbridge show it made little to no effort to undertake a more detailed study of the condition of the pipeline coating/wrap until 2016-2017 – a gap of approximately 13-14 years from notice to response.

---

[27] Recent Enbridge Document Submittals; June 27, 2014 Correspondence to Bill Schuette and Dan Wyant; and November 19, 2014 Correspondence to Bill Schuette and Dan Wyant.
[28] Onyx Inspection Survey Report (2003); JP Kenney Survey of Spans Report (2004); and Kiefner and Associates Report (October 12, 2016).

The 2003 Onyx ROV Report stated that "[t]he focus of this inspection was to positively identify existing conditions, which could potentially compromise the safety of the line. Examples of these conditions could include *exposed* or unsupported *areas of pipe, severely degraded or missing coating*, or damage caused by impact. . . . The exposed portion of the pipeline is heavily covered in zebra mussel growth, *making a detailed analysis* of the coating and actual pipe condition *impossible*." (Emphasis added.)[29]

The very same notice and warning were repeated in the 2004 Onyx ROV Report, the 2005 Onyx ROV Report, the 2007 Veolia ROV Report, the 2011 Veolia ROV Report, and the 2012 Veolia ROV Report.

In 2014, Ballard Marine Construction completed an ROV and diver inspection of the Straits Pipelines which stated that *"a few instance* [sic] *of a small amount of coating delamination was observed*."[30] Several years later, in a 2016 Inspection Report dated January 3, 2017, Ballard Marine once again found *"a few instances of a small amount of coating delamination"* and stated this information was similar to past findings including data obtained during the 2014 inspection.[31]

Despite such notice/warnings, Enbridge did not undertake a thorough investigation of the pipeline coating/wrap until it implemented a May 2017 Biota Work Plan required under a federal Consent Decree arising out of the Marshall, Michigan Line 6B failure. At last, after repeated warnings from Onyx (2003, 2004, and 2005) and Veolia (2007, 2011, and 2012), Enbridge committed to evaluating the effect of the biota (mussels) that covered much of the Straits Pipelines.

Pursuant to the Biota Work Plan, Enbridge would also investigate so-called "holidays" (i.e., gaps exposing bare metal) in the external pipeline coating. In March 2017, in response to questions raised by the Michigan Pipeline Safety Advisory Board, Enbridge publicly represented to the Board, whose members included State agency representatives, that no gaps existed on the Pipelines and there was no need for any repairs.[32] Yet in August 2017, Enbridge informed State officials that there were three small areas of bare metal exposed, and later was forced to acknowledge both that it had known of these coating gaps since 2014 and that some were apparently caused by Enbridge during the installation of pipe supports.[33] Subsequent inspections showed dozens more areas of coating damage.[34]

---

[29] 2003 Onyx Inspection Report, pp. 1 and 8.
[30] 2014 Ballard Report, p. 9 (emphasis added).
[31] 2017 Ballard Report, p. 9 (emphasis added).
[32] https://www.mlive.com/news/2017/03/enbridge_line_5_delamination.html.
[33] https://www.freep.com/story/news/local/michigan/2017/10/27/enbridge-straits-pipeline-coating-michigan/807452001/.
[34] https://www.freep.com/story/news/local/michigan/2017/11/14/enbridge-discloses-dozens-more-gaps-straits-mackinac-pipelines-protective-coating/863490001/.

Enbridge's course of conduct, by failing to undertake a detailed examination of the condition of the pipeline coating/wrap despite being on notice of the need to do so for 13-14 years, delaying disclosure to the State of several areas of bare metal for three years after initially denying such conditions existed, and only belatedly undertaking further inspections and repairs when demanded by the State, evidences a pattern of indifference to, and violation of, the conditions of Paragraph A.(9) of the Easement and its obligation to exercise due care.

### 3.    Pipeline Curvature

Paragraph A.(4) of the Easement includes a condition that "[t]he minimum curvature of any section of pipe shall be no less than two thousand and fifty (2,050) feet radius." This condition relating to pipeline curvature limits stresses placed on the Pipelines.

The DNR requested documents and information relating in any way to Enbridge's efforts to ensure compliance with this condition, and Enbridge provided several GEOPIG Geometry Inspection Reports beginning in 2005.[35] The GEOPIG Reports do not refer to the pipe's radius curvature but rather record the diameter bend of the pipe. A diameter bend of 1230D feet is equivalent to a minimum curvature of 2,050 feet radius.

Any diameter bend between 0D and 1230D would violate the Easement standard. The GEOPIG Reports, however, only provide data on bends less than 100D. Even with this limitation, the GEOPIG Reports identify 20 to 25 exceedances of the Easement's minimum pipe curvature requirement.[36] To the best of the DNR's knowledge, Enbridge has never documented to the State that it took any measures to ensure compliance with this Easement condition when the Pipelines were installed, or reported these exceedances to the State when Enbridge learned of them. Nor are there any records or evidence that the 2,050 feet radius standard of the Easement was ever waived or modified in writing by the State of Michigan.

Enbridge ignored the pipeline curvature mandate of Paragraph A.(4) of the Easement, perhaps from the very beginning with installation of the Straits Pipelines. Noncompliance with the curvature condition continues today and remains uncorrected. This is contrary to the standard of due care imposed by the Easement and represents an ongoing, incurable violation of one of the Easement's fundamental terms and conditions.

### 4.    Unreasonable Risks of Continued Operation of the Straits Pipelines

As discussed in Section I.C above, the continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect the public trust

---

[35] Enbridge Energy Limited Partnership, GEOPIG Geometry Inspection Reports (2005, 2016, 2018, and 2019).
[36] *Id.*

resources of the Great Lakes from the risk of additional anchor strikes or other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects of an oil spill in the Straits. These very same risks and concerns are contrary to and incompatible with Enbridge's obligation under the 1953 Easement to exercise the due care of a reasonably prudent person.

The threat of damage to the Straits Pipelines from anchor strikes and impacts by other external objects remains a clear and present danger. In its Report, Dynamic Risk identified anchor strikes as a "Principal Threat" to the Pipelines, and emphasized that these events are "increas[ing] in frequency" and "not influenced by mitigation measures."[37] As discussed in Section I.C above, in April 2018, a commercial tug and barge vessel inadvertently dropped and dragged an anchor which struck and dented the Straits Pipelines at three locations. But this is not the most recent occurrence of a potential anchor strike causing damage to the Straits Pipelines.

As also discussed in Section I.C above, sometime in 2019, the east and west legs of the Pipelines were hit by external objects (cables or anchors) deployed from vessels operating near the Pipelines. The impacts resulted in severe damage to a pipeline support structure previously installed by Enbridge. The company did not discover the substantial damage done to the support structure until June 2020, and **none** of the detection, mitigation and protective measures employed by Enbridge since the April 2018 incident were effective in preventing or even timely detecting the 2019 impacts and the damage to the Pipelines. Moreover, as discussed above, according to information provided by Enbridge, four of the five vessels that were potentially responsible for the damage disclosed in 2020 were operated by Enbridge contractors.

In the face of the documented and recently demonstrated vulnerability of the Straits Pipelines to external impacts from anchors and other objects, and the complete failure of safety systems intended to mitigate such impacts, as well as the inherent threats to pipeline integrity from incorrect operations and procedural errors, Enbridge's continued operation of the Straits Pipelines is contrary to and incompatible with its affirmative duty under the Easement to "exercise the due care of a reasonably prudent person for the safety and welfare of all persons and of all private and public property." Under these circumstances, continued operation of the Straits Pipelines presents a substantial, inherent and unacceptable risk of a catastrophic oil spill with grave ecological and economic consequences. *Accord* Michigan Tech Report, discussed *supra*, Section I.C.

