UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE STATE OF MICHIGAN, GOVERNOR OF
THE STATE OF MICHIGAN, and MICHIGAN
DEPARTMENT OF NATURAL RESOURCES,

 Plaintiffs,

 v.

ENBRIDGE ENERGY, LIMITED PARTNERSHIP,
ENBRIDGE ENERGY COMPANY, INC., and
ENBRIDGE ENERGY PARTNERS, L.P.,

 Defendants.

No. 1:20-cv-01142-JTN-RSK

HON. JANET T. NEFF

ON PLAINTIFFS' MOTION TO REMAND

---

BRIEF OF AMICUS CURIAE
THE GOVERNMENT OF CANADA
IN SUPPORT OF DEFENDANTS

---

Gordon D. Giffin
 *Counsel of Record*
Tami Lyn Azorsky
Simon A. Steel
Grace M. Dickson
**Dentons US LLP**[1]
1900 K Street NW, Ste. 100
Washington D.C. 20006
(404) 527-4020
gordon.giffin@dentons.com

*Counsel for the Government of Canada*

---

[1] Individual attorneys resident in, and licensed to practice in, various Dentons US LLP offices/jurisdictions.

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................................1

STATEMENT OF INTEREST OF THE GOVERNMENT OF CANADA...................................2

ARGUMENT...................................................................................................................................6

    I.      In Addressing the Issues before It, the Court Should Give Effect to the 1977 Treaty and Consider the Foreign Policy and other Public Interests that Underlie It ..............................................................................................................6

    II.     Michigan's Shutdown Order Presents Substantial and Important Treaty Issues...................................................................................................................9

    III.   This Court Should Ensure that the Shutdown Order Is Not Enforced Prematurely ........................................................................................................12

CONCLUSION..............................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003)...................................................................................................11

*B010 v. Canada (Citizenship and Immigration)*,
  2015 S.C.C. 58 (Can. 2015).........................................................................................8

*Canada (Prime Minister) v. Khadr*,
  2010 S.C.C. 3 (Can. 2010)........................................................................................11

*Cook v. United States*,
  288 U.S. 102 (1933).....................................................................................................7

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)...................................................................................................13

*Kolovrat v. Oregon*,
  366 U.S. 187 (1961)...................................................................................................11

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936)...................................................................................................12

*Murray v. Schooner Charming Betsy*,
  6 U.S. 64 (1804)...........................................................................................................8

*Nken v. Holder*,
  556 U.S. 418 (2009)............................................................................................12, 13

*Speech First, Inc. v. Schlissel*,
  939 F.3d 756 (6th Cir. 2019) ....................................................................................13

*United States v. Postal*,
  589 F.2d 862 (5th Cir. 1979) ......................................................................................8

*Zschernig v. Miller*,
  389 U.S. 429 (1968)...................................................................................................11

**CONSTITUTION, STATUTES AND PUBLIC LAWS**

U.S. Constitution Article II...............................................................................................11

28 U.S.C. § 1331..................................................................................................................6

49 U.S.C. § 60101................................................................................................................6

Trans-Alaska Pipeline Authorization Act, Pub. L. No. 93-153, 87 Stat. 576..................7

**TREATIES**

Agreement Between the Government of the United States and the Government of
  Canada Concerning Transit Pipelines, 28 U.S.T. 7449 (1977)........................ *passim*

  Art. I...............................................................................................................10

  Art. II....................................................................................................... 1, 9-11

  Art. IV ...........................................................................................................10

  Art. V ........................................................................................................9, 10

  Art. IX ..................................................................................................2, 8, 9, 11

Great Lakes Water Quality Protocol of 2012, Sept. 7, 2012, 2012 U.S.T. Lexis 86...................2, 3

Treaty Between the United States and Great Britain Relating to Boundary Waters
  Between the United States and Canada, Jan. 11, 1909, 36 Stat. 2449........................................2

**LEGISLATIVE MATERIALS**

S. Rep. No. 95-9 (1977)...............................................................................................1, 7, 8

**OTHER AUTHORITIES**

*Analysis for the Straits Pipelines*, DYNAMIC RISK, at 278 (Oct. 26, 2017),
  https://mipetroleumpipelines.org/document/alternatives-analysis-straits-
  pipeline-final-report ...............................................................................................14

Beth LeBlanc, *What a Line 5 Shutdown Would Mean for Michigan's Energy*,
  DETROIT NEWS (Dec. 20, 2019),
  https://www.detroitnews.com/story/news/politics/2019/12/19/what-line-5-
  shutdown-means-michigan-energy-enbridge/4334264002/ ..................................................14

