**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

|  |  |
|---|---|
| THE STATE OF MICHIGAN, GOVERNOR OF THE STATE OF MICHIGAN, and MICHIGAN DEPARTMENT OF NATURAL RESOURCES,<br><br>        Plaintiffs,<br><br>v.<br><br>ENBRIDGE ENERGY, LIMITED PARTNERSHIP, ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY PARTNERS, L.P,<br><br>        Defendants. | Case No.  1:20-cv-01142-JTN-RSK<br><br>Hon. Janet T. Neff<br><br>**ORAL ARGUMENT REQUESTED** |

**OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**

**ORAL ARGUMENT REQUESTED**

Peter H. Ellsworth (P23657)
Jeffery V. Stuckey (P34648)
DICKINSON WRIGHT PLLC
123 W. Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730
pellsworth@dickinsonwright.com
jstuckey@dickinsonwright.com

Phillip J. DeRosier (P55595)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866
pderosier@dickinsonwright.com

John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Avenue SE, #78
Caledonia, MI 49316
(616) 450-4235
jbursch@burschlaw.com

David H. Coburn
William T. Hassler
Alice E. Loughran
Joshua H. Runyan
Mark C. Savignac
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

*Counsel for Defendants*

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

ARGUMENT ................................................................................................................. 6

I.      Federal question jurisdiction exists over one or more of the State's claims because they require the resolution of substantial disputed issues of federal law .................................... 7

        A.      The State's claims "necessarily raise" questions of federal law .......................... 9

        B.      The federal questions at issue here are "actually disputed." ............................... 16

        C.      The federal questions at issue here are "substantial" because of their great "importance … to the federal system as a whole." .............................................. 17

        D.      The "federal-state" balance approved by Congress and the Constitution demands that this case be resolved in federal court. .......................................................... 20

II.     The action is removable under federal common law because the allegations in the complaint directly implicate foreign policy concerns and interstate navigable waters .... 22

III.    The action is removable under the federal-officer removal statute. ............................... 25

        A.      Enbridge was "acting under" a federal officer .................................................. 25

        B.      Enbridge satisfies the causal nexus requirement. ............................................. 28

IV.     This case falls within the admiralty jurisdiction of the federal courts because it arises out of ostensible fears of damage from maritime commerce on navigable waters. ............... 29

CONCLUSION ............................................................................................................. 30

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Al Shimari v. CACI Int'l, Inc.*,
  679 F.3d 205 (4th Cir. 2012) ...................................................20

*American Elec. Power Co., Inc. v. Connecticut*,
  564 U.S. 410 (2011)...................................................24

*Arkansas v. Texas Gas Transmission Corp.*,
  171 F. Supp. 413 (E.D. Ark. 1959) ...............................................1, 11, 21

*Bennet v. MIS Corp.*,
  607 F.3d 1076 (6th Cir. 2010) ...................................................25

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017)...................................................15

*Caterpillar Inc. v. Williams*,
  482 U.S. 386 (1987)...................................................25

*Caver v. Central Alabama Electric Cooperative*,
  845 F.3d 1135 (11th Cir. 2017) ...............................................27, 28

*City of St. Louis v. Velsicol Chemical Corp.*,
  708 F. Supp. 2d 632 (E.D. Mich. 2010)...................................................28

*Columbia Gas Transmission, LLC v. Singh*,
  707 F.3d 583 (6th Cir. 2013) ...................................................21

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def.
  Ass'n of Phila.*, 790 F.3d 457 (3d Cir. 2015)...............................................28, 29

*Douglas v. Seacoast Products*,
  431 U.S. 265 (1977)...................................................10

*Drawhorn v. Qwest Communications Int'l, Inc.*,
  121 F. Supp. 2d 554 (E.D. Tex. 2000)...................................................12

*Empire Healthchoice Assur., Inc. v. McVeigh*,
  547 U.S. 677 (2006)...................................................7, 19

*Enbridge Energy LP v. State of Michigan*,
  2019 WL 6036699 (Mich. Ct. Claims Oct. 31, 2019), *aff'd*, 957 N.W.2d 53
  (2020)...................................................2

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938)..................................................................................................22

*Ferguson v. Lorillard Tobacco Co.*,
475 F. Supp. 2d 725 (N.D. Ohio 2007)....................................................................26

*Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*,
865 F.3d 1237 (9th Cir. 2017) .................................................................................28

*Grable & Sons Metal Products v. Darue Engineering & Manufacturing*,
545 U.S. 308 (2005)........................................................................................ *passim*

*Grynberg Production Corp. v. British Gas, P.L.C.*,
817 F. Supp. 1338 (E.D. Tex. 1993)..................................................................18, 23

*Gunn v. Minton*,
568 U.S. 251 (2013).......................................................................................9, 17, 20

*Harmon v. OKI Sys.*,
115 F.3d 477 (7th Cir. 1997) ...................................................................................26

*Hernandez v. State Elections Bd.*,
30 F. Supp. 2d 212 (D.P.R. 1998)............................................................................24

*Illig v. Union Electric Co.*,
334 F. Supp. 2d 1151 (E.D. Mo. 2004)....................................................................12

*Illinois v. City of Milwaukee*,
406 U.S. 91 (1972)..............................................................................................24, 25

*Jefferson County v. Acker*,
527 U.S. 423 (1999)..................................................................................................26

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995)............................................................................................29, 30

*Latiolais v. Huntinton Ingalls, Inc.*,
951 F.3d 286 (11th Cir. 2020) .................................................................................28

*Mashayekhi v. Iran*,
515 F. Supp. 41 (D.D.C. 1981) ................................................................................23

*Michigan v. United States*,
994 F.2d 1197 (6th Cir. 1993) .................................................................................29

*Mikulski v. Centerior Energy Corp.*,
501 F.3d 555 (6th Cir. 2007) (en banc) ..................................................................18

*Milwaukee v. Illinois*,
   451 U.S. 304 (1981) ..................................................................................................25

*Mims v. Arrow Fin. Servs., LLC*,
   565 U.S. 368 (2012) ....................................................................................................7

*Nat'l Wildlife Federation v. Secretary of U.S. Dept. of Transp.*,
   960 F.3d 872 (6th Cir. 2020) .....................................................................................2

*National Wildlife Federation v. Alexander*,
   613 F.2d 1054 (D.C. Cir. 1979) ...............................................................................30

*Olympic Pipe Line Co v. City of Seattle*,
   316 F Supp. 2d 900 (W.D. Wash. 2004), *aff'd*, 437 F3d 872 (9th Cir. 2006) .........14

*Olympic Pipe Line Co. v. City of Seattle*,
   No. C032343L, 2003 WL 27392855 (W.D. Wash. Aug. 21, 2003) .........................16

*People of State of Calif. v. H&H Ship*,
   No. 94-10182, 1995 WL 619293 (9th Cir. Oct. 17, 1995) ......................................27

*Portland Pipe Line Cop. v. City of South Portland*,
   288 F. Supp. 3d 321 (D. Me. 2017) .........................................................................16

*Pretka v. Kolter City Plaza II, Inc.*,
   608 F.3d 744 (11th Cir. 2010) .................................................................................26

*Republic of Philippines v. Marcos*,
   806 F.2d 344 (2d Cir. 1986) .....................................................................................23

*Rivet v. Regions Bank of Louisiana*,
   522 U.S. 470 ..............................................................................................................25

*Sequihua v. Texaco*,
   847 F. Supp. 61 (S.D. Tex. 1994) .........................................................................5, 23

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
   451 U.S. 630 (1981) ..............................................................................................22, 23

*Torres v. Southern Peru Copper Corp.*,
   113 F.3d 540 (5th Cir. 1997) ................................................................................5, 23

*United States v. Rands*,
   389 U.S. 121 (1967) ....................................................................................................3

*United States v. Standard Oil Co.*
   332 U.S. 301 (1947) ..................................................................................................25

*Washington Gas Light Co. v. Prince George's County Council*,
 711 F.3d 412 (4th Cir. 2013) ................................................16

*Watson v. Philip Morris, Co.*,
 551 U.S. 142 (2007)..........................................................26

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*,
 583 F. Supp. 2d 259 (D.R.I. 2008)......................................10

*In re World War II Era Japanese Forced Labor*,
 114 F. Supp. 2d 939 (N.D. Cal. 2000) ................................23

