# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| THE STATE OF MICHIGAN, *et al.*, ) <br> ) <br> *Plaintiffs,* ) <br> ) <br> v. ) <br> ) <br> ENBRIDGE ENERGY, LIMITED ) <br> PARTNERSHIP, *et al.*, ) <br> ) <br> *Defendants.* ) <br> _____) | Case No. 1:20-cv-01142-JYN-RSK <br><br> Hon. Janet T. Neff |

## JOINT AMICUS BRIEF OF NORTH AMERICA'S BUILDING TRADES UNIONS AND UNITED STEELWORKERS, AFL-CIO, IN SUPPORT OF ENBRIDGE'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

David R. Jury, General Counsel
Matthew Lutwen, Assistant General Counsel
United Steelworkers
60 Boulevard of the Allies, Room 807
Pittsburgh, Pennsylvania 15222
412/562-2545
djury@usw.org
mlutwen@usw.org

John G. Adam (P37205)
Law Office of John G. Adam, PLLC
5495 Clearview Drive
Troy, Michigan 48098
248/227-9898
jgabrieldam@gmail.com

*Counsel for United Steelworkers,
AFL-CIO*

Victoria L. Bor
Jonathan D. Newman
Amanda Tomack
Sherman Dunn, P.C.
900 Seventh Street, N.W., Suite 1000
Washington, D.C.  20001
202/785-9300
bor@shermandunn.com
newman@shermandunn.com
tomack@shermandunn.com

John Canzano (P30417)
McKnight, Canzano, Smith, Radtke &
Brault, P.C
423 N. Main, Suite 200
Royal Oak, MI 48067
248/354-9650
jcanzano@michworkerlaw.com

*Counsel for North America's Building
Trades Unions*

## INTRODUCTION

The State of Michigan has sued Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P. (together "Enbridge") in Ingham County Circuit Court, seeking a declaratory judgment approving Michigan's order revoking and terminating the State's easement for Enbridge's Line 5 pipeline and an injunction permanently enjoining Enbridge from operating the pipeline, effective May 12. If granted, the relief Michigan seeks will result in the loss of thousands of unionized middle-class jobs and major interruptions in the flow of energy to multiple states and provinces in the United States and Canada. Because the State's request for relief directly implicates issues of federal and international importance, Michigan's motion to remand should be denied.

This brief is being filed jointly by North America's Building Trades Unions ("NABTU") and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO·CLC ("USW") (collectively, "the Union Amici"). NABTU and USW are international labor organizations that represent employees in both the United States and Canada, including thousands of employees whose livelihoods would be endangered if Michigan succeeds in this lawsuit.

Michigan denies any attempt to regulate or impact national interests, asserting instead that its claims solely concern the State's right to determine the pipeline's siting. But the pipeline at issue carries light crude oil and natural gas liquids (NGLs) from Superior, Wisconsin, across Michigan's Upper Peninsula, through the Lower Peninsula, under the Straits of Mackinac, and into Ontario, Canada. Although Michigan's revocation of the 1953 Easement[1] technically applies only

---

[1] The easement is the Straits of Mackinac Pipe Line Easement Conservation Commission of the State of Michigan to Lakehead Pipe Line Company, Inc. Complaint, ECF No.1-1, Page ID.20.

to the four miles of Line 5 that run through the Straits of Mackinac, closing that portion of Line 5 will halt the flow of product throughout Line 5's entire 645-mile length, and will affect workers, communities, and industries in the states of Wisconsin, Michigan, Ohio, and Pennsylvania, and in Canada's Ontario and Quebec provinces.  Enbridge removed Michigan's case to this Court, and Michigan has moved to remand its case back to state court.

The Union Amici collectively represent thousands of employees in the U.S. and Canada who operate, maintain, and repair not only Line 5, but also the facilities that transform the product Line 5 carries into energy stock on which several states and provinces in the U.S. and Canada depend.  On its face, Michigan's complaint purports to raise only state court issues: whether the state had both the authority and the grounds to terminate the 1953 Easement.  However, as Enbridge details in its Opposition to Plaintiffs' Motion to Remand (ECF No. 47), embedded in those state law claims are significant issues of federal and international law.