C.   **The December 19, 2018 Third Agreement Between Enbridge and the State of Michigan Does Not Preclude Termination of the 1953 Easement**

As noted in Section I.D above, the continued operation of the existing Straits Pipelines under the terms of the Third Agreement is expressly conditioned upon

---

[37] Dynamic Risk Report, pp. 2-35, 2-42 to -43.

Enbridge's compliance with the 1953 Easement. And, as outlined above, Enbridge incurably has violated and continues to violate the Easement.

Section 4.2 of the Agreement addresses compliance with certain terms and conditions of the Easement discussed in this Notice:

> 4.2 Provided that Enbridge complies with Section 4.1 above, the State agrees that:
>
> ***
>
> (b) Enbridge's compliance with *Article 5* below demonstrates compliance *with the specified conditions* of the 1953 Easement.
>
> ***
>
> (e) *Based on currently available information*, the State is not aware of any violation of the 1953 Easement that would not be addressed and cured by compliance with Section 4.1 and Article 5 of this Agreement. (Emphasis added.)

These provisions do not preclude termination of the Easement pursuant to this Notice for at least the following reasons. First, as noted above, Section 4.2 is conditioned on Enbridge's compliance with Section 4.1 of the Third Agreement, and Enbridge is not, and has not been, in compliance with that provision. Second, neither Section 4.2 nor Article 5 addresses in any way two of the terms and conditions of the Easement that form the basis of this Notice of Termination: the obligation to exercise due care and the condition on pipeline curvature in Paragraph A.(4). Third, the statement in Section 4.2(e)—that the State is not aware of any violation of the 1953 Easement that would not be addressed and cured by compliance with Article 5— expressly provided that it was "based on currently available information," i.e., information considered as of December 2018. Here, as noted above, beginning in 2019, the State undertook a systematic investigation and review of Enbridge's compliance with the Easement. It was through that subsequent review that the State has now identified the full scope of repeated past and continuing violations of the Easement that form the grounds for this Notice of Termination.

Article 5 of the Third Agreement, which is referenced in Section 4.2, addresses two of the Easement conditions at issue here: Paragraph A.(9) concerning pipeline coatings (addressed in Section 5.2 of the Third Agreement) and Paragraph A.(10) concerning unsupported pipe spans (addressed in Section 5.3 of the Third Agreement). But the language of Sections 5.2 and 5.3 is limited and qualified in two important ways. First, as in Section 4.2(e), the statements in these provisions of Article 5 regarding compliance with the Easement are expressly qualified by reference to "currently available information":

> The State agrees, *based upon currently available information*, that Enbridge's compliance with the requirements under this Section 5.2

18

satisfies the requirements of Paragraph A (9) of the 1953 Easement. (Section 5.2(d) (emphasis added).)

\*\*\*

The State agrees, *based upon currently available information,* that Enbridge's compliance with the requirements under this Section 5.3 satisfies the requirements of Paragraph A (10) of the 1953 Easement. (Section 5.3(d) (emphasis added).)

Again, as noted above, the full scope of violations of Paragraphs A.(9) and A.(10) of the Easement discussed in this Notice were identified through the State's recent review of Easement compliance. Moreover, the terms of Sections 5.2 and 5.3 were focused solely on actions to be taken prospectively regarding then current or potential future issues with pipeline coatings and unsupported pipe spans. They do not consider or address the longstanding pattern of Enbridge's violations of Paragraphs A.(9) and A.(10). Accordingly, the Third Agreement does not preclude the termination of the Easement for the reasons stated in this Notice.

## Conclusion

By this Notice, the State of Michigan is formally notifying Enbridge that the State is revoking and terminating the 1953 Easement. The Easement is being revoked for violation of the public trust doctrine, and is being terminated based on Enbridge's longstanding, persistent, and incurable violations of the Easement's conditions and standard of due care.

ACCORDINGLY, the State of Michigan, for the legal and factual reasons stated herein:

A. Revokes the 1953 Easement, effective 180 days after the date of this Notice to provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met.

B. Terminates the 1953 Easement, effective 180 days after the date of this Notice to provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met.

C. Requires Enbridge to cease operation of the Straits Pipelines 180 days after the date of this Notice.

D. Requires Enbridge to permanently decommission the Straits Pipelines in accordance with applicable law and plans approved by the State of Michigan.


Gretchen Whitmer
Governor


Daniel Eichinger
Director, Department of
Natural Resources


Date: 11/13/20


Date: 11/13/20


20

# Exhibit 1

# 1953 Easement

123

STRAITS OF MACKINAC PIPE LINE EASEMENT

CONSERVATION COMMISSION OF THE STATE OF MICHIGAN

TO

LAKEHEAD PIPE LINE COMPANY, INC.


THIS EASEMENT, executed this twenty-third day of April, A. D. 1953, by the State of Michigan by the Conservation Commission, by Wayland Osgood, Deputy Director, acting under and pursuant to a resolution adopted by the Conservation Commission at its meeting held on February 13, 1953, and by virtue of the authority conferred by Act No. 10, P. A. 1953, hereinafter referred to as Grantor, to Lakehead Pipe Line Company, Inc., a Delaware corporation, of 510 22nd Avenue East, Superior, Wisconsin, hereinafter referred to as Grantee,

W I T N E S S E T H:

WHEREAS, application has been made by Grantee for an easement authorizing it to construct, lay and maintain pipe lines over, through, under and upon certain lake bottom lands belonging to the State of Michigan, and under the jurisdiction of the Department of Conservation, located in the Straits of Mackinac, Michigan, for the purpose of transporting petroleum and other products; and

WHEREAS, the Conservation Commission is of the opinion that the proposed pipe line system will be of benefit to all of the people of the State of Michigan and in furtherance of the public welfare; and

WHEREAS, the Conservation Commission duly considered the application of Grantee and at its meeting held on the 13th day of February, A. D. 1953, approved the conveyance of an easement.

124

NOW, THEREFORE, for and in consideration of the sum of Two Thousand Four Hundred Fifty Dollars ($2,450.00), the receipt of which is hereby acknowledged, and for and in consideration of the undertakings of Grantee and subject to the terms and conditions set forth herein, Grantor hereby conveys and quit claims, without warranty express or implied, to Grantee an easement to construct, lay, maintain, use and operate two (2) pipe lines, one to be located within each of the two parcels of bottom lands hereinafter described, and each to consist of twenty inch (20") O D pipe, together with anchors and other necessary appurtenances and fixtures, for the purpose of transporting any material or substance which can be conveyed through a pipe line, over, through, under and upon the portion of the bottom lands of the Straits of Mackinac in the State of Michigan, together with the right to enter upon said bottom lands, described as follows:

> All bottom lands of the Straits of Mackinac, in the State of Michigan, lying within an area of fifty (50) feet on each side of the following two center lines:
>
> (1) <u>Easterly Center Line</u>: Beginning at a point on the northerly shore line of the Straits of Mackinac on a bearing of South twenty-four degrees, no minutes and thirty-six seconds East (S 24° 00' 36" E) and distant one thousand seven hundred and twelve and eight-tenths feet (1,712.8') from United States Lake Survey Triangulation Station "Green" (United States Lake Survey, Latitude 45° 50' 00", Longitude 84° 44' 58"), said point of beginning being the intersection of the center line of a twenty inch (20") pipe line and the said northerly shore line; thence, on a bearing of South fourteen degrees thirty-seven minutes and fourteen seconds West (S 14° 37' 14" W) a distance of nineteen thousand one hundred and forty-six and no tenths feet (19,146.0') to a point on the southerly shore line of the Straits of Mackinac which point is the intersection of the said center line of the twenty inch (20") pipe line and the said southerly shore line; and is distant seven hundred and seventy-four and seven tenths feet (774.7') and on a bearing of South thirty-six degrees, eighteen minutes and forty-five seconds West (S 36° 18' 45" W) from United States Lake Survey Triangulation Station "A. Mackinac West Base" (United States

-2-



Lake Survey, Latitude 45° 47' 14", Longitude 84°
46' 22").