Chad Livengood, *Q&A: What Happens if State Shuts Down Line 5 Oil Pipeline*,
  CRAIN'S DETROIT BUS. (June 16, 2019),
  https://www.crainsdetroit.com/energy/qa-what-happens-if-state-shuts-down-
  line-5-oil-pipeline ..............................................................................................14

*Closure of Enbridge Line 5 Would Have Huge Impact on East Canadian
  Refineries*, STRATAS ADVISORS, June 27, 2019,
  https://stratasadvisors.com/Insights/2019/062719-Downstream-Closure-of-
  Enbridge-Line-Would-Have-Huge-Impact-East-Canadian-Refineries ....................................6

ENBRIDGE, *The Great Lakes Tunnel Project*, (last visited May 4, 2021), https://www.enbridge.com/projects-and-infrastructure/public-awareness/line-5-michigan/great-lakes-tunnel-project ................................................................................6

ENBRIDGE, *The Impact of a Line 5 Shutdown* (last visited May 4, 2021), https://www.enbridge.com/~/media/Enb/Documents/Factsheets/FS_Without_Line5_econ_impact.pdf ........................................................................................14

ICF Resources L.L.C., *U.S.-Canada Cross-Border Petroleum Trade: An Assessment of Energy Security and Economic Benefits* (March 2021), https://www.api.org/-/media/Files/News/2021/04/ICF_Cross-Border_Analysis_Final.pdf ...........................................................................................3

James McCarten, *Line 5 is 'Very Different' from Keystone XL and Canada Will Fight Hard for It: O'Regan*, THE CANADIAN PRESS (Mar. 4, 2021), https://www.cbc.ca/news/politics/line-five-seamus-pipeline-keystone-1.5937406 ...................................................................................................14

Kelly House, *Canadian Officials to Michigan Senate: Line 5 Shutdown Would Wreck Economy*, BRIDGE MICHIGAN (Mar. 16, 2021), https://www.bridgemi.com/michigan-environment-watch/canadian-officials-michigan-senate-line-5-shutdown-would-wreck-economy ....................................14

Letter from Ambassador Robert E. Lighthizer to The Honorable Chrystia Freeland, Minister of Foreign Affairs (Nov. 30, 2018), https://www.international.gc.ca/trade-commerce/assets/pdfs/agreements-accords/cusma-aceum/letter-energy.pdf .........................................................3

*NORAD and September 11*, CBC DIGITAL ARCHIVES (Sept. 11, 2002), https://www.cbc.ca/archives/entry/norad-and-september-11 .....................................3

U.S. Dep't of State, Office of Treaty Affairs, Treaty Affairs Staff, *Treaties in Force: A List of Treaties and Other International Agreements in Force on January 1, 2020*, 60 (2020), https://www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf.......................................2

**INTRODUCTION**

Pursuant to this Court's order dated February 18, 2021, the Government of Canada ("Canada") respectfully submits this brief *amicus curiae* to advise this Court of Canada's interests, including international treaty issues raised by the pipeline shutdown order at issue in this case. Canada respectfully urges this Court, both in this case and in the related case No. 1:20-cv-01141-JTN-RSK, to act in a manner that will ensure that Line 5 is not subject to a unilateral compelled shutdown. Canada appreciates the Court's initiative in ordering a mediation between Michigan and Enbridge, hopes that a mediated solution will be reached, and stands ready to work with the United States Government to facilitate a mediated solution. While a shutdown that is inconsistent with governing law should be avoided under all circumstances, in any event, there should be no shutdown before the Governments of the United States and Canada complete their efforts to resolve this matter, pursuant to their bilateral treaty, which directly addresses transit pipelines such as Line 5.

Line 5 is vital to Canada's energy security and economic prosperity (and similarly vital to Michigan, Ohio and Pennsylvania). The United States undertook a solemn and reciprocal commitment to Canada in the 1977 *Agreement between the Government of the United States and the Government of Canada concerning Transit Pipelines*, 28 U.S.T. 7449 (1977) ("1977 Treaty") not to interfere with the operations of international hydrocarbon transit pipelines (such as Line 5) absent specific justifications.[2] That obligation, with legally binding effect under international law, expressly applies to any measures instituted by a "public authority in the territory of either Party" — including the State of Michigan and this Court. 1977 Treaty, Art. II(1). The Treaty also includes

---

[2] Line 5 (then denominated the "Interprovincial Pipeline") was specifically referenced by the U.S. Department of State as a pipeline covered by the 1977 Treaty during the congressional ratification hearings on the Treaty. *See* S. Rep. No. 95-9 (1997), at 80 (Letter from Julius L. Katz, U.S. State Dep't, Assistant Secretary for Economic and Business Affairs, to Sen. John J. Sparkman, Chairman of the Senate Committee on Foreign Relations) ("State Dep't Letter").