**Federal Statutes**

28 U.S.C. § 1331 ......................................................6, 7, 8, 12

28 U.S.C. § 1333 ................................................................29

28 U.S.C. § 1333(1) .............................................................6

28 U.S.C. § 1367 ................................................................15

28 U.S.C. § 1441(a) .........................................................6, 15

28 U.S.C. § 1442(a)(1) ..................................................6, 25, 28

43 U.S.C. § 1311 .................................................................3

43 U.S.C. § 1311(b) ............................................................10

43 U.S.C. § 1314(a) .......................................................1, 3, 10

46 U.S.C. § 30101(a) ....................................................7, 29, 30

49 U.S.C. § 60102(a) ......................................................26, 27

49 U.S.C. § 60104(c) ......................................................14, 16

49 U.S.C. § 60104(e) ......................................................15, 16

49 U.S.C. § 60117(p) ..........................................................14

**Federal Regulations**

49 C.F.R. Part 195..............................................................27

49 C.F.R. § 190.236 ............................................................14

## INTRODUCTION

Given this case's unavoidable foreign-affairs ramifications, federal jurisdiction is not merely permissible but necessary.  The State of Michigan seeks to permanently shut down an Enbridge pipeline—known as Line 5—that has been serving energy markets in Canada and parts of the United States for decades.  The State's proposed shutdown has already triggered Canada to engage directly with numerous high-level U.S. decisionmakers—including the U.S. President and members of his cabinet—to explain how Line 5 is critical to Canada's energy security.

Numerous federal questions are embedded in the State's complaint and must be answered *before* the State is entitled to any relief.  While the State says that it has the "sovereign right to control" the Great Lakes bottomlands underlying the pipeline (Br. 1, ECF No. 42, PageID.480), Congress specifically retained its paramount powers over those same bottomlands for commerce and international agreements, as confirmed in the 1953 Submerged Lands Act.  43 U.S.C. § 1314(a).  And Congress has exercised those powers to prohibit states from shutting down transit pipelines like Line 5.  This Court's interpretation of these federal laws is a necessary prerequisite for the State to prevail.  Further, this case must be decided by federal courts applying a uniform, federal law that is sensitive to foreign-relations concerns and intended to promote the interests of the nation as a whole.

The State's remand brief makes no mention of the Submerged Lands Act, the governing transit treaty with Canada, or the associated arguments, though all appear in Enbridge's removal paperwork.  Instead, the State mislabels these federal issues a "run of the mill preemption defense." Br. 1, ECF No. 42, PageID.480.  This logical flaw undermines the State's entire brief.  Federal law in this case is not merely a defense; it defines the State's rights, creating federal jurisdiction.  *See Arkansas v. Texas Gas Transmission Corp.*, 171 F. Supp. 413 (E.D. Ark. 1959) (removal proper

in trespass action filed by State, as "sole owner" of river bed, to enjoin operations of pipelines laid on the bed of the Mississippi river).  Accordingly, the State's motion to remand should be denied.

## BACKGROUND

Line 5 is a 645-mile pipeline that crosses state borders and the U.S.-Canada border. Compl. at ¶¶ 10, 16, ECF No.1-1, PageID.23-24.  "Beginning in northwestern Wisconsin, the pipeline stretches into the Upper Peninsula of Michigan, takes a right turn at the Straits of Mackinac, and cuts down through the Lower Peninsula before ending in southwestern Ontario." *Nat'l Wildlife Federation v. Secretary of U.S. Dept. of Transp*., 960 F.3d 872, 875 (6th Cir. 2020). In Michigan, a 4.5-mile segment traverses the Straits of Mackinac bottomlands pursuant to an easement the State issued in 1953.  Compl. at ¶¶ 1, 10, 13, 15, ECF No.1-1, PageID.20, 23-24. "[T]he 1953 easement concluded that the granting of the easement was in accordance with the public trust."  *Enbridge Energy LP v. State of Michigan*, 2019 WL 6036699, at *9 (Mich. Ct. Claims Oct. 31, 2019), *aff'd*, 957 N.W.2d 53 (2020).  The easement was issued decades before Congress enacted the comprehensive federal regulatory regime for regulating pipeline safety that exists today.

The State asserts that the easement gives it a right to terminate if Enbridge has breached its terms, subject to notice and an opportunity to cure.  Compl. at ¶¶ 18, ECF No.1-1, PageID.24.  But the State gave no such opportunity here.  Instead, the State sought to unilaterally terminate the easement and then filed suit, seeking an order "requiring Enbridge to (1) cease operation of the Straits Pipelines 180 days from the date of the Notice and (2) permanently decommission the Straits Pipelines in accordance with applicable law and plans approved by the State of Michigan." Compl. at p. 32; ECF No.1-1, PageID.23-24.

Relying on the equal-footing doctrine, the State alleges that it has the power as the sovereign to permanently shut down Line 5.  Compl. at ¶¶ 4, 21-22, ECF No.1-1, PageID.21-22,

23-24; Br. 1, ECF No. 42, PageID.480.[1]  Congress codified the equal-footing doctrine in the 1953 Submerged Lands Act.  *United States v. Rands*, 389 U.S. 121, 127 (1967).  There, Congress ceded "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters."  43 U.S.C. § 1311.  But in so doing, Congress *retained* "all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs."  43 U.S.C.  § 1314(a).   And that Congressional control is "paramount to" the rights and powers of Michigan and other states.  *Id*.

Congress has exercised that paramount authority.  In the mid-1970s—during the oil crisis—the United States negotiated with Canada to ensure Alaska oil could flow unimpeded to the lower 48 States.  Those international parleys resulted in the 1977 Transit Pipeline Treaty, ratified by President Carter with the Senate's advice and consent.[2]  As President Carter explained to the Senate, this treaty "prohibits public authorities of contracting parties from instituting any measures impeding, diverting, redirecting, or interfering with the transmission of hydrocarbons in transit *except in* such events as an actual or threatened natural disaster, an operating emergency, and so forth."[3]  The lead U.S. treaty negotiator explained the agreement's central purpose:  "both

---

[1] The State alleges that Enbridge is in violation of the public trust doctrine and the easement's terms.  Compl. at ¶¶ 23-50, ECF No.1-1, PageID.26-36.  Enbridge has refuted these claims in detailed letters sent to the State in January and February 2021, though these merits issues are irrelevant to the jurisdictional question.

[2] Agreement between the Government of the United States and the Government of Canada concerning Transit Pipelines, Jan. 28, 1977, 28 U.S.T. 7449, TIAS 8720.  *See also* U.S. Dep't of State, *Treaties in Force: A List of Treaties and Other International Agreement of the United States in Force on January 1, 2020*, at 67, *available at* https://www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf.

[3] Papers of the President, President Jimmy Carter's Message to the Senate on the United States-Canada Transit Pipeline Agreement, March 30, 1977, United States, Office of the Federal Register, p. 534 (emphasis added).

the United States and Canada recognized that security of throughput is a fundamental requirement, and both countries have made binding, reciprocal commitments to non-interference."[4]

The Treaty's provisions are consistent with this central purpose.  Article II declares: "No public authority in the territory of either Party shall institute any measures, *other than those provided for in Article V*, which … would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbon in transit."  Art. II(1) (emphasis added).  Article V then makes a limited exception for a "*temporary* reduction or stoppage" in hydrocarbons transmission for a "natural disaster," "operating emergency," or "other demonstrable need."  Art. V(1) (emphasis added).  It also requires that normal pipeline operations must resume when the temporary condition has passed.  Art. V(3).  The Treaty authorizes governmental entities to exercise their regulatory jurisdiction over the transit pipelines (Art. IV), provided that— consistent with Articles II and V—such regulation does not result in a permanent stoppage of flow on the pipeline.  The Executive Branch maintained that this "agreement is self-executing upon its entry into force, and U.S. implementing legislation accordingly will not be required."[5]

The U.S. recognizes that Enbridge's Line 5 falls within the Treaty's protection.  During the ratification hearings, a State Department representative submitted a list of the pipelines transiting the United States that would be covered, and that list included a detailed description of Line 5:  "At Superior, Wisconsin, the system divides into two pipelines, one leg following a northeastern route through Michigan then south to Sarnia, Ontario …."[6]

---

[4] Senate Executive Report No. 95-9, 95th Congress, 1st Session (July 15, 1977), p. 38 (testimony of Julius Katz, Assistant Secretary for Economic and Business Affairs).
[5] Senate Committee on Foreign Relations, Agreement with Canada Concerning Transit Pipelines, S. EXEC. REP. NO. 95-9, at 83 (1977).
[6] *Id*. at 40, 80.