The Union Amici, who represent significant Line 5 stakeholders, file this brief to illustrate that the issues this case raise are inherently federal and should be decided by a federal court. The Amici fully support Enbridge's position, and will not repeat its arguments in full. Instead, after setting forth their interests in this matter, the Union Amici will begin by placing this dispute in context, by explaining the impact closing Line 5 will have on the thousands of men and women the Union Amici represent and whose work is directly affected by Line 5.  The Union Amici will then address two factors that underscore Enbridge's argument that the complaint satisfies the test set forth in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308 (2005), for determining whether a state law complaint may be removed because a question of federal law is embedded in the complaint: (1) that whether a complaint raises a federal issue under

2

*Grable* does not depend on the plaintiff's artful pleading, and (2) that the scope of interests implicated in this case demonstrates that the federal issues at stake are substantial.

## INTEREST OF THE AMICI

NABTU is a labor organization composed of fourteen national and international unions that collectively represent more than 3 million men and women in the construction trades across the U.S. and Canada. Hundreds of thousands of these workers are regularly employed on and around the pipelines that carry – and the facilities that process – vital sources of the energy on which the U.S. and Canada rely.

The work involved in building and maintaining the pipelines is primarily performed by four of NABTU's affiliated unions, commonly referred to as the Pipeline Trades. The United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada represents workers who perform pipefitting and welding on the pipelines. The International Union of Operating Engineers represents heavy equipment operators, mechanics and surveyors who operate, maintain, and repair the heavy equipment used on pipeline projects. Workers represented by the International Brotherhood of Teamsters move material and people to, from and around the sites at which the pipelines are being constructed, repaired and maintained. And the Laborers International Union of North America represents a wide array of construction laborers, whose responsibilities on pipeline construction and maintenance include tasks related to clearing the rights of way, site preparation, pipe placement, and clean-up and restoration of the landscape after the pipeline is buried.

Along a pipeline's route are pumping and service stations, through which employees monitor and regulate the pressure of the product flowing through the operating pipeline. Here, electrical workers represented by the International Brotherhood of Electrical Workers join

members of the Pipeline Trades in ensuring the instruments, valves, gauges, pumps, and motors operate properly on a day-to-day basis, perform annual and as-needed inspections and repairs, and participate in capital improvement projects, replacing equipment and upgrading the stations' capacity.

Constructing and maintaining the pipelines themselves accounts for hundreds of thousands of jobs for construction workers.  But it is also only part of the work tradespersons perform in ensuring communities in the U.S. and Canada receive a consistent supply of energy sufficient to heat and power homes and businesses and fuel all manner of vehicles, from cars to mass transit to airplanes.  Pipelines like Enbridge's Line 5 deliver feedstock to refineries, which refine crude oil, and to "depropanizers" (also called "fractionators"), which separate propane and butane from natural gas liquids. Members of all of NABTU's affiliates[2] perform critically important maintenance in these facilities, both on a daily basis, inspecting, maintaining and repairing the intricate networks of piping and equipment, and periodically overhauling the entire system, during critically important maintenance shutdowns and turnarounds.

USW represents approximately 600,000 members in the U.S. and Canada in numerous industrial and other sectors, including the energy sector, where it represents employees working in oil refineries, as well as those involved in maintaining and constructing pipelines.  USW is the largest union in the American refining industry, representing workers at over seventy refining

---

[2]  In addition to the four Pipeline Trades and the IBEW, NABTU's other affiliates are: the International Union of Bricklayers and Allied Craftworkers; the International Union of Elevator Constructors; the International Union of Painters and Allied Trades; the Operative Plasterers' and Cement Masons' International Association; the International Association of Sheet Metal, Air, Rail and Transportation Workers; the United Union of Roofers, Waterproofers and Allied Workers; the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; the International Association of Heat and Frost Insulators and Allied Workers; and the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers.

locations in the U.S., facilities that together contribute over two-thirds of the nation's domestic fuels.

This case is about far more than the status of a single easement in Michigan. It raises serious questions about the relative authority of a state and the federal government to regulate pipeline safety and control the flow of oil and gas. The questions are particularly significant here, where the pipeline in contention runs through multiple states and both the U.S. and Canada. NABTU, its affiliated unions, and USW together represent thousands of workers whose livelihoods, families and communities depend on the safe and consistent operation of Line 5 and the industries Line 5 feeds. NABTU and USW therefore have a strong interest in this case.

## ARGUMENT

I.  **Shutting Down Line 5 Would Have Devastating Effects on the Workers Whose Jobs and Communities Depend on It**

There is no question that shutting down Line 5 will have a direct, concrete impact on workers represented by the Union Amici and on international communities. Line 5 traverses Wisconsin and Michigan and Ontario, Canada. Refineries in Michigan, Ohio, Pennsylvania, Ontario and Quebec also depend on Line 5. Operating and maintaining the pipeline and its associated industrial facilities provides thousands of members of the Union Amici with meaningful work and solid, middle class wages and benefits. Shutting down Line 5 would threaten these workers' financial security, both in the present economy and in the future. And it would thwart the ability of the construction industry in the affected areas to train the next generation of skilled crafts workers.