(2) <u>Westerly Center Line</u>:  Beginning at a point on the
northerly shore line of the Straits of Mackinac on a
bearing of South forty-nine degrees, twenty-five minutes
and forty-seven seconds East (S 49° 25' 47" E) and dis-
tant two thousand six hundred and thirty-four and nine
tenths feet (2,634.9') from United States Triangulation
Station "Green" (United States Lake Survey, Latitude
45° 50' 00", Longitude 84° 44' 58") said point of be-
ginning being the intersection of the center line of a
twenty inch (20") pipe line and the said northerly shore
line; thence on a bearing of South fourteen degrees,
thirty-seven minutes and fourteen seconds West (S 14°
37' 14" W), a distance of nineteen thousand four hundred
and sixty-five and no tenths feet (19,465.0') to a point
on the southerly shore line of the Straits of Mackinac
which point is the intersection of the said center line
of the twenty inch (20") pipe line and the said southerly
shore line and is distant one thousand no hundred and
thirty-six and four tenths feet (1,036.4') on a bearing
of South sixty-three degrees, twenty minutes and fifty-
four seconds East (S 63° 20' 54" E) from United States
Lake Survey Triangulation Station "A. Mackinac West
Base" (United States Lake Survey, Latitude 45° 47' 14",
Longitude 84° 46' 22").

TO HAVE AND TO HOLD the said easement unto said Grantee, its
successors and assigns, subject to the terms and conditions herein set
forth, until terminated as hereinafter provided.

This easement is granted subject to the following terms and
conditions:

A.  Grantee in its exercise of rights under this easement,
including its designing, constructing, testing, operating,
maintaining, and, in the event of the termination of this
easement, its abandoning of said pipe lines, shall follow
the usual, necessary and proper procedures for the type of
operation involved, and at all times shall exercise the due
care of a reasonably prudent person for the safety and welfare

126

of all persons and of all public and private property,
shall comply with all laws of the State of Michigan and
of the Federal Government, unless Grantee shall be con-
testing the same in good faith by appropriate proceedings,
and, in addition, Grantee shall comply with the following
minimum specifications, conditions and requirements, unless
compliance therewith is waived or the specifications or
conditions modified in writing by Grantor:

(1)  All pipe line laid in water up to fifty
(50) feet in depth shall be laid in a ditch
with not less than fifteen (15) feet of cover.
The cover shall taper off to zero (0) feet at
an approximate depth of sixty-five (65) feet.
Should it be discovered that the bottom material
is hard rock, the ditch may be of lesser depth,
but still deep enough to protect the pipe lines
against ice and anchor damage.

(2)  Minimum testing specifications of the twenty
inch (20") OD pipe lines shall be not less than
the following:

Shop Test----------1,700 pounds per square inch gauge
Assembly Test------1,500 pounds per square inch gauge
Installation Test--1,200 pounds per square inch gauge
Operating Pressure- 600 pounds per square inch gauge

(3)  All welded joints shall be tested by X-Ray.

-4-



(4)  The minimum curvature of any section of pipe shall be no less than two thousand and fifty (2,050) feet radius.

(5)  Automatic gas-operated shut-off valves shall be installed and maintained on the north end of each line.

(6)  Automatic check valves shall be installed and maintained on the south end of each line.

(7)  The empty pipe shall have a negative buoyancy of thirty (30) or more pounds per linear foot.

(8)  Cathodic protection shall be installed to prevent deterioration of pipe.

(9)  All pipe shall be protected by asphalt primer coat, by inner wrap and outer wrap composed of glass fiber fabric material and one inch by four inch (1" x 4") slats, prior to installation.

(10)  The maximum span or length of pipe unsupported shall not exceed seventy-five (75) feet.

(11)  The pipe weight shall not be less than one hundred sixty (160) pounds per linear foot.

(12)  The maximum carbon content of the steel, from which the pipe is manufactured, shall not be in excess of .247 per cent.

128

(13) In locations where fill is used, the top of the fill shall be no less than fifty (50) feet wide.

(14) In respect to other specifications, the line shall be constructed in conformance with the detailed plans and specifications heretofore filed by Grantee with Lands Division, Department of Conservation of the State of Michigan.

B.  Grantee shall give timely notice to the Grantor in writing:

(1) Of the time and place for the commencement of construction over, through, under or upon the bottom lands covered by this easement, said notice to be given at least five (5) days in advance thereof:

(2) Of compliance with any and all requirements of the United States Coast Guard for marking the location of said pipe lines;

(3) Of the filling of said pipe lines with oil or any other substance being transported commerially;

(4) Of any breaks or leaks discovered by Grantee in said pipe lines, said notice to be given by telephone promptly upon discovery and thereafter confirmed by registered mail;

129

(5)  Of the completion of any repairs of said
pipe lines, and time of testing thereof, said
notice to be given in sufficient time to per-
mit Grantor's authorized representatives to be
present at the inspection and testing of the
pipe lines after said repairs; and

(6)  Of any plan or intention of Grantee to
abandon said pipe lines, said notice to be
given at least sixty (60) days prior to commence-
ment of abandonment operations.

C.  The easement herein conveyed may be terminated by
Grantor:

(1)  If, after being  notified in writing by
Grantor of any specified breach of the terms
and conditions of this easement, Grantee shall
fail to correct said breach within ninety (90)
days, or, having commenced remedial action within
such ninety (90) day period, such later time as
it is reasonably possible for the Grantee to cor-
rect said breach by appropriate action and the
exercise of due diligence in the correction thereof;
or

130

(2) If Grantee fails to start construction of
the pipe lines authorized herein within two years
from date of execution of this instrument; or

(3) If Grantee fails for any consecutive three-
year period to make substantial use of said pipe
lines commercially and also fails to maintain said
pipe lines during said period in such condition as
to be available to commercial use within thirty
(30) days.

D. Construction of the pipe lines contemplated by this
instrument shall not be commenced until all necessary authori-
zation and assent of the Corps of Engineers, United States
Army, so far as concerns the public rights of navigation,
shall have been obtained.

E. In the event of any relocation, replacement, major repair,
or abandonment of either of the pipe lines authorized by this
easement, Grantee shall obtain Grantor's written approval of
procedures, methods and materials to be followed or used prior
to commencement thereof.

F. The maximum operating pressure of either of said pipe lines
shall not exceed six hundred (600) pounds per square inch
gauge.

|3|

If there is a break or leak or an apparent break or leak in either of said pipe lines, or if Grantor notifies Grantee that it has good and sufficient evidence that there is or may be a break or leak therein, Grantee shall immediately and completely shut down the pipe line involved and said pipe line shall not be placed in operation until Grantee has conducted a shut-in two (2) hour pressure test of six hundred (600) pounds per square inch gauge showing that no substance is escaping from a break or leak in said pipe line.

G. If oil or other substance escapes from a break or leak in the said pipe lines, Grantee shall immediately take all usual, necessary and proper measures to eliminate any oil or other substance which may escape.

H. In the event the easement herein conveyed is terminated with respect to either or both of said pipe lines, or if any part or portion of a pipe line is abandoned, Grantee shall take all of the usual, necessary and proper abandonment procedures as required and approved by Grantor. Said abandonment operations shall be completed to the satisfaction of Grantor within one year after any abandonment of any part or portion of a pipe line; or in event of termination of this easement, within one year thereafter. After the expiration of one year following the termination of this easement, Grantee

132

shall at the option of Grantor quit claim to the State of Michigan all of its right, title and interest in or to any pipe line, appurtenances or fixtures remaining over, through, under or upon the bottom lands covered by this easement. Abandonment procedures as used herein include all operations that may be reasonably necessary to protect life and property from subsequent injury.