1

a mechanism for settling disputes at the national government level.  1977 Treaty, Art. IX.  Canada has initiated discussions with the United States to resolve this matter without a pipeline shutdown.  This Court should prevent Michigan's shutdown order from taking effect while Treaty related discussions between Canada and the United States are ongoing.

### STATEMENT OF INTEREST OF THE GOVERNMENT OF CANADA[3]

The shutdown order that Michigan seeks to enforce poses grave concerns for Canada at two distinct levels: first, for Canada's ability to rely on bilateral treaties that are at the heart of the U.S.-Canada relationship, and second, for Canada's energy security and economic prosperity.

First, this case raises concerns regarding the efficacy of the historic framework upon which the U.S.-Canada relationship has been successfully managed for generations.  The 1977 Treaty is one of many bilateral agreements between the United States and Canada that address their mutual vital interests in continental security, energy security, and economic and environmental cooperation along the longest national land border in the world.[4]  Through formal and informal diplomatic processes and agreements at the national government level, the two close allies have worked together for over a century to secure their common security and prosperity while managing their shared resources and protecting their shared environment.  Cooperation at the national level between the United States and Canada created a successful, integrated regime to protect navigation and the environment in the shared waters of the Great Lakes;[5] it created the NORAD system, under

---

[3] Counsel for the Government of Canada certify that this brief was not written in whole or in part by counsel for any party, and that no person or entity other than the Government of Canada and its counsel has contributed financially to the submission of this brief.

[4] There are over 200 bilateral treaties in force between the U.S. and Canada.  *See* U.S. Dep't of State, Office of Treaty Affairs, Treaty Affairs Staff, *Treaties in Force: A List of Treaties and Other International Agreements in Force on January 1, 2020*, 60 (2020), https://www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf (last visited May 4, 2021).

[5] *See* Treaty Between the United States and Great Britain Relating to Boundary Waters between the United States and Canada, Jan. 11, 1909, 36 Stat. 2449 (the "Boundary Waters Treaty"); Great Lakes Water Quality

2

which a Canadian general gave the order to scramble jets to protect the United States on 9/11/2001;[6] and it led to the North American Free Trade Agreement and its successor, the U.S.-Mexico-Canada Agreement, as well as the side-letter on energy entered into by the two nations in conjunction with that Agreement, in which they mutually committed "to promote North American energy cooperation, including with respect to energy security and efficiency, standards, joint analysis, and the development of common approaches."[7]  As described below, the 1977 Treaty itself was developed as an important element of the United States' energy security and prompted by U.S. efforts to transport hydrocarbon products from Alaska through Canada to the lower 48 U.S. states. Such cooperation remains critically important to North American energy security: as a recent American Petroleum Institute study explains, the close integration of U.S. and Canadian oil and refining markets, including U.S. refiners' sourcing from Canada of most of the heavy oil they use, protects both nations from significant risks including over-reliance on OPEC suppliers.[8]  A network of over 70 pipelines and over 30 electricity transmission lines cross the border, with essential energy moving back and forth unhindered.  The 21 pipelines that flow from the United States to Canada make Canada the largest market for U.S. crude oil exports and transport almost all of Canada's

---

Protocol of 2012, Sept. 7, 2012, 2012 U.S.T. Lexis 86.  The Boundary Waters Treaty establishes the principles and a mechanism for addressing boundary and transboundary water issues along the Canada-United States boundary and has been in force for over one hundred years.  It stipulates that water levels and flows in the boundary waters must not be altered without the approval of the responsible government and the International Joint Commission.  The Great Lakes Water Quality Protocol is the current iteration of an agreement between the United States and Canada first entered into in 1972 to act jointly to restore and maintain the chemical, physical and biological integrity of the waters of the Great Lakes.

[6] *See NORAD and September 11*, CBC DIGITAL ARCHIVES (Sept. 11, 2002), https://www.cbc.ca/archives/entry/norad-and-september-11.  The Agreement on North American Aerospace Defense Command (NORAD) has been a cornerstone of American-Canadian joint defense since 1958.  Its more recent iteration, TIAS 06-512, was entered into on May 12, 2006.

[7] Letter from Ambassador Robert E. Lighthizer to The Honorable Chrystia Freeland, Minister of Foreign Affairs (Nov. 30, 2018), https://www.international.gc.ca/trade-commerce/assets/pdfs/agreements-accords/cusma-aceum/letter-energy.pdf.