Because the State's complaint requires resolution of federal issues, Enbridge exercised its right to a federal forum and removed this action.  *See* ECF Nos. 1, 12.  While this action was pending, a special committee of Canada's House of Commons conducted hearings over several days and issued an interim report on Line 5.[7]  Canada's Minister of Natural Resources explained that Line 5 "is vital to Canada's energy security" [8] and detailed some reasons why:

- Line 5 is "the source of 53% of Ontario's crude [oil] and 66% of Quebec's via Line 9";

- "[F]our refineries . . . are supplied by Line 5 in Ontario and two in Quebec—in Montreal and in Lévis."

- "Thousands of jobs, on both sides of the border, depend on it.  Thousands of homes, on both sides of the border, depend on it for heating."

- "[I]n Sarnia, to the workers there and to the local economy:  5,000 direct jobs and 23,000 indirect jobs in Sarnia."

- "We raised Line 5 directly with the President and members of his cabinet during our meeting last week."[9]

The special committee of Canada's House of Commons concludes that Michigan's shutdown order strikes directly at Canada's energy security.  "Line 5 is a significant aspect of Canada's economic relationship with the United States and contributes to secure energy supplies in both countries.  Its shutdown could have many implications, including reduced safety, shortages

---

[7] *Enbridge's Line 5:  An Interim Report, Report of the Special Committee on the Economic Relationship between Canada and the United States* (dated April 15, 2021), *available at* https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/report-1/.  This Interim Report and the testimony from Canadian officials are not being introduced for the truth of the matter therein.  Rather, they are being used to show the international scope and importance of the issues raised by the State's complaint.  *See Torres v. Southern Peru Copper*, 113 F.3d 540, 542-43 (5th Cir. 1997) (relying on foreign government's protests, not alleged in the complaint, to find removal was proper); *Sequihua v. Texaco*, 847 F. Supp. 61, 62-63 (S.D. Tex. 1994) (same).

[8] Testimony of the Honorable Seamus O'Regan, Minister of Natural Resources, *available at* https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/meeting-3/evidence#Int-11166045.

[9] *Id.*

5

of various energy products …, and job losses …."[10]   The report adds that the "Government of Canada may take legal action aimed at ensuring the continued operation of Line 5" including by "invoking the 1977 Transit Pipelines Treaty …."[11]

**ARGUMENT**

The removal statute provides:  "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant" to federal court.  28 U.S.C. § 1441(a).  In its motion to remand, the State does not contend that any Act of Congress "expressly provide[s]" that its suit is non-removable.  Nor does it deny that Enbridge properly complied with the procedural requirements for removal.  Rather, it argues only that this case is non-removable because it does not fall within the federal courts' original jurisdiction.

The State is wrong, for four independent reasons.  *First*, there is "federal question" jurisdiction under 28 U.S.C. § 1331 and the *Grable* doctrine because at least one of the State's purported "state" claims turns on a substantial and disputed question of federal law—the scope of federal authority over Straits bottomlands.  *Second*, removal is proper under federal common law, due to the need for uniform federal rules governing foreign affairs and use of interstate, navigable waters.  *Third,* the action is removable under the federal-officer statute, because Enbridge, at the direction and on behalf of the Pipeline and Hazardous Materials Safety Administration (PHMSA), prescribed minimum safety standards for its Lakehead system (including Line 5) under a set of rules known as the Lakehead Plan. 28 U.S.C. § 1442(a)(1).  *Finally*, there is original jurisdiction over this "civil case of admiralty or maritime jurisdiction," 28 U.S.C. § 1333(1), because this case

---

[10] Interim Report at 10, *supra* note 7.
[11] Interim Report at 11, *supra* note 7.

centers on "injury or damage" that, the State says, would be "caused by a vessel on navigable waters," 46 U.S.C. § 30101(a).  In sum, this case belongs in federal court.

## I.     Federal question jurisdiction exists over one or more of the State's claims because they require the resolution of substantial disputed issues of federal law.

The federal district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The State contends that, because its purported causes of action were created by Michigan law, this case "aris[es] under" Michigan law rather than federal law and falls outside § 1331.  Br. 6-7, ECF No. 42, PageID.485-86.  But it is well established that "[e]ven when a right of action is created by state law, if the claim requires resolution of significant federal law, the case may arise under federal law for 28 U.S.C. § 1331 purposes."  *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 379 n.9 (2012); *accord, e.g.*, *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 689-90 (2006) ("A case 'aris[es] under' federal law within the meaning of § 1331 … if … 'the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" (citation omitted)).

The leading case on this facet of federal jurisdiction is *Grable & Sons Metal Products v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005).  Like the State, Grable filed a state-court lawsuit asserting rights over property by means of a cause of action created by state law.  *Id.* at 311.  Like Enbridge, the *Grable* defendant removed to federal court and argued that the court had "arising under" jurisdiction because the plaintiff's state-law claim required the interpretation of a federal statute.  *Id.*  In particular, the plaintiff's assertion of rights over the disputed property—which the IRS seized and sold to satisfy a tax delinquency—turned on whether the Internal Revenue Code required personal service of the seizure notice or merely certified mail.  *Id.*

The district court denied the plaintiff's remand motion, and the Sixth Circuit and the Supreme Court unanimously affirmed.  *Id.* at 311-12.  The Supreme Court first acknowledged that

removal was proper if the case fell within the "arising under" statute, 28 U.S.C. § 1331. *Id.* at 312. While § 1331 is typically invoked by plaintiffs asserting a federal-law claim, there is "another long-standing, if less frequently encountered, variety of federal 'arising under' jurisdiction" for "state-law claims that implicate significant federal issues." *Id.* "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law *that nonetheless turn on substantial questions of federal law*, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* (emphasis added). Consistent with this rationale, federal jurisdiction in such cases requires a "substantial" federal issue, "indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum," *id.* at 313, one that "is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331," *id.* at 313-14. So "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities"? *Id.* at 314.

Applying this standard, the Supreme Court held that there was federal jurisdiction over the case. *Id.* at 314-16. First, the suit necessarily raised a federal issue because it turned on the validity of the IRS's service, a question of federal law. *Id.* at 315. Second, "the meaning of the federal statute [wa]s actually in dispute," with the parties urging competing interpretations. *Id.* Third, the federal statute's proper construction was "an important issue of federal law that sensibly belongs in federal court," because the Federal Government has a "strong interest" in being able to satisfy delinquencies by conveying good title to purchasers "and buyers … may find it valuable to come before judges used to federal tax matters." *Id.* Fourth, "because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement

over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Id*.

The Supreme Court later laid out the *Grable* analysis as a four-element test: "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).  Each of these four requirements is met here and removal was therefore appropriate.

**A.   The State's claims "necessarily raise" questions of federal law.**

As in *Grable*, the State asserts its supposed property rights through state-law causes of action.  Also as in *Grable*, the State's claims necessarily raise questions of federal law.  That is because the *scope* of the asserted property rights necessarily turns on the interpretation of federal laws that burden those rights.  For the reasons that follow, the State is wrong when it says that it "can prove all of its claims without reference to any body of federal law."  Br. 9, ECF No. 42, PageID.488.

The State asserts that, "[u]pon its admission to the Union in 1837," it "took title to all unpatented bottomlands of navigable water within its boundaries, including those in the Great Lakes at the Straits of Mackinac."  Compl. ¶ 4, ECF No. 1-1, PageID.21.  It also alleges that Enbridge holds an easement, granted by the State in 1953, to operate Line 5 across the Straits.  Compl. ¶¶ 7, 13-15, PageID.22-24.  The State claims the right, as title holder to the bottomlands, to terminate that easement and force Enbridge to cease operating Line 5 across the Straits.  Compl. ¶¶ 21-44, PageID.25-32.  The State's remand brief likewise points to this lawsuit's focus on "the use of *State-owned* Great Lakes bottomlands."  Br. 1, ECF No. 42, PageID.480 (emphasis added);

9

*accord, e.g.*, *id.* at 22 (asserting that the complaint challenges "the legality of the location of the Straits Pipelines on *State-owned* public trust bottomlands" (emphasis added)).[12]

But the State's authority over the bottomlands is subject to the Federal Submerged Lands Act. That Act "relinquishes [title to the bottomlands] unto said States … *except as otherwise reserved herein*." 43 U.S.C. § 1311(b) (emphasis added). And the Act goes on to expressly retain for the United States its "paramount" constitutional powers over these lands and waters for purposes of "commerce . . . and international affairs …." *Id.* § 1314(a); *Douglas v. Seacoast Products*, 431 U.S. 265, 284 (1977). The State's "property was burdened from the beginning by this reservation of rights." *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 583 F. Supp. 2d 259, 283 (D.R.I. 2008) (citing *Rands*, 389 U.S. at 122-23). So the Federal Submerged Lands Act governs the scope of the State's property interest.