The work that workers in the building trades generally perform on and around pipelines was described above. Employees represented by NABTU's affiliates perform all these tasks, specifically on and around Line 5.

For members of the building and construction trades, the work associated with Line 5 falls into two basic categories: (1) maintaining the current pipeline, and (2) servicing the heavy industry Line 5 supports.  With respect to the pipeline itself, Enbridge operates twelve pumping stations and crude storage facilities along Line 5's route across the Upper Peninsula. Members of the trades routinely service these facilities, ensuring the pressure gauges and pumps are operating properly, as well as repairing and replacing equipment on an as-needed basis. These workers also monitor Line 5 itself, inspecting the pipeline and its structural components (including, for example, its supports) for problems like corrosion, dents, and cracks, and making the necessary repairs to address any problems.  Such repairs can include anything from reinforcing a portion of pipe to full-scale replacement of a pipe segment.

In addition to work on the pipeline, Line 5 supports thousands of jobs in facilities that process and utilize the crude and NGL it carries.  This includes a wide variety of industrial facilities, but for purposes of this discussion, the Union Amici will focus on the refineries and NGL fractionators.

Line 5 begins in Superior, Wisconsin, the site of a fractionator operated by Plains Midland Canada (PMC).  USW represents approximately 160 production and maintenance employees at Enbridge Employee Services, Inc., in Superior, Wisconsin, the main terminal for Line 5.  Should Line 5 be shut down or idled, it is likely these employees would face temporary, and possibly permanent, job loss.  Traversing Michigan, Line 5 is the exclusive source of NGLs to a fractionator in Rapid River, Michigan, a facility that is the primary source of propane for the Upper Peninsula. The pipeline also provides nearly 30% of the crude processed by Marathon Oil's Detroit facility.

At Marysville, Michigan, Line 5 feeds into and is the sole source of product for Enbridge's Line 9, which provides the crude for two Ohio refineries: PBF Energy Toledo and BP-Husky

6

Toledo.  USW represents approximately 400 production and maintenance and office and technical employees at PBF Energy's Toledo Refinery, and 300 process, production, and maintenance employees at the BP-Husky Toledo Refinery.

In Canada, Line 5 is the major source of product to Sarnia, Ontario's vast industrial base, providing NGLs to PMC's Sarnia fractionator, which separates butane and propane, and crude to Imperial Oil's Sarnia operations, a complex that consists of a refinery, chemical plant, and petroleum research facility; the Suncor Sarnia refinery; and the Shell Sarnia refinery.  Further into Canada, Line 5 feeds Enbridge pipelines that support the Imperial Nanticoke refinery in Ontario, and via another Enbridge pipeline, the Suncor Montreal and Valero Quebec City refineries in the province of Quebec.  And back into the U.S., Line 5 feeds another pipeline that supports United Refining's facility in Warren, Pennsylvania.

These are all large facilities, covering acres of land and housing a web of complex, heavy machinery that must operate consistently and, except in the case of required maintenance, without interruption to provide the energy and fuel needed to meet consumer demand.  The skilled building trades men and women of NABTU's affiliates constantly monitor, maintain and repair this equipment in facilities across the upper Midwest and in Canada.  Thousands of these workers are employed on an on-going basis in these facilities, while thousands of others are brought in on an as-needed or regularly scheduled basis, when the plants are completely shut down to permit full-scale equipment overhauls.

Enbridge estimates that if Line 5 ceases operation, the refineries in Michigan, Ohio, Ontario, Quebec and Pennsylvania will lose 40% of their crude supply and, with that reduction in product, will either close completely or become significantly less competitive.  *See* Complaint in

*Enbridge v. Whitmer*, Case No. 20-cv-1141 (W.D. Mich.), at ¶54.  In either case, the impact on workers who depend on Line 5 for their employment would be dramatic.

Take just the two Ohio refineries.  Data collected by NABTU's affiliated unions shows that in 2020 – a year when one would expect employment to have been affected by the pandemic – the workers they represent performed 2,000,614 hours of routine and large-scale maintenance at the PBF Energy and BP-Husky refineries in Toledo, Ohio, a number that roughly reflects full-time equivalent employment for 1,000 workers.[3]  Wage rates vary by trade and by experience level, but for purposes of perspective, the average hourly wage for building trades workers in Lucas County, the site of the refineries, is approximately $35.93.[4]  At that rate, loss of 2,000,614 hours of work would translate into a loss of $71.88 million in wages – a significant loss to the workers, their families and their communities.