I. Grantee shall permit Grantor to inspect at reasonable times and places its records of oil or any other substance being transported in said pipe lines and shall, on request, submit to Grantor inspection reports covering the automatic shut-off and check valves and metering stations used in connection with the Straits of Mackinac crossing.

J. (1) Grantee shall indemnify and hold harmless the State of Michigan from all damage or losses caused to property (including property belonging to or held in trust by the State of Michigan), or persons due to or arising out of the operations or actions of Grantee, its employees, servants and agents hereunder. Grantee shall place in effect prior to the construction of the pipe lines authorized by this easement and shall maintain in full force and effect during the life of this easement, and until Grantor has approved completion of abandonment operations, a Comprehensive Bodily Injury and Property Damage Liability policy, bond or surety, in form and substance acceptable to Grantor in the sum of at least One Million Dollars ($1,000,000.00), covering the liability herein imposed upon Grantee.

133

(2)  Grantee, prior to commencing construction of the pipe lines authorized by this easement, shall provide the State of Michigan with a surety bond in the penal sum of One Hundred Thousand Dollars ($100,000.00) in form and substance acceptable to Grantor, and surety or sureties approved by Grantor, to well, truly and faithfully perform the terms, conditions and requirements of this easement.  Said bond shall be maintained in full force and effect during the life of this easement and until Grantor has approved completion of Grantee's abandonment operations.  Said bond shall not be reduced in amount except with the written consent of Grantor.

K.  Grantee shall within sixty (60) days thereafter notify Grantor in writing of any assignment of this easement.

L.  The terms and conditions of this easement shall be binding upon and inure to the benefit of the respective successors and assigns of Grantor and Grantees.

M.  All rights not specifically conveyed herein are reserved to the State of Michigan.

-11-

134

N.  Grantee shall not improvise, construct or maintain ship-to-shore or ship-to-pipe line loading or unloading facilities over, through, under or upon any of the bottom lands herein described for the purpose of removing material from or injecting material into said pipe lines.

O.  Grantor shall have the right at all reasonable times and places to inspect the pipe lines, appurtenances and fixtures authorized by this easement.

P.  It shall not be a breach of the terms and conditions of this easement if for operating or maintenance reasons Grantee shall make use of only one of said pipe lines at a time.

Q.  Where provision is made herein that Grantee shall obtain the authorization, approval or consent of Grantor, Grantor agrees that it will not unreasonably withhold the same.

IN WITNESS WHEREOF, the State of Michigan by the Conservation Commission, by Wayland Osgood, Deputy Director, acting pursuant to authority specifically conferred upon him, has caused this instrument to be executed this twenty-third day of April, A.D. 1953.

Signed, Sealed and Delivered  
in the Presence of:

STATE OF MICHIGAN  
BY THE CONSERVATION COMMISSION

/s/ Jane Bower  
Jane Bower

By  /s/ Wayland Osgood  
Wayland Osgood, Deputy Director,  
pursuant to resolutions of the  
Conservation Commission dated  
February 13, 1953 and July 10,  
1951

/s/ Elizabeth Soule  
Elizabeth Soule

-12-

135

STATE OF MICHIGAN )
                   )    ss.
COUNTY OF INGHAM )

        On this twenty-third day of April, A.D. 1953, before me, a
Notary Public, in and for said county, personally appeared Wayland Osgood,
Deputy Director, known by me to be the person who executed the within
instrument and who, being duly sworn, deposes and says that he is the duly
appointed deputy director of the Conservation Commission and that he
executed the within easement under authority specifically conferred upon
him by law and by the Conservation Commission at its meetings held on
February 13, 1953 and July 10, 1951, and who acknowledged the same to be
his free act and deed and the free act and deed of the State of Michigan
by the Conservation Commission, in whose behalf he acts.

                                   /s/ C. R. Humphrys
                                C. R. Humphrys, Notary Public, Ingham County, Michigan
                                My Commission expires September 20, 1954

Examined and approved 4/23/53
as to legal form and effect:

/s/ R. Glen Dunn
Assistant Attorney General

# EXHIBIT 3

**THIRD AGREEMENT BETWEEN THE STATE OF MICHIGAN, MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY, AND MICHIGAN DEPARTMENT OF NATURAL RESOURCES AND ENBRIDGE ENERGY, LIMITED PARTNERSHIP, ENBRIDGE ENERGY COMPANY, INC., AND ENBRIDGE ENERGY PARTNERS, L.P.**

This Third Agreement is entered between the State of Michigan, the Michigan Department of Environmental Quality, and the Michigan Department of Natural Resources (collectively referred to herein as "the State"), AND Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., formerly known as Lakehead Pipe Line Company, Inc., and Enbridge Energy Partners, L.P. (collectively referred to herein as "Enbridge") concerning those segments of Enbridge's Line 5 pipeline ("Line 5") that are located within the State of Michigan. This Third Agreement results from, and is intended to fulfill, the parties' obligations under Paragraph I.G. of the Second Agreement between the State and Enbridge, entered October 3, 2018 ("Second Agreement"), in which the parties agreed to pursue further agreements to address Line 5's crossing of the Straits of Mackinac ("Straits").

WHEREAS, the Second Agreement affirms that the segments of Line 5 located within Michigan must be operated and maintained in compliance with all applicable laws that are intended to protect the public health, safety, and welfare and prevent pollution, impairment, or destruction of the natural resources of the State of Michigan, including the unique resources of the Great Lakes, and requires specified measures to further protect ecological and natural resources held in public trust by the State of Michigan;

WHEREAS, the Second Agreement remains in effect and the parties wish to supplement it pursuant to Paragraph I.G. of that Agreement by entering into this Third Agreement addressing the operation, replacement, and decommissioning of the existing Dual Pipelines at the Straits, conditioned upon and in conjunction with, an Agreement between Enbridge and the Mackinac Straits Corridor Authority ("Authority") to design, construct, operate, and maintain a utility tunnel at the Straits to accommodate a replacement for the Dual Pipelines and other utilities ("Tunnel Agreement");

WHEREAS, on December 19, 2018, Enbridge and the Authority entered into the Tunnel Agreement.

The Parties hereby agree as follows:

1

Article 1 Definitions and Interpretation

1.1. Definitions

   (a) "1953 Easement" means the "Straits of Mackinac Pipe Line Easement [granted by the] Conservation Commission of the State of Michigan to Lakehead Pipe Line Company, Inc. (Lakehead) executed April 23, 1953.

   (b) "Authority" means the Mackinac Straits Corridor Authority.

   (c) "Bare Metal" means any area on the Dual Pipelines where the metal pipe is visually exposed and in direct contact with water.

   (d) "Day" means a calendar day unless expressly stated to be a business day. In computing any period of time under this Third Agreement, where the last Day would fall on a Saturday, Sunday, or U.S. federal holiday or Michigan state holiday, the period shall run until the close of business of the next business day.

   (e) "Dual Pipelines" means the 4.09-mile portion of Enbridge's Line 5 pipeline consisting of two 20-inch diameter seamless pipelines that cross the Straits.

   (f) "Enbridge Board of Directors" means the Enbridge Inc. Board of Directors.

   (g) "Enbridge" means Enbridge Energy, Limited Partnership or its successors and assigns.

   (h) "Government Approval" means all permissions, consents, approvals, certificates, permits, licenses, agreements, registrations, notices, exemptions, waivers, filings, and authorizations (whether statutory or otherwise) required by law.

   (i) "Heavy Crude Oil" means any liquid petroleum with an American Petroleum Institute gravity index of less than 22 degrees, including, but not limited to, diluted bitumen.