[8] *See* ICF Resources L.L.C., *U.S.-Canada Cross-Border Petroleum Trade: An Assessment of Energy Security and Economic Benefits* (March 2021), https://www.api.org/-/media/Files/News/2021/04/ICF_Cross-Border_Analysis_Final.pdf.

3

natural gas imports. It is essential to the continued success of the relationship that both countries can trust that their reciprocal legal commitments will be fully honored and implemented, notwithstanding initiatives at the state, provincial or local government level. It is equally essential that, in the first instance, any treaty issues will be raised and resolved between the Parties to such treaties, rather than by domestic courts.

Michigan's apparent position that it can invoke the "public trust" doctrine to act unilaterally with respect to an international pipeline that crosses the shared Lake Huron/Lake Michigan hydrological system threatens to undermine important aspects of that cooperative international relationship. Canada fully shares Michigan's interest in protecting our shared waters, and works continuously with the United States, in consultation with subnational partners, to do so, including under the Boundary Waters Treaty and other international agreements. But the United States and Canada have agreed to accommodate international transit pipelines under the 1977 Treaty, just as they have agreed to accommodate international navigation under the Boundary Waters Treaty. The agreed international processes for reconciling Canadian interests with U.S. interests and reconciling environmental interests with energy security and economic interests should be followed, and should not be set aside based on unilateral state action under state law. For a domestic court in the United States to enforce a shutdown of the Line 5 pipeline while Canada and the United States are engaged in discussions under the 1977 Treaty concerning substantial issues regarding the compatibility of the shutdown with the 1977 Treaty would undermine confidence in the reciprocal commitments that provide the legal framework for the U.S.-Canada relationship.

Second, the shutdown of Line 5 ordered by Michigan would have immediate and severe adverse impacts in Canada. Since 1953, Canada has relied on Line 5 to transport vital fuels from producers in western Canada to users in central Canada (along with users in Michigan, Ohio and Pennsylvania). Line 5 currently transports up to 540,000 barrels of predominantly western

4

Canadian hydrocarbons (oil and natural gas liquids) per day to refineries in central Canada and the northern United States.[9]  In central Canada, Toronto Pearson International Airport, Canada's largest airport, is heavily reliant on Line 5 for its jet fuel supplies.  Line 5 supplies approximately 66% of Quebec's crude oil needs and about 50% of the feedstock used by Ontario's refineries to make gasoline and other fuels.  A Line 5 shutdown would severely disrupt the supply and increase the price consumers pay for fuel across Quebec and Ontario.  Additionally, Line 5 provides essential feedstock for the Sarnia-Lambton Petrochemical and Refining Complex in Ontario, which employs more than 4,900 people and indirectly generates an additional 23,500 jobs.  In western Canada, the loss of Line 5 would have a devastating impact on the industry and economy.  In the context of an already full pipeline system, it would strand up to 400,000 barrels per day of oil originating from western Canada (much of it destined for the United States).  The rail system may not have capacity to handle such a large volume, and even if it did, diversion to oil-by-rail would increase costs by about $2 billion annually, as well as entailing its own environmental concerns, including a larger carbon footprint.  The shutdown would cause massive revenue losses and potentially significant job losses in the energy sector in western Canada, just as it is struggling to recover from the impacts of covid-19.  Thus, the economic impacts of a shutdown would be immediate and severe both for fuel users in the east and for producers in the west.

Under Michigan's order, Line 5 would be entirely shut down on May 12, 2021.  Even assuming rapid approval (including by Michigan authorities) of Enbridge's plan to build a tunnel across the Mackinac Straits and re-route Line 5 through it, Canada understands that it would likely

---

[9] Four refineries (three in Sarnia (Imperial, Shell and Suncor) and one in Nanticoke (Imperial)) supply the vast majority of gasoline used in the Greater Toronto Area, including the jet fuel for Pearson Airport. Three of the four rely heavily on Line 5 for their crude oil supply.

take at least three years to bring the tunnel online.[10] That would mean that on short notice, and for a long duration, there would be a major interference with the transmission of hydrocarbons destined for Canada, and Canadian producers and users would need to find alternative means of transit for fuel from western Canadian producers to central Canadian (and U.S.) users. That would entail disruption and uncertainty, long-term increased transit costs and impaired energy security, and a likely transition from relatively safe, low-carbon and environmentally sound pipeline transportation to other means of transportation, which are relatively less safe and have more environmental impact, all on a massive scale.[11]