Exercising those "paramount" rights, the federal government burdened the State's ownership interest in the bottomlands by way of a 1977 Transit Pipelines Treaty with Canada. The Treaty expressly governs not only the "pipeline or any part thereof" but also "all real … property … connected therewith." Art. I. And it declares: "No public authority in the territory of either Party shall institute any measures, *other than those provided for in Article V*, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." *Id.* Art. II(1). The exception for measures provided for in Article V of the Treaty is inapplicable here: That article addresses only "*temporary* reduction[s] of the flow of hydrocarbons" (*id.* Art. V (emphasis added)), whereas the State seeks to force Enbridge to "*permanently* decommission the Straits Pipelines" (ECF No. 1-1 at p. 19,

---

[12] The States *amici* apparently agree, emphasizing that this is a case about "*state-owned* submerged lands" and "vindicate[ing] *state* property rights." Br. of States *Amici* 1-2, ECF No. 43, PageID.512-13 (emphases added).

PageID.37 (emphasis added)).  *See also* Br. 2, ECF No. 42, PageID.481 (acknowledging that the State seeks to force Enbridge to "cease operation of the Straits Pipelines … and … decommission them").  The State's assertion of the right to terminate Line 5's operations across the Straits is diametrically opposed to the federal-law burden that the Treaty imposes on the State's title.

*Arkansas v. Texas Gas Transmission Corp.*, 171 F. Supp. 413 (E.D. Ark. 1959), is directly on point.  There, Arkansas, which claimed ownership over half of the Mississippi River riverbed, sued Texas Gas in state court to eject its pipeline from that submerged land.  *Id.* at 415.  In denying the state's motion to remand, the federal district court explained that Arkansas was claiming the right, as "sole owner," to enjoin "transportation pipe lines" on Arkansas property.  *Id.* at 416.  But "[t]here is, … in the 'sole ownership' claim, the rather obvious assertion, that such ownership is paramount and superior to the rights of the United States" under the Constitution, the Federal Submerged Lands Act, and other laws.  *Id*. at 416-17.  "Conflicts appearing between those provisions and the 'sole ownership' claim, are issues apparent from the face of the plaintiff's original petition … and they compel the conclusion that the plaintiff by that pleading *has raised a federal question*" requiring the denial of its motion to remand.  *Id.* at 417 (emphasis added).

*Arkansas* is materially indistinguishable from this case.  If anything, the argument for federal jurisdiction is stronger here because of the direct conflict between the State's desired remedy and the Treaty with Canada—and the resulting implications for the United States' foreign relations.  Although Enbridge highlighted the *Arkansas* case in its pre-motion conference papers (ECF No. 16, PageID.262), the State makes no mention of the case in its brief, much less the Federal Submerged Lands Act.

Similarly, in *Nicodemus v. Union Pacific Corp.*, plaintiff landowners sued the defendant railroad company, which held easements to run its railway over their land, over its practice of "licensing" telecommunications companies to run their fiber-optic cables along its right-of-way.

440 F.3d 1227, 1233 (10th Cir. 2006).  The plaintiffs asserted state-law claims, but those claims "hinge[d] on whether Union Pacific's use of the right-of-way has exceeded the purpose for which it was granted."  *Id.* at 1234.  And the right-of-way originated in "federal-land grant statutes."  *Id.*  Thus, the scope of plaintiffs' ownership was necessarily a federal-law question.  *Id.* at 1234-35.  Applying *Grable*, the Tenth Circuit held that the federal burden on title meant the case fell within § 1331.  *See id.* at 1234-37.  *Accord, e.g., Drawhorn v. Qwest Communications Int'l, Inc.*, 121 F. Supp. 2d 554 (E.D. Tex. 2000) ("Plaintiffs cannot walk into court and ask to have their rights declared without the court interpreting the federal statutes since the railroads' rights derive from these statutes."); *Illig v. Union Electric Co.*, 334 F. Supp. 2d 1151, 1154 (E.D. Mo. 2004) ("Before plaintiffs can prevail on their state law claims, federal questions such as Trailnet's rights under the Trails Act and whether those rights include licensing to defendant must be answered.").

Similarly, in *Hornish v. King County*, the Ninth Circuit held that a state-law claim seeking "a declaration of rights" over land burdened by a federal railroad easement raised a federal question because the property rights' scope hinged on the construction of a federal law governing the easement's scope.  899 F.3d 680, 689-90 (9th Cir. 2018).  The court explained: "The resolution of this dispute turns on an interpretation of the [federal] Trails Act, because deciding the scope of King County's rights pursuant to the Quit Claim Deed will require this court to determine whether the Trails Act creates, supplements, or replaces any previously existing railroad easement."  *Id.* at 690.  "In other words, 'the vindication of [Plaintiffs-Appellants'] right[s] under state law necessarily turn[s] on the construction of federal law.'"  *Id.* (quoting *Franchise Tax Board of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9 (1983)).

Likewise, in *North Carolina v. Alcoa Power Generating, Inc.*, North Carolina sued in state court for a declaration that it owned a riverbed that Alcoa had purportedly acquired.  853 F.3d 140, 143 (4th Cir. 2017).  Alcoa removed.  *Id.* at 145.  North Carolina's ownership claim turned on

whether the river was navigable when North Carolina became a state. *Id.* at 143-44. And *that* is

a question of federal law. *See id.* at 146-50. The Fourth Circuit affirmed the district court's denial

of North Carolina's remand motion. *Id.* at 149-50.

The case that the State discusses in support of its own position on this *Grable* prong is

inapposite. Br. 11, ECF No. 42, PageID.490. The plaintiffs in *Waldock v. Rover Pipeline LLC*

sued the defendant pipeline company for allegedly "damag[ing] their respective properties by: (1)

diverting excess water out of the easement areas and onto plaintiffs' lands; and (2) entering onto

plaintiffs' property without permission." No. 3:17-cv-959, 2017 WL 3224573, at *1 (N.D. Ohio

July 31, 2017). The claims had nothing to do with the pipeline itself, but rather with the allegedly

tortious actions of the personnel building it. *Id.* at *1-2. The defendant attempted to remove on

the ground that the plaintiffs' state-law tort claims actually "arise[] under the [federal Natural Gas

Act]" because a federal agency, FERC, had authorized pipeline construction and diversion of water

onto the plaintiffs' property supposedly "necessary" to construct that pipeline. *Id.* at *2. But the

plaintiffs "d[id] not question" the defendant's right to condemn the easement and "exercise

complete discretion" in building the pipeline on the easement area—they merely objected to the

defendant's pumping water off the easement area and onto their land. *Id.* at *3. Here, by contrast,

the State directly challenges Enbridge's right to operate the Straits Pipelines *at all* and seeks to

undermine the federal government's decision to commit in the Treaty with Canada to keeping Line

5 in operation. This case is a world away from the garden-variety trespass issue in *Waldock*.

Finally, the State argues that its complaint does not "necessarily raise" any federal issue

because it cleverly drafted the complaint not to reference the Treaty or other relevant federal laws.

Br. 12, ECF No. 42, PageID.491. This argument misunderstands the *Grable* analysis, which turns

on whether the plaintiff's claim *necessarily raises* a federal question—not the plaintiff's artful

pleading. If the State is correct, then *Grable* is a nullity. And nothing in *Grable* suggests that the

13

decision turned on whether the plaintiff mentioned "the Internal Revenue Code" in his complaint. The same is true of the numerous other authorities just discussed. Because the State's claim "to control the use of State-owned Great Lakes bottomlands" cannot be adjudicated without reference to the federal laws that burden the State's ownership, this case necessarily raises federal questions as to the proper interpretation and application of those laws.