Shutting Line 5 would have a similarly devastating effect on the oil workers USW represents, because it is unlikely they would be able to find jobs with similar wage structures elsewhere in their regional economy.  The light crude oil Line 5 supplies to PBF Energy's Toledo Refinery is primarily refined into jet fuel that supplies the bulk of the fuel for Detroit Metro

---

[3] Because many construction trades workers often work intermittently, moving from job to job and employer to employer, and because wages and benefits are paid and reported on an hourly basis, employment in the industry is commonly tracked through hours of work rather than numbers of individual workers. Assuming the reported hours reflect full-time employment (40 hours a week for 50 weeks in a year), these numbers would represent work for 1,000 individuals. However, while the employees performing routine maintenance were likely employed on an on-going basis in these refineries, many more are brought in for large-scale, albeit short-term, projects, meaning the lives of far more than 1,000 individual workers would be affected by shuttering these plants.

[4] This figure was derived by averaging the lowest of the trades' rates, for laborers, at $28.18 per hour, and the highest of the trades' rates, for pipefitters, at $43.68 per hour.  *See* Ohio Lucas County Prevailing Wage, *available at* https://www.actohio.org/issues/prevailing-wage/by-county/lucas-county/ (last accessed May 7, 2021).  The prevailing rate is often pegged to the unions' negotiated rates.

Airport. There are currently no viable alternative sources of crude oil for this facility, as its location lacks the infrastructure to receive the needed supply by rail or truck. Indeed, PBF Energy's Toledo Refinery processes approximately 189,000 barrels per days, or the equivalent of 900 to 1,000 tanker truck loads. For that reason, it is almost certain that if Line 5 is shut down, the production and maintenance employees at this facility will lose their jobs. Those are good-paying, family-sustaining jobs – with the straight-time hourly wage rates of senior production and maintenance employees ranging from $39.02 to $49.15 per hour – that allow USW members to contribute to the economic vitality of Toledo and its surrounding communities.

The BP-Husky Toledo Refinery likewise receives crude oil through Line 5. Should Line 5 be shut down, BP-Husky would need to locate an alternative source for crude oil, and even if the facility did not close altogether, its operations would be disrupted, and with it, the financial stability of USW's members, whose straight time hourly rates for senior employees ranges from $43.05 to $52.62 per hour.

For NABTU's affiliates' members, the unavailability of jobs is not just about a loss of income, and it does not just affect their immediate financial security. In the construction industry, unions commonly negotiate collective bargaining agreements with multi-employer contracting groups, to ensure that as the workers move from job to job and contractor to contractor, they work under similar conditions and accrue benefits that travel with them. These agreements not only commit the employers to pay hourly wages, commensurate with the employees' skills, but also to contribute to jointly-trusted employee benefit funds, which pool the contributions for the benefit of all workers employed under the multi-employer contract. These funds provide employees with health insurance and pension benefits and finance the building trades' robust training programs. Entitlement to and the amount of these vital benefits depend on the availability of work and the

9

number of hours worked.  For example, eligibility for health insurance often depends on working a minimum number of hours during specified time periods. Retirement benefits are computed based on hours an individual works over time, so any break in employment reduces the resources on which a worker can expect to rely in retirement.  Moreover, the overall viability of the benefit funds covering these workers depends on the amount of work available in the area over time.

Returning to the example of NABTU members performing work at the Toledo refineries, at an average hourly benefit contribution of $20.47 (based on averaging the laborers' and pipefitters' rates for 2020), the potential closure of these two refineries could place annual benefit contributions of $40.95 million in jeopardy, for a total of $112.83 million in potentially lost wages and benefits.  Combined with the lost production jobs workers represented by the USW currently hold, it is unlikely many of these workers would soon find comparable work in the same geographic area, adding great strain to these workers and their families, as well as the area's overall social safety net.

In addition to eliminating work for the current workforce, this level of dislocation would threaten the construction industry's ability to train for the future. The trades and their signatory contractors fund and operate a vast network of apprenticeship and other training programs. Because the programs are financed by contributions based on hours worked under the parties' collective bargaining agreements, their financial viability depends on the availability of work.  But so too does the training, the heart of which is the ability to merge classroom and on-the-job instruction. Without jobs to staff, the vital on-the-job training element disappears, threatening the building trades' ability to bring new workers into industries that could provide them with solid, blue-collar careers.