   (j) "Line 5" means the Enbridge light crude and natural gas liquids pipeline that extends from Superior, Wisconsin, through the Upper Peninsula of Michigan to the Lower Peninsula of Michigan and then across the U.S.-Canada international boundary to Sarnia, Ontario, Canada.

   (k) "PPI" means the Producer Price Index for Finished Goods published each year by the U.S. Department of Labor, Bureau of Labor Statistics or any lawful successor agency thereto.

   (l) "Second Agreement" means the agreement entered on October 3, 2018 between the State of Michigan, the Michigan Department of Environmental Quality, and the Michigan Department of Natural Resources AND Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P.

   (m) "State of Michigan" means the State of Michigan and the Departments of Environmental Quality and Natural Resources.

   (n) "Straits of Mackinac" or "Straits" means that segment of water between the upper and lower peninsulas of Michigan that connects Lake Michigan and Lake Huron.

2

(o)   "Straits Line 5 Replacement Segment" means that segment of 30-inch pipe that is to be constructed, operated, and maintained within the Tunnel to connect to Enbridge's existing Line 5 pipeline on either side of the Straits so as to serve as a replacement to the Dual Pipelines.

(p)   "Tunnel" has the meaning set forth in the description provided in Section 6.1 of the Tunnel Agreement.

(q)   "Tunnel Agreement" means the agreement entered into on December 19, 2018 between Enbridge and the Mackinac Straits Corridor Authority.

1.2.   In this Third Agreement unless the context otherwise requires:

(a)   the words "including," "includes," and "include" will be read as if followed by the words "without limitation";

(b)   the meaning of "or" will be that of the inclusive "or," that is meaning one, some or all of a number of possibilities;

(c)   a reference to any Party includes each of their legal representatives, trustees, executors, administrators, successors, and permitted substitutes and assigns, including any Person taking part by way of novation;

(d)   a reference to this Third Agreement or to any other agreement, document, or instrument includes a reference to this Third Agreement or such other agreement, document or instrument as amended, revised, supplemented or otherwise modified from time to time;

(e)   a reference to any Governmental Entity, institute, association or body is:  (i) if that Governmental Entity, institute, association or body is reconstituted, renamed or replaced or if the powers or functions of that Government Entity, institute, association or body are transferred to another organization, a reference to the reconstituted, renamed or replaced organization or the organization to which the powers or functions are transferred, as applicable; and (ii) if that Governmental Entity, institute, association or body ceases to exist, a reference to the organization which serves substantially the same purposes or objectives as that Governmental Entity, institute, association or body;

(f)   words in the singular include the plural (and vice versa) and words denoting any gender include all genders;

(g)   headings are for convenience only and do not affect the interpretation of this Third Agreement;

(h)   a reference to this Third Agreement includes all Schedules, Appendices, and Exhibits;

(i)   a reference to a Section or Schedule is a reference to a Section or Schedule of or to the body of this Third Agreement;

(j)   where any word or phrase is given a defined meaning, any other part of speech or other grammatical form of that word or phrase has a corresponding meaning.

3

Article 2 Representations

2.1.    Authority - Signatories for each Party represent that they have authority to enter into this Third Agreement.

Article 3 Relationship to Tunnel Agreement

3.1    Agreements Mutually Dependent - This Third Agreement is premised upon the existence, continued effectiveness of, and Enbridge's compliance with the Tunnel Agreement, under which Enbridge is required to design, construct, and operate and maintain the Tunnel to accommodate the Straits Line 5 Replacement Segment that will replace the Dual Pipelines.

Article 4 Continued Operation of Dual Pipelines Pending Completion of Tunnel and Activation of Line 5 Replacement Segment

4.1    The State agrees that Enbridge may continue to operate the Dual Pipelines, which allow for the functional use of the current Line 5 in Michigan, until the Tunnel is completed, and the Straits Line 5 Replacement segment is placed in service within the Tunnel, subject to Enbridge's continued compliance with all of the following:
- (a)    The Second Agreement;
- (b)    The Tunnel Agreement;
- (c)    This Third Agreement;
- (d)    The 1953 Easement; and
- (e)    All other applicable laws, including those listed in Section V of the Second Agreement.

4.2    Provided that Enbridge complies with Section 4.1 above, the State agrees that:
- (a)    The work done and to be done at the water crossings pursuant to the Second Agreement adds protections to the health, safety, and welfare of Michiganders and increases protection for Michigan's environment and natural resources.
- (b)    Enbridge's compliance with Article 5 below demonstrates compliance with the specified conditions of the 1953 Easement.
- (c)    The replacement of the Dual Pipelines with the Straits Line 5 Replacement Segment in the Tunnel is expected to eliminate the risk of a potential release from Line 5 at the Straits.
- (d)    In entering into this Third Agreement, and thereby authorizing the Dual Pipelines to continue to operate until such time that the Straits Line 5 Replacement Segment is placed into service within the Tunnel, the State has acted in accordance with and in furtherance of the public's interest in the protection of waters, waterways, or bottomlands held in public trust by the State of Michigan.

4

(e) Based on currently available information, the State is not aware of any violation of the 1953 Easement that would not be addressed and cured by compliance with Section 4.1 and Article 5 of this Agreement.

4.3 Additional measures to assure integrity of Dual Pipelines:

(a) Enbridge will implement an enhanced inspection regime for the Line 5 Dual Pipelines beginning in 2024 or sooner as specified in Appendix 1, attached to his Third Agreement, and continuing while the Line 5 Dual Pipelines are still in use. If the Line 5 Dual Pipelines are still in use in 2026, Enbridge will conduct a hydrotest (or an equally reliable alternative technology for confirming integrity and material strength) of the Line 5 Dual Pipelines unless the Tunnel and the Straits Line 5 Replacement Segment are expected to be completed and operational on or before December 31, 2026. Reports of the inspections will be made available to the State of Michigan for review. The inspection regime as described will be used to evaluate whether agreed upon technical criteria are being met. The enhanced inspection regime and the agreed upon criteria are specified in attached Appendix 1.

(b) Enbridge agrees that it will not assert that these additional measures required under this Third Agreement or the measures regarding Line 5 water crossings other than the Straits required under Paragraph I.I. of the Second Agreement are preempted by federal law or otherwise unenforceable.

## Article 5 Compliance with 1953 Easement

5.1 Financial Assurance:

(a) Until the Dual Pipelines are permanently decommissioned, Enbridge will maintain compliance with the requirements of Paragraph I.J of the Second Agreement, supplemented and modified as follows:

   (i) The $1,878,000,000 minimum amount will be annually adjusted for inflation based on the PPI on October 1, 2019 and each year thereafter.

   (ii) Enbridge will file with the State updated financial assurance information on an annual basis in a format consistent with Appendix 3 to the Second Agreement, beginning thirty (30) days after the effective date of this Third Agreement.

   (iii) Enbridge will promptly notify the State in writing of any material change concerning the financial assurance information provided under Section 5.1(a)(ii). A material change shall be any change in the financial status of Enbridge that may prevent Enbridge from complying with Section 5.1(a)(i).

(b) The State agrees that if Enbridge meets the requirements under Section 5.1 (a) of this Third Agreement, Enbridge will be deemed to satisfy its financial assurance obligations specified under Paragraph J of the 1953 Easement.

5.2 Pipeline Coatings:

(a) Enbridge is committed to completing the implementation of the State-approved plan for visual inspection of pipeline coatings at all locations on the Dual Pipelines where screw anchor supports have been installed. Enbridge will promptly repair the coating at any and all locations where Bare Metal is identified as a result of such visual inspection. Enbridge will take all reasonable efforts to complete implementation by October 30,2019.

(b) Enbridge will, not later than March 31, 2019, submit to the State for review and approval, a work plan to, in conjunction with the Close Interval Surveys required under Section I.D of the Second Agreement, visually inspect pipeline coatings at sites to be specified in the work plan along the Dual Pipelines and to repair the coating at any and all sites where Bare Metal is identified. The work plan will include a proposed implementation schedule. Enbridge will implement the State-approved plan in accordance with the approved schedule.