## ARGUMENT

**I.  In Addressing the Issues before It, the Court Should Give Effect to the 1977 Treaty and Consider the Foreign Policy and other Public Interests that Underlie It**

Canada understands that there are multiple issues of U.S. domestic law before this Court, including the applicability of federal question jurisdiction under 28 U.S.C. § 1331, preemption under the Pipeline Safety Act, 49 U.S.C. § 60101, *et seq.*, the revocability (subject to preemption) of the pipeline easement under the public trust doctrine, and Enbridge's compliance with the terms of that easement. Canada will not address purely domestic contested issues of substantive U.S. and Michigan law. However, this Court plainly has jurisdiction over this case currently, and this Court plainly has and will retain jurisdiction over the case in which Enbridge seeks to enjoin Michigan's shutdown order, No. 1:20-cv-01141-JTN-RSK, which is essentially a mirror-image of this case, so

---

[10] *See* ENBRIDGE, *The Great Lakes Tunnel Project*, (last visited May 4, 2021), https://www.enbridge.com/projects-and-infrastructure/public-awareness/line-5-michigan/great-lakes-tunnel-project.

[11] *See Closure of Enbridge Line 5 Would Have Huge Impact on East Canadian Refineries*, STRATAS ADVISORS, June 27, 2019, https://stratasadvisors.com/Insights/2019/062719-Downstream-Closure-of-Enbridge-Line-Would-Have-Huge-Impact-East-Canadian-Refineries.

this Court has and should take the opportunity to allow Canada and the United States to complete their discussions, including pursuant to the 1977 Treaty.

As one of the two Parties to the 1977 Treaty, Canada is uniquely placed to address its significance to this litigation.  Canada respectfully urges the Court to give effect to the Treaty.  The Treaty represents a specific and reciprocal legally binding commitment the United States and Canada each made to the other not to impede the pipeline transit of hydrocarbon products from somewhere in Canada to somewhere else in Canada via the United States, or vice versa.  Its original impetus in the 1970s was to support the proposed Trans-Alaska Pipeline extension from Alaska through Canada to the lower 48 U.S. states, reflecting the United States' critical dependency at that time on hydrocarbon products from north of its main border with Canada.[12]  But the 1977 Treaty is fully reciprocal, and the protection it offers for Canada's interest in binational infrastructure such as Line 5, which has played a vital role in Canada's economy since 1953, was an essential part of the international agreement.  Further, Line 5 remains critical to the energy security of both Canada and many Michigan, Ohio and Pennsylvania residents and businesses.  Allowing the Treaty to be fully implemented is necessary to uphold the United States' commitments under international law and to further the shared U.S.-Canada public interests in energy security and cross-border cooperation.

---

[12] *See* S. Rep. No. 95-9, at 2  ("The Agreement was negotiated in response to a request made by the Congress in the Trans-Alaska Pipeline Authorization Act, Pub. L. No. 93-153, 87 Stat. 576 that: (1) the President determine the willingness of the Government of Canada to permit the construction of pipelines across Canada to carry oil and gas from Alaska's North Slope to markets in the lower 48 states; (2) the terms and conditions which might apply to the operation of such pipelines; and (3) the need for intergovernmental agreements for this purpose.").

First, the 1977 Treaty is self-executing under U.S. law. The congressional record of its ratification makes that clear.[13] As such, the Treaty constitutes federal law that this Court can and should effectuate.

Second, even if that were not the case, it is a fundamental principle of U.S. law that domestic laws are to be interpreted and applied in a manner consistent with treaty and other international law obligations insofar as ambiguity in domestic law or judicial discretion permits. *See, e.g.*, *Murray v. Schooner Charming Betsy,* 6 U.S. 64, 118 (1804) ("an act of congress ought never be construed to violate the law of nations if any other possible construction remains").[14]

Third, the text of the 1977 Treaty provides a clear indication as to how this Court should give it effect. Canada does not contend, and does not understand Enbridge to contend, that the Treaty creates a private right of action for Enbridge against Michigan.[15] Instead, the Treaty specifies its own primary mode of implementation, enforcement and interpretation, which is to occur outside this Court. Article IX(1) provides that "[a]ny dispute between the Parties regarding the interpretation, application or operation of this Agreement shall, so far as possible, be settled by negotiation between them." Article IX(2) and (3) further provide that, absent settlement by negotiation, either Party may submit the dispute to binding arbitration by a three-arbitrator

---

[13] *See* S. Rep. No. 95-9, at 83 (State Dep't Letter: "The agreement is self-executing upon its entry into force, and U.S. implementing legislation accordingly will not be required."). An uncontradicted State Department statement to Congress during the ratification process should be given effect in court. *See, e.g.*, *Cook v. United States*, 288 U.S. 102, 119, n.19 (1933) (relying on pre-ratification statement of Secretary of State to conclude treaty was self-executing); *United States v. Postal*, 589 F.2d 862, 881-83 (5th Cir. 1979) (relying on pre-ratification statements of State Department officials and U.S. negotiators to conclude treaty was not self-executing).