A single federal question is enough to satisfy the *Grable* test; *Grable* itself involved only one such question. 545 U.S. at 314. This Court need not look beyond the Treaty to deny the State's remand motion. That said, the federal Pipeline Safety Act further burdens the State's supposed authority to shut down Line 5 by expressly prohibiting states from imposing safety regulations on interstate pipeline operations. *E.g.*, 49 U.S.C. § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation"). Under this language, it is irrelevant whether the federal agency has promulgated a regulation covering the same subject as the state standard. The statute says that a state "*may not* adopt or continue in force safety standards"; in other words, *no* state regulation of pipeline safety is allowed. This is true even if the state safety standards are embodied in an easement.[13] Further, Congress has vested a federal agency—PHMSA—with exclusive jurisdiction to issue an emergency order requiring pipeline closure when an unsafe condition or practice "constitutes or is causing an imminent hazard." 49 U.S.C. § 60117(p); 49 C.F.R. § 190.236.

A court could not grant the State the relief it seeks without answering the federal question of whether the Pipeline Safety Act precludes the State from exercising its asserted property rights to shut down Line 5 based on the supposed safety risks described in the complaint. *E.g.*, Compl.

---

[13] *See Olympic Pipe Line Co v. City of Seattle*, 316 F Supp. 2d 900, 904-07 (W.D. Wash. 2004) (explaining that a state cannot use its status as a party to a contract to regulate in preempted fields and citing U.S. Supreme Court cases in support), *aff'd*, 437 F3d 872, 880 (9th Cir. 2006).

¶¶ 33-44, ECF No. 1-1, PageID.27-32 (asserting authority to terminate Line 5's operations across the Straits based on alleged risk of "destruction" to the Great Lakes, the "inherent risks of pipeline operations," and supposed failures to meet ostensible technical requirements for pipeline safety). The Pipeline Safety Act provides an independent basis for federal jurisdiction under the *Grable* doctrine and further confirms that this case belongs in federal court.[14]

On the merits, the State will doubtless argue that the Pipeline Safety Act does not apply because the State is not trying to regulate pipeline safety, but instead is trying to end the use of the Straits Pipelines entirely, which (according to the State) is consistent with the Act's recognition that states retain authority over pipelines' locations.  49 U.S.C. § 60104(e).  This merits argument does not affect the existence of federal jurisdiction; *Grable* does not ask whether the party asserting federal jurisdiction has a winning (or even a strong) argument on the federal issue.  *Accord, e.g.*, *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1322 (2017) (a nonfrivolous interpretation of federal law is sufficient to confer "arising under" jurisdiction, even if the interpretation is ultimately held to be erroneous).

Equally important, the State's merits argument is wrong.  The Pipeline Safety Act's "location or routing" provision, 49 U.S.C. § 60104(e), is irrelevant to the Straits Pipelines, whose location and routing was determined according to state law by the Michigan Conservation Commission in April 1953.  Complt. ¶ 13, ECF No. 1-1, PageID.23.  What the State desires now—

---

[14] Counts I and II both rest on the State's asserted authority as bottomlands owner, meaning that the federal question of the scope of the burden on the State's ownership is necessarily raised by both counts.  And Count III depends on Count II.  That said, the jurisdictional question can be readily resolved by reference to Count II alone.  Count II turns on the scope of the State's asserted title to the bottomlands and "necessarily raises" the federal question of whether the State's attempt to terminate Line 5's operations across the Straits is consistent with the Treaty's burden on that title.  At a bare minimum, the other two counts would fall within the Court's supplemental jurisdiction, 28 U.S.C. § 1367, making removal of the entire action appropriate, 28 U.S.C. § 1441(a).  *E.g.*, *Nicodemus*, 440 F.3d at 1235 n.8 ("If any one claim within Plaintiffs' complaint supports federal question jurisdiction, a federal court may assert jurisdiction over all the claims").

15

to shut down the existing pipelines based on trumped-up safety concerns—is prohibited by the Act's provision that a "State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  The State's position renders this preemption provision a dead letter because, if that argument were accepted, then a state could adopt its own pipeline safety regulations and provide that any pipeline that failed to comply with them would be shut down.  That is not what Congress said.  Rather, the Act allows states to determine where new pipelines can be built, but it prohibits them from interfering with the operation of an existing pipeline based on purported safety concerns.  *E.g.*, *Olympic Pipe Line Co. v. City of Seattle*, No. C032343L, 2003 WL 27392855, at *1, 3-4 (W.D. Wash. Aug. 21, 2003) (holding that "federal law preempts Seattle's efforts to impose conditions upon continued operation of the [pipeline]" and that Seattle could not rely on its authority under § 60104(e) "to locate pipeline facilities" to impose safety-related conditions since the "location and routing of the pipeline has already been established").[15]

**B.    The federal questions at issue here are "actually disputed."**

Without a doubt, the federal questions at issue here are "actually in dispute."  *Grable*, 545 U.S. at 315.  The State's remand motion does not argue otherwise.  Indeed, in its pre-motion conference filing, the State specifically disputed Enbridge's argument that the State's suit is an attempt to impose state "safety standards" in violation of the Pipeline Safety Act.  *See* ECF No.

---

[15] The federal agency's interpretation confirms that "the location of *new* pipeline facilities may be subject to state or local regulation."  PHMSA Interpretation Response #PI-95-028 (July 24, 1995); *see also, e.g.*, *Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412 (4th Cir. 2013) (holding that Pipeline Safety Act did not preempt local zoning regulation of *new* facility); *Portland Pipe Line Cop. v. City of South Portland*, 288 F. Supp. 3d 321, 430-31 (D. Me. 2017) (holding that Pipeline Safety Act did not bar local government regulation of a *new* loading facility to be constructed *at the end of a pipeline*).  Enbridge is unaware of any case where a court has held that the Pipeline Safety Act allows a state to force an already-built pipeline to relocate based on purported safety concerns or location concerns masquerading as safety concerns, as here.

14, Page ID 253.  The State further declared that it "also oppose[s] [Enbridge's] other arguments for dismissal, e.g. interstate and foreign commerce, and foreign affairs theories."  *Id.* n.1.  "This is just the sort of '"dispute … respecting the … effect of [federal] law"' that *Grable* envisioned."  *Gunn*, 568 U.S. at 259 (quoting *Grable*, 545 U.S. at 313).  A dispute certainly exists.

### C.    The federal questions at issue here are "substantial" because of their great "importance … to the federal system as a whole."

"[F]ederal jurisdiction demands" a "substantial" federal issue "indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum."  *Grable*, 545 U.S. at 313.  Thus, "[t]he substantiality inquiry under *Grable* looks … to the importance of the issue to the federal system as a whole."  *Gunn*, 568 U.S. at 260.

The federal issue in *Grable*—the proper interpretation of the Internal Revenue Code's notice requirement—was "substantial" in the relevant sense because "[t]he meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court."  *Grable*, 545 U.S. at 315.  After all, uncertainty about whether certified mail was sufficient notice had given rise to uncertainty about whether the defendant had really acquired good title to the property by purchasing it from the IRS.  *Id.* at 310-11.  Such uncertainty would make potential buyers wary, hurting the IRS's ability to sell seized property at good prices.  "[T]he ability of the IRS to satisfy its claims from the property of delinquents requires clear terms of notice to allow buyers … to satisfy themselves that the [IRS] has touched the bases necessary for good title."  *Id.* at 315.

The federal interests involved here are of a far higher order than the IRS's interest in ensuring that seized property will fetch a decent price.  Line 5 crosses the U.S.-Canada border pursuant to a Presidential Permit issued by President Eisenhower in 1953 to facilitate foreign commerce, and the 1977 Transit Treaty commits the United States to eschew all measures that would interfere with Line 5's international transmission of hydrocarbons.  In fact, the United States

and Canada have long dealt with environmental issues in the Great Lakes through international agreements.[16]  "Questions of international relations are almost always substantial."  *Grynberg Production Corp. v. British Gas, P.L.C.*, 817 F. Supp. 1338, 1356-57 (E.D. Tex. 1993).

Further emphasizing the ideal that federal courts be available to answer federal questions, the *Grable* Court added that parties interested in IRS property sales "may find it valuable to come before judges used to federal tax matters."  *Grable*, 545 U.S. at 315.  By the same token, parties in cases that turn on the interpretation of federal treaties or federal regulatory regimes like the one created by the Pipeline Safety Act will find it valuable to come before judges with more experience in fields such as federal regulation and international affairs.