The situation in the Ohio refineries is repeated in all the facilities dependent on Line 5: the potential significant loss of good-paying, solid middle-class jobs that provide skilled tradespeople in the U.S. and Canada with consistent employment, health insurance, pension benefits, and other vital benefits, and opportunities for the next generation of working people to achieve the same.

## II.     The Complaint Satisfies the *Grable* Test for Federal Jurisdiction

This Court has jurisdiction over "civil actions arising under the Constitution, laws, or treaties of the United States." 29 U.S.C. § 1331. A case like this one, in which the plaintiff purports to assert only state law claims, will nonetheless "arise under" federal law if the well-pleaded complaint "establishe[s] that [the plaintiff's] right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd. of California v. Constr. Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 13 (1983).

As Enbridge details in its Opposition, in *Grable,* the Supreme Court laid out a four-part test for determining when a question of federal law embedded in a state law claim is sufficiently substantial to defeat a motion to remand: The state law claim must "[1] necessarily raise a stated federal issue, [2] actually disputed and [3] substantial, which [4] a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Opposition, ECF No. 47, PageID.599; *see Grable,* 545 U.S. at 314, and *Gunn v. Minton,* 568 U.S. 251, 258 (2013). Enbridge has further established that Michigan's claim of authority to revoke the 1953 Easement necessarily depends on substantial federal issues arising under the 1953 Submerged Lands Act, 43 U.S.C. § 1314(a), the 1977 Treaty,[5] and the Pipeline Safety Act, 49 U.S.C. § 60104; that these issues are both substantial and disputed; and that

---

[5] Transit Pipelines Agreement between the United States of America and Canada, signed at Washington January 28, 1977, 28 UST 7449 (Jan. 28, 1977).

entertaining this dispute will promote, rather than disturb, the "congressionally approved" federal-state balance. Opposition, ECF No. 47, PageID.599-611. The Union Amici fully endorse Enbridge's arguments, and add two points that underscore the appropriateness of rejecting Michigan's claim that this case should be remanded to state court.

### A. *Whether a complaint "necessarily raise[s] a stated federal issue" does not depend on the plaintiff's "artful pleading."*

The dispute in *Grable* began when the Internal Revenue Service seized Grable & Sons Metal Products' property for failure to pay taxes and sold the property to Darue Engineering. 545 U.S. at 310. Grable then sued Darue in state court, claiming that Darue's title to the property was invalid, specifically because the IRS had failed to provide Grable with notice required by 26 U.S.C. § 6335. *Id.* at 311. Darue removed the case to federal court. In affirming the lower courts' denial of Grable's attempts to remand the case, the Supreme Court noted that on its face, Grable's complaint "premised its superior title claim on a failure by the IRS to give it adequate notice, as defined by federal law." *Id.* at 314-15. In that case, Grable itself had identified the federal law embedded in its state law claim. But whether a complaint "necessarily raise[s] a . . . federal issue" for purposes of *Grable*'s first prong does not turn on how the plaintiff frames its claim. Instead, plaintiffs may not avoid removal jurisdiction "by artfully casting their essentially federal law claims as state-law claims." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, n. 2 (1981) (internal quotation marks, citations, and edits omitted).

Thus, in *Arkansas v. Texas Gas Transmission Corp.,* a case raising issues nearly identical to those Michigan raises here, the State of Arkansas filed a state court action seeking to enjoin Texas Gas from transporting "gas and other products" through a pipeline that crossed under the Mississippi River on land "belonging to the State of Arkansas." 171 F. Supp. 413, 415 (E.D. Ark. 1959). The complaint alleged "that the State of Arkansas is the sole owner of the land" on which

12

the defendant "has laid and is maintaining pipelines," and that "defendant's use of said land belonging to the State of Arkansas . . . constitutes a continuing trespass." *Id.* As pled, the complaint simply asserted an ownership claim. The court, however, found in that claim "the rather obvious assertion, that such ownership is paramount and superior to the rights of the United States" under the Constitution and various statutes, including the Submerged Lands Act. *Id.* at 16. Because conflicts between federal law and Arkansas' ownership claim, although not expressly identified in the complaint, were nonetheless "issues apparent from the face of the plaintiff's original petition," the court found "they compel[led] the conclusion that the plaintiff by that pleading has raised a federal question or questions." *Id.* at 417.