(c) If at any time, any other area(s) of coating damage along the Dual Pipelines where Bare Metal exists is identified, Enbridge will repair the identified area(s) as soon as practicable thereafter. Enbridge will notify the State within thirty (30) days after any Bare Metal is identified, and again thirty (30) days after the Bare Metal is repaired.

(d) The State agrees, based upon currently available information, that Enbridge's compliance with the requirements under this Section 5.2 satisfies the requirements of Paragraph A (9) of the 1953 Easement.

5.3 Maximum Span of Unsupported Pipe:

(a) Based upon currently available information, there are no locations along the Dual Pipelines where the span or length of unsupported pipe exceeds the seventy-five (75) feet maximum specified in Paragraph A (10) of the 1953 Easement.

(b) Until the Dual Pipelines are permanently decommissioned, Enbridge will continue to visually inspect the Dual Pipelines at least every two (2) calendar years to verify that no unsupported spans exceed the specified maximum. If at any time an unsupported span exceeding the maximum is identified, Enbridge will, within thirty (30) days after receiving the final report from the third-party contractor performing such inspection where a span exceedance is identified, submit to the State for review and approval, a work plan to promptly eliminate the exceedance through installation of additional anchor supports or other suitable means. Enbridge will implement the work plan as soon as practicable after receiving all

6

necessary federal or State permits or approvals required to conduct work to eliminate the exceedance.

(c)    As additional means of preventing exceedances of the maximum span, Enbridge will continue to implement the span management measures included in the federal Consent Decree, as amended, while the federal Consent Decree remains in effect.

(d)    The State agrees, based upon currently available information, that Enbridge's compliance with the requirements under this Section 5.3 satisfies the requirements of Paragraph A (10) of the 1953 Easement.

Article 6 Construction and Operation of Straits Line 5 Replacement Segment

6.1    Enbridge will design, construct, operate, and maintain the Straits Line 5 Replacement Segment within the Tunnel:

(a)    At its own expense; and

(b)    In compliance with all applicable laws and regulations and the terms of the Tunnel Agreement and the Tunnel Lease to be issued by the Authority under the Tunnel Agreement.

(c)    Nothing under this Third Agreement shall be construed to provide the State with authority over the design, operation, or maintenance of the Straits Line 5 Replacement Segment.

6.2    Enbridge will not transport Heavy Crude Oil through the Straits Line 5 Replacement Segment.

6.3    When Enbridge ceases use of the Straits Line 5 Replacement Segment, it will permanently deactivate the Straits Line 5 Replacement Segment in compliance with all applicable laws and regulations and Section 3.3 of the Tunnel Lease.

Article 7 Permanent Deactivation of Dual Pipelines

7.1    Enbridge agrees that as soon as practicable following completion of the Tunnel and after the Straits Line 5 Replacement Segment is constructed and placed into service by Enbridge, Enbridge will cease operation of the Dual Pipelines and permanently deactivate the Dual Pipelines.

7.2.    Consistent with Paragraphs E, H, and Q of the 1953 Easement, the procedures, methods, and materials for replacement, relocation, and deactivation of the Dual Pipelines are subject to the written approval of the State, which the State agrees shall not be unreasonably withheld.  At a minimum, any portion of the Dual Pipelines that remains in place after deactivation shall be thoroughly cleaned of any product or residue thereof and the ends shall be permanently capped to the satisfaction of the State, which shall not be unreasonably withheld.

7.3    The State and Enbridge agree that decisions regarding the method of deactivation, including potential removal of the Dual Pipelines should take into account short- and long-term effects of the deactivation method options and associated sediment and water quality disturbance on natural resources, particularly fishery resources, in proximity to the Straits.  The options include:  (a) abandoning in place the entire length of each of the Dual Pipelines; or (b) removing from the Straits the submerged portions of each of the Dual Pipelines that were not fully buried in a ditch and placed under cover near the shoreline of the Straits at the time of initial construction.

Article 8 Delay Events

8.1    Enbridge's performance under this Third Agreement shall be excused as a result of any Delay Event.  For purposes of this Third Agreement, "Delay Event" is defined as any event arising from causes beyond the control of Enbridge, any entity controlled by Enbridge, or any of Enbridge's contractors, that delays or prevents the performance of any obligation under this Third Agreement, despite Enbridge's best efforts to fulfill the obligation.  "Best efforts to fulfill the obligation" includes using best efforts to address the effects of any such event:  (a) as it is occurring; and (b) following its occurrence, such that the delay and any adverse effects of the delay are minimized.

8.2    Automatic Delay Events - The Parties agree that the following circumstances automatically constitute a Delay Event:

(a)    The inability to undertake activities required under this Third Agreement due to the need to obtain a Government Approval or other legal authorization required to undertake such activities.

(b)    Acts of God, war, terrorist acts, pandemics, strikes, civil disturbances, and other causes beyond the reasonable control of Enbridge.

(c)    Unavailability of necessary materials or equipment because of industry-wide shortages.

(d)    An injunction or other judicial or governmental order preventing the timely performance of the obligation.

8.3     Other Delay Events - The Parties further agree that any other circumstance included within the definition of Delay Event in Section 8.1 may on a case-by-case basis be determined by Enbridge and the State to constitute a Delay Event.

8.4     Notice - If a Delay Event occurs, Enbridge will notify the State of the Delay Event within a reasonable time after Enbridge is aware that a Delay Event has occurred. The notice will describe the Delay Event, the anticipated duration of the Delay Event, if known, and the efforts taken by Enbridge   to minimize the delay and any adverse effects of the delay.

8.5     Disputes - Any dispute between the Parties relating to the existence or duration of a Delay Event will be resolved in accordance with Article 9, Dispute Resolution.

Article 9 Dispute Resolution

9.1     Except as otherwise specified in this Third Agreement, the Parties agree to the following procedures to resolve all disputes between them arising under this Third Agreement.

9.2     Informal Dispute Resolution - First, designated representatives of the Parties will engage in good faith efforts to informally resolve the dispute for a period of up to sixty (60) days, provided that the Parties may mutually agree in writing to extend that period.

9.3     Optional Mediation - If the dispute is not resolved informally though Section 9.2, the Parties may, though mutual written agreement, select a neutral mediator to facilitate the resolution of the dispute. Unless otherwise agreed, the parties will equally share the costs of the mediator's services.

9.4     Judicial Dispute Resolution - If the dispute is not resolved informally though Section 9.2, or, if applicable, through Section 9.3, either Party may submit the dispute to a court of competent jurisdiction for resolution.

Article 10 Termination

10.1     Term. This Third Agreement shall remain in effect until such time that the Dual Pipelines are decommissioned, unless terminated in accordance with 10.2 or 10.3 below.

10.2     Termination by the State. The State may terminate this Agreement if: (i) after being notified in writing by the State of any material breach of this Agreement, Enbridge fails to commence remedial action within ninety (90) days to correct the identified breach or fails to use due diligence to complete such remedial action within a reasonable time thereafter; (ii) the dispute resolution procedures of Article 9 are followed with respect to the breach; and (iii) the final judicial resolution of the dispute is in favor of the State's position that the Agreement should be terminated.