[14] As the Canadian Supreme Court noted in *B010 v. Canada (Citizenship and Immigration)*, 2015 S.C.C. 58, ¶ 48 (Can. 2015), the presumption that domestic legislation is intended to conform to international obligations "is a feature of legal interpretation around the world."

[15] Enbridge has properly raised the 1977 Treaty, *see* Notice of Removal, ECF No. 1, PageID.6, 7, but has not made a claim for affirmative relief under it.

8

international panel.  It is in this context that discussions are currently ongoing between Canada and the United States.  The proper role for this Court in implementing the 1977 Treaty under the current circumstances is to prevent interference with the Treaty-prescribed processes between the two sovereigns.[16]  At such time as those processes yield an agreed outcome, there may be a further role for this Court to enforce that outcome.

**II.     Michigan's Shutdown Order Presents Substantial and Important Treaty Issues**

Given Article IX of the 1977 Treaty, it is neither necessary nor proper for this Court (or any other domestic court) to make a substantive determination under the Treaty at this time.  However, the Court should be under no doubt that substantial and important Treaty issues have been raised, and that Canada is actively seeking what it hopes will be an expeditious, consensual resolution consistent with the Treaty.

As of May 12, 2021, Governor Whitmer's order would completely and unconditionally shut down Line 5.  As such, it would implicate Article II(1) of the 1977 Treaty, which provides:

> No public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit.

Governor Whitmer issued her shutdown order, and Michigan asks this Court (or a state court) to enforce it, as a "public authority in the territory" of the United States.  It would impede the transmission of hydrocarbons along Line 5 directly and maximally.  And Canadian hydrocarbons travelling from producers in western Canada to users in central Canada along an international pipeline as it traverses Michigan fall within the 1977 Treaty's definition of "hydrocarbons in

---

[16] Canada welcomes the Court's direction to Michigan and Enbridge to mediate.  If Michigan and Enbridge can reach a consensual solution that allows hydrocarbon products to continue to flow along Line 5, Canada's concerns may be mooted.  Given time, there may also be scope for productive informal discussions involving both the litigation parties — Michigan and Enbridge — and the Treaty Parties — the United States and Canada.  Canada strongly favors a negotiated, cooperative solution, that respects Michigan's safety and environmental concerns while ensuring an uninterrupted flow of hydrocarbon products along Line 5.

transit": "hydrocarbons transmitted in [an international pipeline] located within the territory of one Party, which hydrocarbons do not originate in the territory of that Party, for delivery to, or for storage before delivery to, the territory of the other Party." 1977 Treaty Art. I(c).

The sole exception to the Article II prohibition on such interference, Article V, is subject to two conditions. First, the exception applies only "[i]n the event of an actual or threatened natural disaster, an operating emergency, or other demonstrable need temporarily to reduce or stop for safety or technical reasons the normal operation" of the pipeline. 1977 Treaty, Art. V(1). Michigan has not, to Canada's knowledge, asserted such a predicate. Second, Article V authorizes only "temporary" measures. Michigan's shutdown order does not appear to be temporary.

A Treaty analysis also may consider Article IV, which permits "regulations by the appropriate governmental authorities having jurisdiction" over international hydrocarbons transit pipelines, subject to those regulations being "just and reasonable" and non-discriminatory vis-à-vis the regulation of comparable local and domestic pipelines. Whereas Article V authorizes temporary emergency shutdowns, Article IV refers to "regulations" and is not listed as an exception to the Article II prohibition on shutdowns. Michigan does not purport to be engaged in "regulation"; indeed, Michigan's motion to remand emphasizes that Michigan "does not seek to change the manner in which Enbridge may continue to operate the Straits Pipelines, or to impose any sort of pipeline safety standard on such operation," but instead seeks a complete and permanent shutdown. Plaintiffs' Brief in Support of Mot. to Remand, ECF. No. 42, PageID.482. There are also questions as to whether the Governor of Michigan is the "appropriate governmental authorit[y] having jurisdiction" over an international pipeline, and whether the shutdown order is just, reasonable and non-discriminatory.