The State invokes a four-factor analysis to contend that the federal questions its complaint raises are not substantial but "fact-bound" (Br. 12-13, ECF No. 42, PageID.491-92): "(1) whether the case includes a federal agency … ; (2) whether the federal question is important (i.e., not trivial); (3) whether a decision as to the federal question will resolve the case (i.e., the federal question is not merely incidental to the outcome); and (4) whether a decision as to the federal question will control numerous other cases."  *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 570 (6th Cir. 2007) (en banc).  "[N]o single factor is dispositive and these factors must be considered collectively, along with any other factors that may be applicable."  *Id.*  But these four factors support *Grable* jurisdiction.

*First*, this case "includes" a federal agency—or, actually, the federal government as a whole, acting through the President and Congress to ratify the Treaty—in the relevant sense.  True,

---

[16] The agreements include:  the 1972 Agreement on Great Lakes Water Quality, Apr. 15, 1972, U.S.-Can., 23 U.S.T. 301, CTS 1972/12. Canada and the United States have also entered into the Agreement Concerning the Transboundary Movement of Hazardous Waste, Oct. 28, 1986, Can.-U.S., T.I.A.S. No. 11,099, CTS 1986/39, and the Canada-United States Joint Inland Pollution Contingency Plan, July 25, 1994, U.S.-Can., to address spills and other environmental emergencies along the Canada-United States border.

the federal government is not a party, but the IRS was not a party in *Grable*.  Nonetheless, "[t]he

dispute [in *Grable*] centered on the action of" the IRS.  *Empire*, 547 U.S. at 700.  So too here: The

central federal question in this suit is whether Michigan may shut down Line 5 despite the clear

terms of the Treaty preventing it from doing so, and so the case centers on whether that Treaty is

to be given effect or rendered a nullity.  Further, the State's action in this case undermines the

exclusive jurisdiction of the federal agency—PHMSA— to regulate pipeline safety.

> *Second*, this case implicates extremely important (i.e., not "trivial") matters of international

affairs.   The State complains that Enbridge "attempts to cast the federal issues it raises as

substantial by framing them in the broadest possible terms."  Br. 13, ECF No. 42, PageID.492.

But Enbridge is not "inflat[ing]" the importance of those issues.  *Id.* at 14.  This lawsuit is the

State's attempt to shut down a major channel of interstate and international commerce in the face

of a Treaty expressly prohibiting such interference.  That is why Canada's Minister of Natural

Resources testified in the recent hearings that the Canadian Government is engaging in a "full

court press at the political and diplomatic levels."  *Supra* note 8.  This case is not at all like *Empire*,

where the claims at issue would have only a miniscule effect on the federal government's interest

in attracting able workers.  547 U.S. at 701.  The State also contends that "[t]he proper resolution

of the scope of a pipeline easement is a fact-bound inquiry that looks at the specific context of the

land." Br. 13, ECF No. 42, PageID.492 (quoting *Columbia Gas Transmission, LLC v. Singh*, 707

F.3d 583, 590 (6th Cir. 2013)).  But that plainly is not true of the substantial federal question at

issue here: the proper interpretation of federal law.  Indeed, the State itself opens by declaring that

this case involves "weighty issues" of "enormous consequence."  Br. 1, ECF No. 42, PageID.480.

Its effort to transform the case into a trivial, run-of-the-mill easement dispute fails.

> *Third*, the State does not deny that a decision as to the federal question will resolve the

case.  If the Treaty bars the State from shutting down Line 5, then the litigation will end.

*Finally*, whether a decision here would control other cases depends on whether other plaintiffs make similar attempts to interfere with international pipelines covered by the Treaty. Regardless of whether that comes to pass, the first three factors confirm that the federal issues at stake here are indeed substantial.  They are certainly more substantial than the tax question in *Grable*.

### D.     The "federal-state" balance approved by Congress and the Constitution demands that this case be resolved in federal court.

*Grable*'s fourth and final requirement is that the class of case at issue be "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.  This requirement arises from the concern that large classes of cases that have traditionally been resolved in state court should not be shifted to federal court.  In *Grable*, the Court held that, "because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor."  545 U.S. at 315.

The same can be said here.  It is the rare state-law claim that turns on the scope of the state's authority over bottomlands when Congress has exercised its paramount powers over international agreements and commerce under the Submerged Lands Act.  Opening the federal courthouse doors to such questions would have only a "microscopic effect" on federal court dockets. *Id.*

Indeed, exercising federal jurisdiction in cases like this one would affirmatively *promote* the federal-state balance approved by Congress and by the Constitution.  Under that balance, "the federal government has exclusive power over foreign affairs, and … states have very little authority."  *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 231 (4th Cir. 2012).  Consigning this case

to state court would vest a judge elected by people in a single state with substantial authority over foreign affairs between the United States and Canada, disrupting the federal-state balance.

The State contends that, "[u]nder Enbridge's jurisdictional theory, any dispute over the terms of an easement involving an interstate pipeline could be moved to federal court." Br. 15, ECF No. 42, PageID.494. This is fanciful: very few such cases involve an attempt to force a pipeline to permanently cease its operations over bottomlands. In fact, the last case to raise this precise issue was *in 1959: Arkansas*, 171 F. Supp. 413. The State's reliance on *Columbia Gas* (Br. 15-16, ECF No. 42, PageID.494-95) is misplaced. There, a pipeline sued a landowner in federal court raising an "interference-with-easement" claim. 707 F.3d at 585. Because there was no dispute over the meaning of federal law, the Sixth Circuit held that the pipeline's claim arose under state law. *Id.* at 589-90. The court added that allowing such state law disputes into federal court would "disrupt the congressionally approved balance of federal and state judicial responsibilities." *Id.* at 591. This case, by contrast, raises substantial, disputed federal issues including the proper interpretation of a federal treaty.

*       *       *

In *Grable*, the Supreme Court concluded that "the national interest in providing a federal forum for federal tax litigation is sufficiently substantial to support the exercise of federal-question jurisdiction over the disputed issue on removal." 545 U.S. at 310. Replace "federal tax litigation" with "litigation over the interpretation of federal treaties" and the Court's statement fits this case to a T. Although the State purports to invoke causes of action created by state law, this is fundamentally a federal case, and it amply "justif[ies] resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 313.[17]

---

[17] The sole question presented at this stage is whether the case should be heard in federal court. Yet the amici briefs in support of remand do not explain how amici's interests would be harmed

**II.     The action is removable under federal common law because the allegations in the complaint directly implicate foreign policy concerns and interstate navigable waters**

According to the State, this is just a straightforward property case raising only an intrastate dispute, with no foreign-relations implications.  Br. 23, ECF No. 42, PageID.502.  But since the shutdown order was announced, Canadian officials have protested Michigan's actions, held hearings, and issued an interim report.[18]  The interim report explains that Line 5 is integral to Canada's energy security, with Line 5 providing more than 50% of the crude oil in Ontario and Quebec (via Line 9).[19]  As Canada's Natural Resources Minister explained, Canada has employed a "full court press at the political and diplomatic levels" to stop Michigan's shutdown order.[20] Canada's Assistant Minister of the Americas confirmed that Canada is "looking at all options, including the 1977 [pipeline transit] agreement, for changing this situation."[21]  Canada has directly engaged with numerous high-level U.S. decisionmakers—including the U.S. President and members of his Cabinet—and is considering invoking the dispute resolution clause in the Transit Treaty.[22]  There is a compelling—indeed, unprecedented—need for application of the federal common law here.

Although there is "no federal general common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), it is well-settled that federal courts have the "authority in some limited areas to formulate what has come to be known as federal common law." *Texas Indus., Inc. v. Radcliff Materials, Inc*., 451 U.S. 630, 640 (1981) (quotation omitted).  In particular, federal courts have

---

by having the case heard by this Court.  They do not deny that federal courts are competent to fairly interpret and apply state and federal law—and often do so, including in diversity cases.

[18] *Supra* notes 7, 8.

[19] *Supra* note 9 and accompanying text.

[20] *Supra* note 8.

[21] *See* Hearing before Special Committee on the Economic Relationship between Canada and the United States (Mar. 2, 2021), *available at* https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/meeting-2/evidence.

[22] *Supra* note 7, Interim Report at p. 11.

authority to fashion federal law in areas "in which a federal rule of decision is necessary to protect uniquely federal interests." *Id.* (quotation omitted).  One such area is cases "implicating ... our relations with foreign nations." *Id*. at 641 (footnote omitted).  Because foreign relations are an inherently federal subject, cases raising foreign relations concerns cannot be left to state court judges applying state law.  "[T]here is federal question jurisdiction over actions having important foreign policy implications." *Republic of Philippines v. Marcos*, 806 F.2d 344, 352 (2d Cir. 1986).