Similarly, in *R.I. Fishermen's All., Inc. v. R.I. Dept. of Envtl. Mgmt.,* 585 F.3d 42 (1st Cir. 2009), the Fishermen's Alliance challenged the State's regulation restricting the number of lobster traps the Alliance's members could set. Although the complaint alleged only that the regulation violated state law, the court found that under the law on which the plaintiffs based their claims, the State's authority rested on the terms of a federal law and thus, that the complaint raised a federal question. *Id.* at 49 ("[T]he question of whether the [agency] acted outside the scope of [its] authority . . . turns exclusively on the antecedent (and embedded) federal question of whether that act was expressly required by federal law.") *See also Sarauer v. Machinists Dist. No. 10,* 966 F.3d 661 (7th Cir. 2020) (finding the plaintiff's claim that defendants violated state labor and wage and hour laws necessarily required determination whether the defendants' collective bargaining agreement had been "renewed, modified [or] extended" by a certain date, a question committed to federal law).

Because Michigan's control over the bottomlands that Line 5 traverses depends on the extent to which the State retains property rights under the Submerged Lands Act and the 1977

13

Treaty, the complaint's state law claims necessarily raise federal issues. Michigan cannot avoid this result through artful pleading.[6]

> **B.    The scope of interests implicated by this dispute demonstrate that the federal issues are "substantial."**

To establish substantiality – the third *Grable* prong – "it is not enough that the federal issue be significant to the particular parties in the immediate suit[.] . . . The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole." *Gunn,* 568 U.S. at 260; *see also Mikulski v. Centerior Energy Corp.* 501 F.3d 555, 570 (6th Cir. 2007) (citing *Empire HealthChoice Assurance, Inc. v. McVeigh,* 547 U.S. 677 (2006), as summarizing aspects of a case that "affect the substantiality of the federal interest in that case," including "whether the federal question is important.")  There is no question Michigan's complaint presents important federal issues, as evidenced both by the applicable laws Enbridge identifies in its Opposition and the concerns the various stakeholders chosen to bring before this Court, even in this very preliminary stage of the litigation.

As Enbridge explains, while the State claims this case involves only its own property rights and ability to abrogate an easement controlling activity on its property, those claims rest on issues arising under federal statutes and international treaties. Opposition, ECF No. 47, PageID.599-601, PageID.604.  Moreover, the number and variety of parties participating as *amici* – including the Government of Canada – demonstrate that the dispute between Michigan and Enbridge raises a panoply of other concerns of critical importance in the federal system. These include, *at a minimum,* whether a single state can unilaterally decide the fate of a pipeline that crosses and

---

[6] The fact that this case implicates critical aspects of international relations – an inherently federal subject – also demonstrates the need to apply federal common law. *See* Opposition, ECF No. 47, PageID.613-614.

provides product to at least four states and two countries; the impact of the State's decision on jobs and on the economic viability of the communities that depend on Line 5; the impact of potential breaches in Line 5 on the environment, and the relative rights of states and the federal government to address pipeline safety; and the rights of foreign governments to enforce their treaties and to participate in litigation in the U.S.. The very fact that these issues are raised in this case demonstrates the importance – and thus, the substantiality – of the federal and international questions Michigan's complaint raise.

## CONCLUSION

The instant case raises serious disputed issues of federal and international law, which should be heard in federal court.  Michigan's remand motion should therefore be denied.

Respectfully submitted,

David R. Jury, General Counsel
Matthew Lutwen, Assistant General Counsel
United Steelworkers
60 Boulevard of the Allies, Room 807
Pittsburgh, Pennsylvania 15222
412/562-2545
djury@usw.org
mlutwen@usw.org

s/John G. Adam
John G. Adam (P37205)
Law Office of John G. Adam, PLLC
5495 Clearview Drive
Troy, Michigan 48098
248/227-9898
jgabrieldam@gmail.com

*Counsel for United Steelworkers,
AFL-CIO*

Victoria L. Bor
Jonathan D. Newman
Amanda Tomack
Sherman Dunn, P.C.
900 Seventh Street, N.W., Suite 1000
Washington, D.C.  20001
202/785-9300
bor@shermandunn.com
newman@shermandunn.com
tomack@shermandunn.com

s/John Canzano
John Canzano (P30417)
McKnight, Canzano, Smith, Radtke & Brault, P.C
423 N. Main, Suite 200
Royal Oak, Michigan 48067
248/354-9650
jcanzano@michworkerlaw.com

*Counsel for North America's Building Trades Unions*

15