10.3    Termination by Enbridge.  Enbridge may terminate this Agreement:

    (a)    By written notice to the State if:  (i) Enbridge has involuntarily ceased operation of the existing Line 5 Dual Pipelines as a result of a court order or at the direction of a Governmental Entity at any point during the design or construction of the Tunnel; or (ii) Enbridge has voluntarily chosen to permanently cease operations on the existing Line 5 Dual Pipelines at any point during the design or construction of the Tunnel;

    (b)    If:  (i) after being notified in writing by Enbridge of any material breach by the State of this Agreement, which shall include but not be limited to any unreasonable impairment by the State of Enbridge's ability to construct the Tunnel or construct, operate, and maintain the Straits Line 5 Replacement Segment within the Tunnel in accordance with the Tunnel Agreement and the Lease, the State has failed to commence remedial action within ninety (90) days to correct the identified breach or impairment or failed to use due diligence to complete such remedial action within a reasonable time thereafter; (ii) the dispute resolution procedures of Article 9 are followed with respect to the breach; and (iii) the final judicial resolution of the dispute is in favor of Enbridge's position that the Agreement should be terminated.

10.4  Survival.

The assurances provided in Section 4.2 above shall survive in the event of termination of this Third Agreement, under Sections 10.3(b) and (c).

Article 11 Amendment

This Third Agreement may be amended only through written agreement executed by authorized representatives of both Parties.

Article 12 Notices

12.1    Unless otherwise agreed to by the Parties, all notices, submissions, or communications required under this Agreement must be in writing and served either by personal service, by prepaid overnight courier service or by certified or registered mail to the address of the receiving Party set forth below (or such different address as may be designated by such Party in a notice to the other Party, from time to time).  Notices, consents, and requests served by personal service shall be deemed served when delivered.  Notices, consents, and requests sent by prepaid overnight courier service shall be deemed served on the day received, if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours.  Notices, consents, and requests sent by certified or registered mail, return receipt requested, shall be deemed served ten (10) business days after mailing.

As to the State of Michigan:

    Attn: Deputy Director
    Michigan Department of Environmental Quality
    525 W. Allegan
    Post Office Box
    Lansing, MI 48909-7528

    Attn: Natural Resource Deputy
    Michigan Department of Natural Resources
    525 W. Allegan
    Post Office Box 30028
    Lansing, MI 48909-7528

As to Enbridge:

    Attn: Vice President of US Operations, Liquids Pipelines
    7701 France Avenue South, Suite 600 – Centennial Lakes Park I
    Edina, MN 55435

    With a copy to Corporate Secretary
    5400 Westheimer Court
    Houston, TX 77056

    With a copy to Director of Great Lakes Region
    222 Indianapolis Blvd., Suite 100
    Schererville, IN 46375

    With a copy to Associate General Counsel U.S. Law
    26 East Superior Street, Suite 309
    Duluth, MN 55802
    And an emailed copy to legalnotices@enbridge.com

12. 2    Notice of any change by a Party of the designations or addresses listed in Section 12.1 above will be promptly provided to the other Party.

Article 13 No Third-Party Beneficiaries

13.1     This Third Agreement is intended for the exclusive benefit of the Parties hereto and their respective successors.  Nothing contained in this Third Agreement shall be construed as creating any rights or benefits in or to any third party.  This Third Agreement does not give rise to a private right of action for any person other than the Parties to this Third Agreement.

Article 14 Miscellaneous

14.1     Approvals under this Third Agreement - Each Party agrees that whenever this Third Agreement provides for it to approve, concur with, or jointly act with the other Party, such approval, concurrence, or joint action will not unreasonably be withheld.

14.2     Good Faith - The Parties agree to act in good faith in the interpretation, execution, performance, and implementation of this Third Agreement.

14.3     Execution.  This Third Agreement may be executed in counterparts without the necessity that the Parties execute the same counterpart, each of which will be deemed an original, but which together will constitute one and the same agreement.  The exchange of copies of this Tunnel Agreement by electronic or hard-copy means shall constitute effective execution and delivery thereof and may be used in lieu of the original for all purposes.

14.4     Governing Law.  This Third Agreement shall be construed, interpreted, and applied in accordance with the laws of the State of Michigan without reference to its conflict of laws rules.

14.5     Entire Agreement.  This Third Agreement and Schedules hereto, contain all covenants and agreements between the State and Enbridge relating to the matters set forth in this Third Agreement.

14.6     Severability.  If any provision of this Agreement will be held illegal, invalid, or unenforceable by a court of competent jurisdiction, the same will not necessarily affect any other provision or provisions herein contained or render the same invalid, inoperative, or unenforceable, and the Parties will expeditiously negotiate in good faith in an attempt to agree to another provision or provisions (instead of the provision which is illegal, inoperative or unenforceable) that is legal, operative, and enforceable and carries out the Parties' intentions under this Agreement.

12

Article 15 Assignment

15.1    Either Party may assign, charge, or transfer its rights or obligations under this Third Agreement provided that it obtains the written consent of the other Party.

FOR THE STATE OF MICHIGAN

Name:  Rick Snyder
Title:  Governor
Dated:_____12-19-18_____

Name:  Keith Creagh
Title:  Director, Michigan Department of Natural Resources
Dated:_____12/18/2018_____

Name: C. Heidi Grether
Title:  Director, Michigan Department of Environmental Quality
Dated:_____12.18.18_____

13

FOR ENBRIDGE ENERGY, LIMITED PARTNERSHIP
BY: ENBRIDGE PIPELINES (LAKEHEAD) L.L.C.
AS MANAGING GENERAL PARTNER

Name: Brad Shamla
Title: Vice President, U.S. Operations
Dated:  12/19/2018

Name: John Swanson
Title: Vice President, Major Projects, Execution
Dated:  17 Dec 2018

Name: Al Monaco
Title: Authorized Signatory for Enbridge Pipelines (Lakehead) L.L.C.
Dated:  Dec 18, 2018

FOR ENBRIDGE ENERGY COMPANY, INC.

Name: Brad Shamla
Title: Vice President, U.S. Operations
Dated:  12/19/2018

Name: John Swanson
Title: Vice President, Major Projects, Execution
Dated:  14 Dec 2018

Name: Guy Jarvis
Title: Executive Vice President – Liquids Pipelines
Dated:  12/19/2018

FOR ENBRIDGE ENERGY PARTNERS, L.P.
BY: ENBRIDGE ENERGY MANAGEMENT, L.L.C.
AS DELEGATE OF ITS GENERAL PARTNER

Name: Brad Shamla
Title: Vice President, U.S. Operations
Dated:  12/19/2018

Name: John Swanson
Title: Vice President, Major Projects, Execution
Dated:  19 Dec 2018

**Appendix 1**

**Enbridge Dual Pipelines Inspection and Operational Requirements Through Decommissioning**

Enbridge Line 5 Dual Pipelines Crossing the Straits of Mackinac
Inspection and Operational Requirements Through Decommissioning

December 13, 2018
Page 1 of 4

A

| Description | Existing Requirements PHMSA – 49 CFR Part 195 | May 2017 Consent Decree¹ Requirements | Proposed Requirements State of Michigan |
|---|---|---|---|
| Visual Inspection | §195.412 Inspection of rights-of-way and crossings under navigable waters; inspect surface conditions at intervals not exceeding 3 weeks, but at least 26 times each calendar year; except for offshore pipelines, inspect each crossing under a navigable waterway to determine the condition of the crossing at intervals not exceeding 5 years | Subsection VII.E., Paragraphs 68.c. and 68.f. require visual inspection of the pipelines by July 31, 2016 and at intervals not to exceed 24 months thereafter until termination of the Consent Decree. | Starting in 2024, visual inspection (ROV, AUV) of the lines once per calendar year, completed by July 31. |
| Span Management Program | §195.110 External Loads – Provide support for anticipated external loads; supports must not cause excess localized stresses | Current requirements are set forth under Subsection VII.E., Paragraph 68, and any modification thereto. | Consistent with Consent Decree requirements and to begin when Consent Decree ends. |
| Pipeline Movement Investigation | | If a crack feature requiring repair is identified, Subsection VII.E., Paragraph 72 requires an investigation to determine whether the cause of cracking is related to pipeline movement; if so, Enbridge must develop and complete corrective measures as soon as practicable, but no later than 270 days after completing the investigation. | Consistent with Consent Decree requirements and to begin when Consent Decree ends. |
| Quarterly Inspection Using Acoustic Leak Detection Tool | | Subsection VII.E., Paragraph 73 requires quarterly inspection using an acoustic ILI tool capable of detecting small leaks and, if a leak is found, requires shutdown, isolation and repair of the leaking line | Consistent with Consent Decree requirements and to begin when Consent Decree ends. |

¹ The May 2017 Consent Decree, as referenced herein, refers to the Consent Decree entered in *United States v. Enbridge Energy, Limited Partnership, et al.*, No. 1:16-cv-914, ECF No. 14 (E.D. Mich.) on entered May 23, 2017, and any modifications thereto.