Canada provides the above outline of the substantive issues under the Treaty not to seek a ruling from the Court thereon, but to illustrate that the concerns raised under the Treaty are legally

10

substantial as a matter of both international and U.S. law. They are, of course, also highly substantial as a matter of public policy. The proposed shutdown would cause a massive and potentially permanent disruption to Canada's economy and energy security.

Further, such unilateral action by a single state would impair important U.S. and Canadian foreign policy interests by raising doubts about the capacity of the Government of the United States to make and uphold commitments without being undermined by an individual state. This Court should be vigilant to protect the authority over foreign policy assigned to the President under Article II of the United States Constitution against such undermining by state action or court order. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) ("There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place.") (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)); *Zschernig v. Miller*, 389 U.S. 429, 440-41 (1968) (state "regulations must give way if they impair the effective exercise of the Nation's foreign policy" or "conflict with a treaty"); *Kolovrat v. Oregon*, 366 U.S. 187, 198 (1961) (holding Oregon law preempted by treaty concerning international monetary controls and exchange because "the power to make policy with regard to such matters is a national one from the compulsion of both necessity and our Constitution.").[17]

---

[17] Again, there are commonalities between U.S. and Canadian legal principles regarding foreign relations. Under Canadian law, foreign relations matters, such as dispute resolution under Article IX of the 1977 Treaty, fall to the federal executive branch under the Crown prerogative. *See, e.g., Canada (Prime Minister) v. Khadr*, 2010 S.C.C. 3, ¶35 (Can. 2010) ("The Crown prerogative in foreign affairs includes the making of representations to a foreign government…"), ¶38 ("the courts possess a narrow power to review and intervene on matters of foreign affairs").

11

**III.     This Court Should Ensure that the Shutdown Order Is Not Enforced Prematurely**

As explained above, the shutdown order raises serious issues under the 1977 Treaty that, in accordance with the Treaty, should be addressed by the national governments of the United States and Canada in the first instance.  It also raises serious public policy concerns.  These weighty issues of international law and foreign policy should be resolved at the national governments/Treaty level, not preemptively determined by a state (or federal) domestic court applying Michigan law.  Canada is seeking a mutually agreeable solution that also respects environmental and safety concerns.  But neither this Court nor any state court should act in a way that bypasses and undermines the Treaty.  This Court should hold this case in abeyance pending the outcome of the Treaty process.

Accordingly, Canada respectfully requests that this Court do two things.  First, this Court should hold adversarial litigation on Michigan's complaint (including its motion to remand) in abeyance pending completion of Treaty related discussions.   This Court has discretion to manage its docket, including holding proceedings in abeyance.  *See, e.g.*, *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.") (citations omitted); *Nken v. Holder*, 556 U.S. 418, 426-27 (2009) ("[A reviewing] court's power to hold an [administrative] order in abeyance while it assesses the legality of the order has been described as 'inherent.' . . . . The authority to hold an order in abeyance pending review allows an appellate court to act responsibly.  A reviewing court must bring considered judgment to bear on the matter before it, but that cannot always be done quickly enough to afford relief to the party aggrieved by the order under review. The choice for a reviewing court should not be between justice on the fly or participation in what may be an 'idle ceremony.'").  There is no statutory or other deadline for resolution of

12

Michigan's motion to remand. By exercising that discretion in favor of abeyance, this Court can provide time for a cooperative resolution to be reached — whether through the mediation process the Court has already ordered, through bilateral contacts including under the Treaty process, or through discussions among all interested parties. Delaying any remand will also avoid the potential for a state court adjudicating Michigan's complaint and this Court adjudicating Enbridge's mirror-image complaint (No. 1:20-cv-01141-JTN-RSK) to reach conflicting decisions.

Second, if and when called upon to issue substantive relief, either in this case or in Enbridge's case, this Court should exercise its remedial discretion in a manner that avoids the potential for conflict with the 1977 Treaty and protects the public interest. Any request by the parties for an injunction or stay order necessarily implicates this Court's equitable discretion, which should be exercised in a manner that gives substantial weight to the overall public interest and the balance of harms that would arise from alternative decisions. *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the **balance of hardships** between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the **public interest** would not be disserved by a permanent injunction.") (emphasis added); *Speech First, Inc. v. Schlissel,* 939 F.3d 756, 763 (6th Cir. 2019) (similar balance of hardships and public interest factors in preliminary injunction test); *Nken,* 556 U.S. at 434 (standard stay test mirrors standard preliminary injunction test).