Where a case implicates the federal common law of foreign relations, the case "arises under" federal law and may be removed.  In *Torres v. Southern Peru Copper Corp*., 113 F.3d 540 (5th Cir. 1997), the Fifth Circuit held that a suit filed by Peruvian citizens alleging injuries from sulfur dioxide emissions in Peru arose under the federal common law of foreign relations because it implicated vital economic and sovereign interests of Peru.  *Id.* at 541. The Fifth Circuit noted that Peru's mining industry was "critical to that country's economy, contributing up to 50% of its export income and 11% of its gross domestic product" and that the defendant before it was the largest in that industry. *Id*. at 542-43.  The court also observed that Peru had "injected itself into th[e] lawsuit" by submitting an amicus brief protesting the case. *Id*. at 542-43.[23]

Courts have also found the federal interest in treaties—and more generally, the federal interest in fulfilling the obligations of the United States to other countries—sufficient to give rise to federal common law, conferring federal jurisdiction over purported state law claims.  *E.g.*, *Mashayekhi v. Iran,* 515 F. Supp. 41, 43 (D.D.C. 1981) ("Although this case is for breach of contract, the meaning of the Treaty is at the core of any decision and the strong federal interest in

---

[23] *Accord, e.g.*, *Grynberg Production*, 817 F. Supp. at 1356-57; *Sequihua v. Texaco*, 847 F. Supp. 61, 62-63 (S.D. Tex. 1994) (removal proper where the Government of Ecuador officially protested the litigation); *In re World War II Era Japanese Forced Labor*, 114 F. Supp. 2d 939, 943 (N.D. Cal. 2000) (removal proper where the cases "implicate the uniquely federal interests of the United States to make peace and enter treaties with foreign countries").

the interpretation of the Treaty and the resolution of these numerous disputes is sufficient to ground federal court jurisdiction."); *Hernandez v. State Elections Bd.*, 30 F. Supp. 2d 212, 216 (D.P.R. 1998) (federal jurisdiction over purported state-law claims because "[t]he plaintiff's pleadings, viewed in … context … raise important federal implications regarding the relationship between the United States and the Commonwealth of Puerto Rico").  Although nominally couched as state-law claims, the State's action here is inherently federal in nature.

Federal common law governs for an independent reason:  This Complaint is premised on concerns about environmental harm to the Great Lakes from petroleum transport by non-Michigan sources.  It necessarily implicates uniquely federal interests and must be governed by federal common law.  The Supreme Court has long recognized that "[e]nvironmental protection is undoubtedly an area within national legislative power" for which "federal courts may . . . fashion federal common law." *American Elec. Power Co., Inc. v. Connecticut,* 564 U.S. 410, 419, 421 (2011) (cleaned up).  *Accord, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91, 99 (1972) ("The question is whether pollution of interstate and navigable waters creates actions arising under the 'laws' of the United States within the meaning of § 1331(a).  We hold that it does; and we also hold that § 1331(a) includes suits brought by a State.").  Here, the Complaint's gravamen is that international and interstate petroleum transport could result in environmental damage.  Compl. Ex. 2 at pp. 5-9, ECF No. 1-1, PageID.57-61.  Such claims inherently implicate national and international interests that require consistency and thus must be governed by a uniform, federal common-law rule, as opposed to interests unique to the State of Michigan.

The State invokes the well-pleaded complaint rule.  Br. 18-21, ECF No. 42, PageID.497-500.  But in doing so, the State misunderstands the relationship between state law and federal common law.  The State argues that plaintiffs can usually avoid removal by pleading only state-law claims, even if federal claims are available.  Br. 18, ECF No. 42, Page ID.497, citing

*Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  But in an area that the Constitution instructs is governed exclusively by federal law, state law cannot apply.  "[I]f federal common law exists, it is because state law cannot be used."  *Milwaukee v. Illinois*, 451 U.S. 304, 313 n.7 (1981).  Put another way, such a plaintiff cannot choose between state and federal law, because no state law exists.  Any claims by the plaintiffs, even if nominally couched as state-law claims, are inherently and necessarily federal in nature.  A federal question is "necessary" not only where "federal law completely preempts a plaintiff's state-law claim," *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475 (1998), but also where the constitutional structure mandates the application of federal law.  *See City of Milwaukee*, 451 U.S. at 313 n.7.[24]  And despite the State's contrary suggestion (Br. 16-18, ECF No. 42, PageID.495-97), state law can be wholly displaced in "matters essentially of federal character," even when "Congress has not acted affirmatively about the specific question."  *United States v. Standard Oil Co.*, 332 U.S. 301, 307 (1947).

## III.  The action is removable under the federal-officer removal statute.

This action was also properly removed under the federal officer statute.  That statute provides removal jurisdiction where a private defendant shows (1) that it "act[ed] under [a federal] officer"; (2) there is a causal connection between the plaintiff's claims and the actions performed under color of federal office; and (3) the defendant raises a "colorable federal defense."  28 U.S.C. § 1442(a)(1); *Bennet v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010).  Here, the State challenges the first two elements.  *See* Br. 26-27, ECF No. 42, PageID.505-06.  The third element is not in dispute.  Enbridge has a "colorable federal defense":  federal preemption of state law.

### A.   Enbridge was "acting under" a federal officer

---

[24] *See also* U.S. *Amici* Brief at 26-28, filed in *BP P.L.C. v. Mayor and City of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020) (explaining that removal was proper under federal common law in climate change lawsuit, although nominally couched in state law claims), *available at* https://www.scotusblog.com/case-files/cases/bp-p-l-c-v-mayor-and-city-council-of-baltimore/.

Enbridge satisfies the "acting under" requirement.  A private defendant "act[s] under" a federal officer when it has a relationship with the federal government such that the government is functioning as defendant's superior.  *Watson v. Philip Morris Cos*., 551 U.S. 142, 151-52 (2007). That relationship typically involves "subjection, guidance, or control" and must involve an effort to "assist, or to help carry out," the duties or tasks of the federal government.  *Id*.  But the words "acting under" are "broad" and must be "liberally construed" to effectuate § 1442(a)(1)'s policy objectives—principally, "to protect the Federal Government from [state] interference with its 'operations.'"  *Watson*, 551 U.S. at 150.  The Supreme Court has instructed district courts to "credit the [removing defendant's] theory of the case for purposes of . . . [this] jurisdictional inquiry." *Jefferson County v. Acker*, 527 U.S. 423, 431-32 (1999).

Enbridge worked hand-in-hand and at the direction of its federal regulator PHMSA to develop and prescribe additional safety standards for Enbridge's Lakehead system (including Line 5).  The Pipeline Safety Act states that the "Secretary [of Transportation] shall prescribe minimum safety standards …" that "apply to *any* or all of the owners or operators of pipeline facilities." 49 U.S.C. § 60102(a)(2) (emphasis added).  As part of a 2012 order, PHMSA directed Enbridge to take corrective actions on all of the pipelines in the Lakehead system (including Line 5) "to protect the public and the environment."  Ex. A attached hereto, Declaration of David Stafford at ¶ 6.[25]  A subsequently-executed Consent Agreement and Order required Enbridge, on behalf of

_____

[25] This declaration is properly considered in deciding whether a court has subject matter jurisdiction pursuant to a removed action.  *See Pretka v. Kolter City Plaza II, Inc*., 608 F.3d 744, 774 (11th Cir. 2010) ("[T]he jurisdictional evidence ... attached to its opposition to remand should not have been excluded merely because it was submitted in response to the plaintiffs' motion to remand."); *Harmon v. OKI Sys*., 115 F.3d 477, 479-80 (7th Cir. 1997) ("[S]hould a court really be barred from considering reliable evidence ... merely because the evidence was not in the record on the date of removal?  The test should simply be whether the evidence sheds light on the situation which existed when the case was removed."); *Ferguson v. Lorillard Tobacco Co*., 475 F. Supp. 2d 725, 728 (N.D. Ohio 2007) (relying in part upon defendant's declaration showing facts supporting federal officer defense to overrule plaintiff's motion to remand).