Enbridge Line 5 Dual Pipelines Crossing the Straits of Mackinac
Inspection and Operational Requirements Through Decommissioning

December 13, 2018
Page 2 of 4

| Description | Existing Requirements PHMSA – 49 CFR Part 195 | May 2017 Consent Decree Requirements | Proposed Requirements State of Michigan |
|---|---|---|---|
| Pressure Testing | §195.452(j)(5)(ii) – Pressure test conducted in accordance with 49 CFR Part 195, Subpart E is an acceptable Integrity Assessment method | Subsection VII.C. requires submittal of testing plan and schedule to US EPA and sets out specific test procedures; hydrostatic pressure testing of the Line 5 Dual Pipelines was successfully completed in 2017 | Conduct hydrostatic pressure test or equally reliable alternative technology to confirm pipeline integrity and material strength in 2026 |
| Cathodic Protection | §195.571 – Cathodic protection must comply with NACE SP 0169, which requires protection levels of -850 mV (CSE) | | Starting in 2024, maintain cathodic protection levels at or below -950 mV (CSE) |
| Close Interval Survey | | | Starting in 2024, conduct CIS once every year, not to exceed 15 months |
| Integrity Assessment Intervals | §195.452(j)(3) - Five years, not to exceed 68 months | Subsection VII.D.(VI) – For crack inspections, no more than one-half of the shortest remaining life of any unrepaired crack feature; for corrosion inspections, no more than one-half of the shortest remaining life of any corrosion feature; no more than five years | Starting in 2024, annual geometry, corrosion and circumferential crack inspections and assessments, using best available technology. |
| Temporary Pressure Reduction or Pipeline Shutdown | §195.452(h)(1)(i) and (ii) – Pressure reduction based on calculated safe operating pressure of anomaly or, if this cannot be calculated, 80% of the highest sustained operating pressure in the 60 days prior to the ILI; use to provide safety for Immediate Repair Conditions and other repairs for which schedules cannot be met; notify PHMSA if pressure reduction will exceed 365 days | Subsections VII.D.(III), (IV) and (V) establish requirements and timing for identification of ILI report features requiring excavation based on calculated burst pressure, remaining life, and other unique characteristics, and for establishing pressure restrictions to provide safety until digs and repairs are complete | Consistent with Consent Decree requirements and to begin when Consent Decree ends. |

Enbridge Line 5 Dual Pipelines Crossing the Straits of Mackinac                December 13, 2018
Inspection and Operational Requirements Through Decommissioning                Page 3 of 4

| Description | Existing Requirements PHMSA – 49 CFR Part 195 | May 2017 Consent Decree[1] Requirements | Proposed Requirements State of Michigan |
|---|---|---|---|
| Schedules for Evaluation and Remediation of ILI-indicated Anomalies | See below | Subsection VII.D.(V) sets out criteria and timelines governing excavation, repair and imposition of pressure restrictions for crack features (Table 1, pp 55-56), corrosion features (Table 2, pp 60-62), dents and other geometric features (Table 4, pp 67-68), and intersecting or interacting feature types (Table 5, pp 70-71) | Consistent with Consent Decree requirements and to begin when Consent Decree ends. |
| • Metal loss greater than 80% of nominal wall regardless of dimensions | §195.452(h)(4)(i)(A) – Immediate Repair Condition | | Starting in 2024, immediate Repair Condition and pipeline shutdown |
| • Metal loss greater than 50% of nominal wall regardless of dimensions | New Requirement | | Starting in 2024, immediate Repair Condition and pipeline shutdown |
| • Calculated burst pressure less than established maximum operating pressure (MOP) at anomaly location | §195.452(h)(4)(i)(B) – Immediate Repair Condition - Suitable remaining strength calculation methods include, but are not limited to, ASME/ANSI B31G and PRCI PR-3-805 (R-STRENG) | | Starting in 2024, immediate Repair Condition and pipeline shutdown |
| • Dents | §195.452(h)(4)(i)(C) – Immediate Repair §195.452(h)(4)(i)(D) – Immediate Repair §195.452(h)(4)(i)(E) – Immediate Repair §195.452(h)(4)(ii)(A) – 60-day Repair §195.452(h)(4)(ii)(B) – 60-day Repair §195.452(h)(4)(iii)(A) – 180-day Repair §195.452(h)(4)(iii)(B) – 180-day Repair §195.452(h)(4)(iii)(C) – 180-day Repair | | Starting in 2024, immediate Repair Condition and pressure restriction of 80% of last 60-day high pressure. |
| • Calculated safe operating pressure less than established MOP at anomaly location | §195.452(h)(4)(iii)(D) – 180-Day Repair Condition - Suitable remaining strength calculation methods include, but are not limited to, ASME/ANSI B31G and PRCI PR-3-805 (R-STRENG) | | Starting in 2024, immediate Repair Condition and pipeline shutdown |

Enbridge Line 5 Dual Pipelines Crossing the Straits of Mackinac
Inspection and Operational Requirements Through Decommissioning

December 13, 2018
Page 4 of 4

| Description | Existing Requirements PHMSA – 49 CFR Part 195 | May 2017 Consent Decree¹ Requirements | Proposed Requirements State of Michigan |
|---|---|---|---|
| • An area of general corrosion with a predicted metal loss greater than 50% of nominal wall | §195.452(h)(4)(iii)(E) – 180-Day Repair Condition | | Starting in 2024, immediate Repair Condition and pipeline shutdown |
| • Predicted metal loss greater than 50% of nominal wall that is located at a crossing of another pipeline, or is in an area with widespread circumferential corrosion, or is in an area that could affect a girth weld | §195.452(h)(4)(iii)(F) – 180-Day Repair Condition | | Starting in 2024, immediate Repair Condition and pipeline shutdown |
| • A potential crack indication that when inspected is determined to be a crack | §195.452(h)(4)(iii)(G) – 180-Day Repair Condition | | Starting in 2024, immediate Repair Condition and follow Consent Decree requirements for crack remediation |
| • A gouge or groove greater than 12.5% of nominal wall thickness | §195.452(h)(4)(iii)(I) – 180-Day Repair Condition | | Starting in 2024, immediate Repair Condition |
| • Anomalies in addition to those listed above that could impair the integrity of the pipeline | §195.452(h)(4)(iv) - Other Repair Conditions - schedule for remediation as appropriate (per engineering analysis); see §195.452 Appendix C for guidance concerning other conditions to evaluate | | Follow PHMSA requirements |

Immediate Repair Condition - Upon learning of an immediate repair condition indicated by in-line inspection, Enbridge agrees to make the condition safe by operating pressure reduction or pipeline shutdown (see Inspection and Operational Requirements Table), and to notify the State of the condition within 24 hours. Enbridge will proceed with planning, permitting, inspection, and necessary repair of the condition as expeditiously as practicable subject to permitting requirements and weather/ice conditions in the Straits of Mackinac.  Once the feature is fully assessed, repaired or mitigated, Enbridge will notify the State and may return the pipeline to normal operating pressures.