With respect to the public interest in these cases, Canada shares Michigan's interest in protecting the waters of Lake Michigan and Lake Huron. Preventing pollution of those shared waters is an important public interest that Canada, the United States, and subnational jurisdictions

13

have worked together to protect since at least the Boundary Waters Treaty of 1909. However, there has not been a major pollution event involving the Mackinac Straits section of Line 5 in its 68-year history, and Canada understands that the federal agency responsible for regulating Line 5 as to safety, PHMSA, found no unsafe or hazardous conditions in reports based on monitoring and in-line inspections of Line 5 in 2019 and 2020.[18]

On the other side of the ledger, as outlined above, a shutdown of Line 5 would cause certain, immediate and serious harm to several important public interests. Economic prosperity and employment in Alberta and Saskatchewan would be harmed if a key part of their economies — hydrocarbon production — lost efficient and reliable access to its main markets. Central Canada and parts of the northern United States would lose relatively safe, efficient and reliable access to fuel that is essential to the Toronto and Detroit Airports, to businesses that employ thousands of people in Ontario, Quebec, Michigan, Ohio, and Pennsylvania, and to the propane supply on which many residents in Michigan rely for heating and cooking.[19] More expensive and/or more environmentally harmful fuels, or more expensive and more environmentally harmful modes of transit might need to be substituted.[20] In short, businesses, employees, consumers, and potentially

---

[18] *See* Defendant's Supplemental Submission of Correspondence from PHMSA In Support of Defendant's Response to Plaintiff's Motion for Preliminary Injunction, *Michigan v. Enbridge Energy*, Case No. 19-474-CE (Ingham County Cir. Ct June 29, 2020); Stipulation to Modify Second Amended Temporary Restraining Order to Allow for Restart of East Line in Accordance with PHMSA Sept. 4, 2020 Letter, *Michigan v. Enbridge Energy*, Case No. 19-474-CE (Ingham County Cir. Ct. Sept. 9, 2020).

[19] *See* Kelly House, *Canadian Officials to Michigan Senate: Line 5 Shutdown Would Wreck Economy*, BRIDGE MICHIGAN (Mar. 16, 2021), https://www.bridgemi.com/michigan-environment-watch/canadian-officials-michigan-senate-line-5-shutdown-would-wreck-economy; James McCarten, *Line 5 is 'Very Different' from Keystone XL and Canada Will Fight Hard for It: O'Regan*, THE CANADIAN PRESS (Mar. 4, 2021), https://www.cbc.ca/news/politics/line-five-seamus-pipeline-keystone-1.5937406; Chad Livengood, *Q&A: What Happens if State Shuts Down Line 5 Oil Pipeline*, CRAIN'S DETROIT BUS. (June 16, 2019), https://www.crainsdetroit.com/energy/qa-what-happens-if-state-shuts-down-line-5-oil-pipeline; ENBRIDGE, *The Impact of a Line 5 Shutdown* (last visited May 4, 2021), https://www.enbridge.com/~/media/Enb/Documents/Factsheets/FS_Without_Line5_econ_impact.pdf.

[20] Beth LeBlanc, *What a Line 5 Shutdown Would Mean for Michigan's Energy*, DETROIT NEWS (Dec. 20, 2019), https://www.detroitnews.com/story/news/politics/2019/12/19/what-line-5-shutdown-means-

14

the environment, would suffer. Finally, a hastily and unduly imposed shutdown would undermine the confidence in reciprocal, enforceable commitments and cross-border cooperation that lies at the heart of the United States-Canada relationship.

## CONCLUSION

The public and foreign policy interests that would be harmed by a premature shutdown in this case are extraordinarily substantial. Unless and until it is determined that Michigan's shutdown order is consistent with the Parties' rights and obligations established by the United States and Canada in the 1977 Treaty, this Court should take appropriate measures to ensure that Enbridge is not compelled to shut down Line 5.

Respectfully submitted,

Gordon D. Giffin
  *Counsel of Record*
Tami Lyn Azorsky
Simon A. Steel
Grace M. Dickson
**Dentons US LLP**
1900 K Street NW, Ste. 100
Washington D.C. 20006
(404) 527-4020
gordon.giffin@dentons.com

*Counsel for the Government of Canada*

---

michigan-energy-enbridge/4334264002/; *Analysis for the Straits Pipelines*, DYNAMIC RISK, at 278 (Oct. 26, 2017), https://mipetroleumpipelines.org/document/alternatives-analysis-straits-pipeline-final-report ("Alternate markets for light crude and NGLs from western Canada and North Dakota currently transported on Line 5 may be difficult to secure given the limited available pipeline capacity to other markets. To access alternative markets through pipeline expansions or by rail would likely increase the transportation costs for crude oil and NGLs currently transported by Line 5.").

15