PHMSA, to identify additional safety standards for its Lakehead system to "provide adequate protection against risks to life and property posed by pipeline transportation." 49 U.S.C. § 60102(a)(1). The additional safety standards were formally prescribed by Enbridge, upon acceptance by PHMSA, under a "comprehensive written plan"—known as the Lakehead Plan. Ex. A, Stafford Decl. at ¶ 8.

This process to prescribe additional safety standards under the Lakehead Plan extended from 2012 to 2016 and far exceeded the usual regulator/regulated relationship. *Id.* at ¶ 8. While PHMSA's safety standards at 49 C.F.R. Part 195 generally apply to all operators, the Lakehead Plan established safety standards unique to Enbridge, overhauling federally-enforceable requirements applicable to the Lakehead system (including Line 5). Ex. A, Stafford Decl. at ¶¶ 13-15. The new safety standards extended to among other subjects, integrity management (*id.* at ¶ 17), leak detection safety standards (*id.* at ¶ 18), standards to improve the effectiveness and safe control of its pipeline operations by control room staff during normal and abnormal operating conditions (*id.* at ¶ 19), valve placement, damage prevention, safety management systems, and public awareness (*id.* at ¶ 20). Enbridge's process to develop and implement the Lakehead Plan was under PHMSA's direct "subjection, guidance, or control," and fulfilled PHMSA's duty to prescribe safety standards to protect the public. PHMSA continues to audit Enbridge's compliance with safety standards, including those prescribed by the Lakehead Plan. *Id.* at ¶ 22.

Courts have found the "acting under" requirement satisfied in analogous circumstances. For example, in *Caver v. Central Alabama Electric Cooperative*, 845 F.3d 1135 (11th Cir. 2017), the defendant performed tasks under the federal government's "close supervision" pursuant to a statute designed to guide and control a basic government task—bringing electricity to underserved rural areas. *See id.* at 1143-44. In this sense, the defendant was "closer in kind to a federal contractor performing work on behalf of the government than a private business working for its

own ends." *Id.* at 1144. Similarly, courts have found that private companies "act under" federal authority when they perform EPA-directed cleanups. *E.g.*, *People of State of Calif. v. H&H Ship*, No. 94-10182, 1995 WL 619293, at *1-2 (9th Cir. Oct. 17, 1995) (defendants were federal officers when their actions were taken as part of a spill cleanup supervised by the Coast Guard to protect the public welfare); *City of St. Louis v. Velsicol Chemical Corp*., 708 F. Supp. 2d 632, 660 (E.D. Mich. 2010) (allowing federal-officer removal where EPA exercised direct and detailed control pursuant to a settlement agreement pursuant to a federal environmental statute). Similarly, here, PHMSA subjected Enbridge's operations to an unprecedented level of control and supervision for a specific and important public function. The "acting under" requirement is met.

>      **B.**      **Enbridge satisfies the causal nexus requirement.**

Enbridge also satisfies the causation element because the State's claims concern acts "for or relating to" the Lakehead Plan—acts that Enbridge performed under the color of federal office. Historically, the hurdle erected by this second requirement was "quite low." *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244-45 (9th Cir. 2017). In 2011, Congress lowered the bar even further. *See Craver,* 845 F.3d at 1144; *Latiolais v. Huntinton Ingalls, Inc*., 951 F.3d 286, 291-92 (11th Cir. 2020). As amended, the federal statute requires that the conduct at issue "relate to" acts under color of federal office. 28 U.S.C. § 1442(a)(1). This test requires nothing more than a "connection or association" between the acts in the lawsuit and the federal office. *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila*., 790 F.3d 457, 471 (3d Cir. 2015). Enbridge satisfies this low hurdle.

Here, the State asserts that Enbridge's current use of Line 5 in the Straits bottomlands, including its operational and safety management practices, creates a risk and thus violates the public trust doctrine. But through the Lakehead Plan, the federal government exercised an unprecedented level of control of those very practices to protect the public. Thus, a connection

exists between the State's claims and Enbridge's actions under the Lakehead Plan.  To the extent

the State suggests differently (Br. 27, ECF No. 42 PageID.506), Enbridge could but is not required

to show that the exact same conduct it took at the behest of the federal government caused the

perceived risk upon which the State now relies.  *E.g.*, *In re Commonwealth's Motion*, 790 F.3d

457, 470 (3d Cir. 2015) ("[W]e disagree that the [Defendant] is required to allege that the

complained-of conduct *itself* was at the behest of a federal agency.").

In sum, Enbridge has satisfied the first and second requirements of the federal officer

statute.  The State does not dispute the third and last requirement.  Br. 26-27, ECF No. 42,

PageID.505-06.  The State's remand motion should be denied.

**IV.  This case falls within the admiralty jurisdiction of the federal courts because it arises out of ostensible fears of damage from maritime commerce on navigable waters.**

Finally, there is original jurisdiction over this case because it falls within the federal

admiralty jurisdiction.  The Constitution provides that "[t]he judicial power [of the United States]

shall extend … to all cases of admiralty and maritime jurisdiction."  *Michigan v. United States*,

994 F.2d 1197, 1203 n.5 (6th Cir. 1993) (quoting U.S. Const. Art. III, § 2).  Congress has

confirmed this grant of jurisdiction by statute: "The district courts shall have original jurisdiction

… of: (1) Any case of admiralty or maritime jurisdiction."  28 U.S.C. § 1333.  And Congress has

further specified that "[t]he admiralty and maritime jurisdiction of the United States extends to and

includes cases of injury or damage, to person or property, *caused by a vessel on navigable waters*."

46 U.S.C. § 30101(a) (emphasis added).  This provision sweeps broadly, applying even where "the

injury or damage is done or consummated on land."  *Id.*

The State's complaint leaves no doubt that claims of "damage … caused by a vessel on

navigable waters" form the heart of its case.  The Straits, of course, are navigable and are the site

of substantial maritime commerce on the Great Lakes.  Br. 23, ECF 42, PageID.502 ("the Straits

Pipelines are located in navigable waters"); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 530 (1995) (recognizing that "the Chicago River [is] a navigable waterway within the meaning of" federal admiralty law); *National Wildlife Federation v. Alexander*, 613 F.2d 1054, 1061 n.12 (D.C. Cir. 1979) ("the Chicago River is as much a part of the navigable waters of the United States as is the Strait of Mackinac" (quoting 20 Op. Att'y Gen. 101, 106 (1891))). And the State's Complaint acknowledges that its purported concern is "anchor strikes and other external impacts to the Pipelines." Compl. ¶ 33, ECF No. 1-1, PageID.27; *accord, e.g.*, Compl., Ex. 2 at 5-7, ECF No. 1-1, PageID.57-61. A case about "anchor strikes" in the vicinity of the Straits of Mackinac is a "case[ ] of injury or damage … caused by a vessel on navigable waters." 46 U.S.C. § 30101(a); *see also, e.g.*, *Jerome B. Grubart*, 513 U.S. at 529 (holding that federal admiralty jurisdiction embraced a lawsuit about flooding of a freight tunnel under the Chicago River as a result of piledriving from a barge on the River). It therefore falls well within "[t]he admiralty and maritime jurisdiction of the United States." 46 U.S.C. § 30101(a). For this reason, too, this case belongs in federal court.

## CONCLUSION

Enbridge's remand papers and its pre-motion briefing highlighted many of the cases, statutes, and treaties that establish this case as within federal jurisdiction. The State has chosen to ignore nearly all of them in its opening brief, depriving Enbridge of an opportunity to respond to any State counterarguments in this brief. These authorities prove that federal and international law limits the State's ability to control the Straits bottomlands, thus establishing jurisdiction in this Court. This Court should deny the State's motion to remand and set a briefing schedule for Enbridge's motion to dismiss.

Dated this 27th of April, 2021

Respectfully submitted,

s/   Peter H. Ellsworth
Peter H. Ellsworth  (P23657)
Jeffery V. Stuckey (P34648)
DICKINSON WRIGHT PLLC
123 W. Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730
pellsworth@dickinsonwright.com
jstuckey@dickinsonwright.com

Phillip J. DeRosier (P55595)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866
pderosier@dickinsonwright.com

John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Avenue SE, #78
Caledonia, MI 49316
(616) 450-4235
jbursch@burschlaw.com

David H. Coburn
William T. Hassler
Alice E. Loughran
Joshua H. Runyan
Mark C. Savignac
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
dcoburn@steptoe.com
whassler@steptoe.com
aloughran@steptoe.com
jrunyan@steptoe.com
msavignac@steptoe.com